**ORIGINAL**

1  Robert D. Phillips, Jr. (SBN 82639)
   rphillips@reedsmith.com
2  Miles M. Cooley (SBN 206783)
   mcooley@reedsmith.com
3  REED SMITH LLP
   355 South Grand Avenue, Suite 2900
4  Los Angeles, CA  90071-1514

5  Telephone:  213.457.8000
   Facsimile:   213.457.8080
6
7  Attorneys for Plaintiff
   North American Company For Life and
   Health Insurance
8
                 UNITED STATES DISTRICT COURT
9
               SOUTHERN DISTRICT OF CALIFORNIA
10
11  NORTH AMERICAN COMPANY FOR       No.: '08 CV 0270 BEN NLS
    LIFE AND HEALTH INSURANCE,
                                     **COMPLAINT FOR:**
12                 Plaintiff,
                                     **(1) UNFAIR COMPETITION under**
13          vs.                      **California Business & Professions**
                                     **Code § 17200, et seq.;**
14  MICHAEL L. PHILPOT, an individual,
    VIRGINIA B. HIRSH, an individual,  **(2) BREACH OF CONTRACT;**
15  JOHN B. KUYKENDALL, an individual,
    RENE ALEJANDRO LACAPE, an        **(3) BREACH OF THE COVENANT**
16  individual, C. RICHIE MCNAMEE, an **OF GOOD FAITH AND FAIR**
    individual and HECTOR PAEZ VALDEZ, **DEALING;**
17  an individual,
                                     **(4) FRAUD;**
                   Defendants.
18                                   **(5) NEGLIGENCE;**

19                                   **(6) UNJUST ENRICHMENT;**

20                                   **(7) VIOLATION OF 18 U.S.C §**
                                     **1962(c)– CIVIL RICO;**
21
                                     **(8) DECLARATORY RELIEF; and**
22
                                     **(9) ACCOUNTING**
23
24                                   **JURY TRIAL DEMANDED**
25
26
27
28

                              – 1 –

Plaintiff North American Company for Life and Health Insurance ("North American" or "NACOLAH") complains of defendants Michael L. Philpot ("Philpot"), Virginia B. Hirsh, John B. Kuykendall, Rene Alejandro Lacape, C. Richie McNamee, and Hector Paez Valdez (collectively referred to herein as "Defendants"), and alleges as follows:

## I.

## THE PARTIES

1.      Plaintiff North American is a corporation incorporated under the laws of the State of Iowa, having re-domesticated to Iowa from Illinois on September 27, 2007, having its principal place of business in the State of Iowa, with an executive office in the State of Illinois, and is authorized to do business and is doing business within the State of California generally, and this judicial district specifically, as an insurer.  At all times mentioned herein, North American was an Illinois company.

2.      Between January 2004 and May 2007, Defendant Philpot was an insurance general agent for North American.  Philpot is licensed in the State of California as an insurance agent, and sold North American insurance products, specifically Universal Life or "UL" policies, in this judicial district between 2004 and 2007, and North American is informed and believes, and on these bases alleges, that defendant Philpot still sells life insurance products of other insurance companies in this judicial district.  North American is informed and believes, and on these bases alleges, that at all times mentioned in this complaint Philpot was a citizen of the State of California, a resident of Downey, California, with a business in Lake Havasu City, Arizona.

3.    In addition to selling insurance policies himself, Philpot as a general agent for North American, has recruited and supervises a number of writing agents (hereinafter referred to as the "Michael Philpot Agency"). The Michael Philpot Agency is a network of individual sales agents, an enterprise, located in this judicial district and elsewhere in California and Arizona, which is used to sell insurance products in interstate commerce. North American has learned, is informed and believes, and on these bases alleges, that Philpot and certain other individual agents in the network of agents constituting the Michael Philpot Agency, supervised by Philpot and acting at his direction, are and have been involved in a scheme to use the Michael Philpot Agency, through its sale of North American's and other insurance companies' life insurance products, to illegally obtain compensation for the sale of life insurance policies issued by North American and by other insurance companies, in the form of sales commissions from North American and other insurance companies and in the form of bonuses from other managing general agents or general agents for which he has worked, called "upline" agents in the insurance industry; agents working under the supervision of managing general agents or general agents are referred to as "downline" agents.

4.    North American is informed and believes, and on these bases alleges, that Defendants, to wit, Philpot and certain other individual agents in the Michael Philpot Agency enterprise over which he presides, have illegally obtained millions of dollars in undeserved and unearned commissions and bonuses, through a scheme of offering and paying secret rebates and/or advancing premium payments to North American and other insurance companies in exchange for the application for life insurance policies from North American and other companies by certain complicit individuals, without any good faith intention of actually maintaining these policies or paying the premiums for them as those policies were designed or as these policies require. Defendants use instrumentalities of interstate commerce, specifically wire and mail, to apply for said

1   life insurance policies in the name of certain complicit individuals.

2

3   5.      North American is informed, believes and on these bases alleges that

4   Defendants either purchase these life insurance policies for the complicit individuals

5   by advancing premium payments or paying these complicit individuals secret rebates

6   for applying for these policies. A single premium is paid for each such policy in an

7   amount equal to the minimum premium necessary for Defendants to earn the

8   maximum commission on the policy, an amount insufficient to continue the policy in

9   force for more than a few years. Defendants then unlawfully collect the up-front sales

10  commissions paid to them by North American and other insurance companies for

11  these policies. In addition, Defendants unlawfully collect bonuses paid to their upline

12  agents for the sales of these policies. These policies lapse with significant negative

13  account values within three years of their issue, long before collected premiums cover

14  the costs and expenses associated with these policies incurred by North American.

15

16  6.      Employing the afore-described scheme, through the Michael Philpot

17  Agency enterprise, Defendants have been able to illegally obtain millions of dollars in

18  commissions from North American and other life insurance companies and millions of

19  dollars in bonuses from their upline agents. The afore-referenced scheme perpetrated

20  by Defendants is described in more detail below, and is hereafter referred to as "the

21  Illegal Commission Scheme". North American is informed, believes and upon these

22  bases, alleges, that the Illegal Commission Scheme is ongoing and continuous and

23  was and is done in the regular way that the Michael Philpot Agency did and does

24  conduct its business.

25

26  7.      Defendant Hirsh is an insurance sales agent with the Michael Philpot

27  Agency, is licensed in the state of California as an insurance agent, and has sold North

28  American UL policies, and presently sells the life insurance products of other

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    insurance companies, in this judicial district. North American is informed and

2    believes, and on these bases alleges that acting in concert with Philpot and at his

3    direction, defendant Hirsh has participated and actively participates in the Illegal

4    Commission Scheme by way of her association with the Michael Philpot Agency

5    enterprise. North American is informed and believes, and on these bases alleges, that

6    defendant Hirsh is, and at all times mentioned in this complaint was, a citizen of the

7    State of California, a resident of San Diego, California.

8

9        8.    Defendant Kuykendall is an insurance sales agent with the Michael

10   Philpot Agency, is licensed in the state of California as an insurance agent, and has

11   sold North American UL policies, and presently sells the life insurance products of

12   other insurance companies, in this judicial district. North American is informed and

13   believes, and on these bases alleges that acting in concert with Philpot and at his

14   direction, defendant Kuykendall has participated and actively participates in the

15   Illegal Commission Scheme by way of his association with the Michael Philpot

16   Agency enterprise. North American is informed and believes, and on these bases

17   alleges, that defendant Kuykendall is, and at all times mentioned in this complaint

18   was, a citizen of the State of California, a resident of San Diego, California.

19

20       9.    Defendant Lacape is an insurance sales agent with the Michael Philpot

21   Agency, is licensed in the state of California as an insurance agent, and has sold North

22   American UL policies, and presently sells the life insurance products of other

23   insurance companies, in this judicial district.  North American is informed and

24   believes, and on these bases alleges that acting in concert with Philpot and at his

25   direction, defendant Lacape has participated and actively participates in the Illegal

26   Commission Scheme by way of his association with the Michael Philpot Agency

27   enterprise. North American is informed and believes, and on these bases alleges, that

28   defendant Lacape is, and at all times mentioned in this complaint was, a citizen of the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    State of California, a resident of San Diego, California.

2

3        10.    Defendant McNamee is an insurance sales agent with the Michael Philpot

4    Agency, is licensed in the state of California as an insurance agent, and has sold North

5    American UL policies, and presently sells the life insurance products of other

6    insurance companies, in this judicial district.  North American is informed and

7    believes, and on these bases alleges that acting in concert with Philpot and at his

8    direction, defendant McNamee has participated and actively participates in the Illegal

9    Commission Scheme by way of his association with the Michael Philpot Agency

10   enterprise.  North American is informed and believes, and on these bases alleges, that

11   defendant McNamee is, and at all times mentioned in this complaint was, a citizen of

12   the State of California, a resident of Brentwood, California.

13

14       11.    Defendant Valdez is an insurance sales agent with the Michael Philpot

15   Agency, is licensed in the state of California as an insurance agent, and has sold North

16   American UL policies, and presently sells the life insurance products of other

17   insurance companies, in this judicial district.   North American is informed and

18   believes, and on these bases alleges that acting in concert with Philpot and at his

19   direction, defendant Valdez has participated and actively participates in the Illegal

20   Commission Scheme by way of his association with the Michael Philpot Agency

21   enterprise.  North American is informed and believes, and on these bases alleges, that

22   defendant Valdez is, and at all times mentioned in this complaint was, a citizen of the

23   State of California, a resident of Bonita, California.

24

25       12.    North American will amend this complaint to add as defendants in this

26   action those individuals who have assisted Defendants in perpetrating the Illegal

27   Commission Scheme and participated therein, including those complicit sales agents

28   in the Michael Philpot Agency enterprise and those individuals who applied for and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    purchased life insurance policies but who, unbeknownst to North American and other

2    insurance companies, were complicit in the Illegal Commission Scheme, at such time

3    as the identities of these individuals are discovered by North American.

4

5    13.    The Illegal Commission Scheme is harmful, not only to North American,

6    but to the life insurance industry as a whole, and to life insurance consumers across

7    the country. The Illegal Commission Scheme violates that legitimate purpose of

8    providing insurance, which is to provide benefits to individuals or entities with an

9    insurable interest in the insured, by instead providing immediate and significant

10    monetary benefits to a group of complicit individuals and sales agents through

11    fraudulent and ill-gotten commissions, bonuses, rebates and free short-term insurance.

12    The cost of insurance for those products utilized by the Illegal Commission Scheme is

13    shifted to those honest policyholders who pay sufficient premiums to maintain their

14    policies in force and who intend to keep their policies in force as those products have

15    been designed by insurance companies, such as North American.  In addition, the

16    Illegal Commission Scheme deprives honest consumers of fairly priced life insurance

17    products by transferring the expenses associated with underwriting and issuing such

18    products thereby causing honest consumers to pay a higher price for the product than

19    they would have if the Illegal Commission Scheme had not occurred.

20

21                                         **II.**

22                          **JURISDICTION AND VENUE**

23

24    14.    This Court has jurisdiction of the subject matter of this action pursuant to

25    28 U.S.C. Section 1332 based on the diversity of the parties' citizenship --North

26    American is a Iowa corporation and the Defendants are California residents-- and

27    under federal question jurisdiction, based upon 28 U.S.C 1331 and the Civil RICO

28    statute-- 18 U.S.C. §1962 (c), and because the amount in controversy exceeds

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

$75,000, exclusive of interest and costs.

15.    This Court also has personal jurisdiction over Defendants pursuant to the RICO statute, specifically 18 U.S.C. § 1965(a) and (d), which confers nationwide service of process authority upon this Court.  Additionally, this Court has personal jurisdiction over Defendants because they have sufficient contacts with California as to satisfy the "minimum contacts" doctrine articulated in *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

16.    Venue is proper pursuant to 28 U.S.C. Section 1391 in that a substantial part of the events, acts and omissions giving rise to North American's claims occurred within this judicial district, and is also proper under 18 U.S.C. § 1965 (a) and (d) because Defendants, through the Michael Philpot Agency have transacted and, presently transact their affairs in this judicial district.

# III.

# FACTUAL ALLEGATIONS COMMON
# TO ALL CAUSES OF ACTION

**A.    North American's Business And Its Agents**

17.    North American offers a portfolio of life insurance products to consumers in the United States.  The specific type of North American insurance products sold by Defendants to perpetrate the Illegal Commission Scheme was an UL policy known as the Custom Accumulator UL.  North American's UL policies permit the policyholder to pay premiums in one sum (a single premium fixed life insurance) or in multiple payments over the life of the policy (a flexible premium adjustable life insurance).  With a flexible premium adjustable life insurance plan, the policyholder has the option

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   to change the amount and timing of payments of his or her premiums (within certain

2   limits as disclosed in the policy contract) during the life of the policy.  The UL will

3   remain in force as long as sufficient premiums have been paid to continue coverage

4   pursuant to the policy contract.  UL policies typically build account value, which may

5   be used to cover the monthly deduction charges (which includes charges for the costs

6   of providing the insurance coverage) and which may be taken as a loan (which may be

7   repaid to restore the account value to its pre-loan level) or partial surrender (which

8   decreases the account value by an amount equal to the partial surrender amount).

9

10      18.    The primary manner by which North American retails its insurance

11  products to consumers is through three tiers of independent agents: managing general

12  agents or independent marketing companies who primarily recruit distributors and

13  producers; general agents or "distributors", sometimes referred to as regional

14  managers or marketing offices, who also recruit producers and may directly sell

15  insurance; and independent sales agents or "producers", sometimes referred to as

16  writing agents, who sell insurance directly to consumers.  More specifically:

17

18      (a)    North American's managing general agents or independent

19             marketing companies (together referred to herein as "MGA")

20             perform  certain marketing related functions on North American's

21             behalf, including recruiting, recommending for appointment and

22             supervising other independent agents who are licensed to sell

23             North American products (as well as those of other insurers);

24

25      (b)    North American's independent general agents or "distributors" are

26             authorized by North American to be its representatives for North

27             American's business and their responsibilities include marketing,

28             recruiting, recommending for appointment and supervising other

independent agents.  General agents may also sell policies
themselves;

(c)    Independent sales agents or "producers" who have contracted to
sell North American insurance products throughout the United
States, usually by directly interfacing with consumers, and are
primarily responsible for soliciting, selling and servicing insurance
policies.

19.    North American's managing general agents, general agents and sales
agents are independent contractors, not North American employees and, as part of
their insurance business activities, sell insurance for other life insurance carriers,
including North American's competitors.

20.    North American enters into a binding contract with each of its general
agents called a "Distributor Application and Agreement".  Pursuant to this agreement,
North American's general agents agree to do, *inter alia*, the following:

(a)    make reasonable efforts to maintain [North American's] policies
(Section 2(a)5);

(b)    Operate in compliance with all applicable laws and regulations
(Section 2(a)6);

(c)    Supervise and be responsible for keeping [their] Distributors
informed of [North American's] published rules, guidelines,
procedures, and practices which [North American] provides
(Section 2(a)7);

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

(d)    Exercise reasonable due care for the faithful performance, fidelity and honesty of [their] employees, and Distributors and maintain responsibility for all funds collected and business done by or entrusted to [them and their] employees (Section 2(a)8); and

(e)    Not pay any premium personally, or rebate premium to any policyholder (Section 3(b)).

21.    North American also enters into a binding contract with each of its sales agents called a "Producer Application and Agreement."  Pursuant to this agreement, North American's sales agents agree to do, *inter alia*, the following:

(a)    make reasonable efforts to maintain [North American's] policies (Section 2(a)5);

(b)    Operate in compliance with all applicable laws and regulations (Section 2(a)5);

(c)    Be responsible for keeping [their] producers informed of [North American's] published rules, guidelines, procedures, and practices provided by [their] Distributor or published by [North American] (Section 2(a)6);

(d)    Exercise reasonable due diligence for the faithful performance, fidelity and honesty of [their] employees and Producers and maintain responsibility for all funds collected and business done by or entrusted to [them] and [their] employees (Section 2(a)7);

(e)   Not pay any premium personally, or rebate premium to any
policyholder (Section 3(b)).

22.   The independent general agents and independent sales agents who have
contracted to sell North American's products are compensated for the sale of North
American's insurance products on a commission basis.  A general agent is entitled to a
higher level of commission compensation (percentage) than a producer and typically
receives commission "overrides" on the business that his or her recruitee "producer"
sales agents produce.  In addition, if a general agent signed a Regional Manager
contract with North American, the general agent will also earn production credits on
the business that his or her recruitee "producer" sales agents generate.  These
production credits are used to qualify for various incentive programs that North
American offers.

23.   For the Custom Accumulator UL product, North American's independent
sales agents receive a sizeable upfront commission on each policy they sell, usually
between 70-120 percent of the total first year target premiums paid or to be paid by
the policyholder for the policies they buy.  Of this total compensation, between 80 to
100 percent typically goes to the sales agent as a commission, with a 15 to 20 percent
"override" going to the general agent above the sales agent, and, when applicable, a 5
percent "override" going to the MGA above both of them.

24.   In addition to the commission and overrides, MGAs earn a bonus on the
total sales of each product by the downline agents who sell policies for them –between
28 to 36 percent for the Custom Accumulator product.   This bonus is paid by North
American to the MGA.  An MGA may keep or distribute such bonus at his/her
discretion.   It is North American's belief that a significant portion of the bonuses paid

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   on the Custom Accumulator product to Philpot's MGA was distributed to him by his

2   upline MGA.

3

4       25.    Under North American's contracts with its agents, upfront commissions

5   paid for the sale of North American's policies vest immediately; unless the policy

6   lapses or is surrendered for any reason within the first year of issuance, in which case,

7   these upfront commissions, or a percentage thereof, can be recovered by North

8   American by way of a "chargeback" of commissions paid to the agent who sold the

9   lapsed or surrendered policy.

10

11      26.    Notably, because North American amortizes the recovery of its

12  acquisition costs for every policy, which includes marketing, underwriting, new

13  business, premium taxes, reinsurance, and the upfront commission and bonus paid to

14  the sales agent, over the first 20 years of the policies it sells, the early lapse of a UL

15  policy causes North American to incur a significant financial loss.

16

17  **B.    Philpot Becomes A Regional Manager For North American**

18

19      27.    Philpot joined North American under a Regional Manager contract in

20  January 2004 upon the acquisition of Clarica Life Insurance Company-U.S.

21  ("Clarica"), an insurance company for which Philpot had previously sold life

22  insurance policies, by Midland National Life Insurance Company ("Midland

23  National"), an affiliate of North American.  All the sales agents previously appointed

24  by Clarica were invited to become appointed with North American upon the merger of

25  Clarica with Midland National by completing the appropriate appointment paperwork

26  with North American.

27

28      28.    Philpot and North American entered into a Distributor Application and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   Agreement (hereinafter "the Philpot RM Agreement") pursuant to which North

2   American and Philpot agreed in writing that Philpot would act as North American's

3   regional manager. This agreement became effective on January 14, 2004. A true and

4   correct copy of this agreement is attached hereto as <u>Exhibit "1"</u> and is incorporated

5   herein by this reference.

6

7       29.    Pursuant to Section 2 of the Philpot RM Agreement, Philpot agreed to

8   "procure applications for policies written by [North American]," "operate in strict

9   compliance with all applicable laws and regulations," "exercise reasonable due care

10  for the faithful performance, fidelity and honesty of [its] employees, agents and

11  brokers", and "make reasonable efforts to maintain [North American's] policies".

12  Pursuant to Section 3(b) of this agreement, Philpot was prohibited from paying any

13  premium personally or rebating any premium to any policyholder.

14

15      30.    Philpot also completed a Confidential History Report, pursuant to which

16  Philpot certified that it had received, understood and would conform with the

17  procedures outlined in the brochure "Partnering with You on Compliance Matters"

18  (hereinafter "Compliance Manual"). Pursuant to the Compliance Manual, a true and

19  correct copy of which is attached hereto as <u>Exhibit "2"</u> and made a part hereof, North

20  American associates agreed to "comply with applicable state and federal laws

21  fostering fair competition."

22

23  **C.    <u>Philpot Becomes A Marketing Office For North American</u>**

24

25      31.    On or about July 20, 2005, Philpot entered into a Distributor Application

26  and Agreement with North American (hereinafter "the Philpot MO Agreement"). A

27  true and correct copy of this agreement is attached hereto as <u>Exhibit "3"</u> and is

28  incorporated herein by this reference. This agreement became effective on July 29,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   2005, making Philpot a marketing office for North American as of this date.

2

3       32.    Just as he did under the Philpot RM Agreement, under the Philpot MO

4   Agreement, Philpot agreed to "procure applications for policies written by [North

5   American]," "operate in strict compliance with all applicable laws and regulations,"

6   "exercise reasonable due care for the faithful performance, fidelity and honesty of [its]

7   employees, agents and brokers" and "make reasonable efforts to maintain [North

8   American's] policies". And, pursuant to the Philpot Distributor Agreement, Philpot

9   was prohibited from paying any premium personally or rebating any premium to any

10  policyholder.

11

12  **D.    Philpot Develops The Michael Philpot Agency, Which Includes Defendants**

13  **Hirsh, Kuykendall, Lacape, McNamee And Valdez**

14

15      33.    Upon his appointment as an Regional Manager in 2004 and continuing

16  with his appointment as a Marketing Office in 2005, Philpot proceeded to establish

17  the Michael Philpot Agency, a network of sales agents, an enterprise, over which he

18  presides. The Michael Philpot Agency enterprise presently consists of approximately

19  155-190 sales agents in various states, including, but not limited to, California,

20  Arizona, Florida, Georgia, Illinois, Indiana, Louisiana, Minnesota, North Carolina,

21  Nevada, New York, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Utah, and

22  Wisconsin, who have sold North American UL policies, and, as North American is

23  informed, believes and upon these bases alleges, is presently selling the life insurance

24  products of other insurance companies. Approximately 54 of Philpot's sales agents

25  are located in this judicial district. Defendants Hirsh, Kuykendall, Lacape, McNamee

26  and Valdez also entered into producer agreements with North American as follows:

27

28          (a)    Effective January 27, 2004, Defendants Hirsh, Kuykendall, Lacape

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    and Valdez were appointed pursuant to the "North American

2    Producer Contracting Application – *Transition from Clarica to*

3    *North American*" appointment form, a specimen copy containing

4    that agreement's material terms is attached as <u>Exhibit "4"</u> and is

5    incorporated herein by this reference.

6

7    (b)    Effective  June 5, 2006 and August 21, 2006, Defendants Lacape

8    and Kuykendall, respectively, were appointed under the "Producer

9    Contract Application and Agreement", a specimen copy

10    containing that agreement's material terms is attached as <u>Exhibit</u>

11    <u>"5"</u> and is incorporated herein by this reference.

12

13    (c)    Effective August 4, 2004, Defendant McNamee was appointed

14    under the "North American Company for Life & Health

15    Insurance's Producer's Agreement", a specimen copy  containing

16    that agreement's material terms is attached as <u>Exhibit "6"</u> and is

17    incorporated herein by this reference.

18

19    (d)    Copies of the signature pages of these producer agreements

20    executed by defendants Hirsh, Kuykendall, Lacape, McNamee and

21    Valdez are attached hereto as <u>Exhibits "7", "8", "9", "10" and "11"</u>

22    respectively, and incorporated herein by this reference.

23

24    34.    Like Philpot, Hirsh, Kuykendall, Lacape, McNamee and Valdez were

25    obligated by their producer agreements to "procure applications for policies written by

26    [North American]," "operate in strict compliance with all applicable laws and

27    regulations," and "exercise reasonable due care for the faithful performance, fidelity

28    and honesty of [its] employees, agents and brokers," as well as prohibited from paying

1   any premium personally or rebating any premium to any policyholder.  The

2   agreements entered into between North American referred to herein are hereinafter

3   collectively "the Defendants' Agreements."

4

5      35.   The Defendants' Agreements are standard agency agreements for the life

6   insurance industry.  North American is informed, believes, and on these bases alleges,

7   that Defendants have also entered into other agreements with other insurance

8   companies related to their sale of life insurance policies for those companies similar to

9   the afore-referenced Defendants' Agreements.

10

11   **E.**     **The Illegal Commission Scheme**

12

13      36.   North American has learned, and is informed, believes and upon these

14   bases alleges, that from at least 2004 through May 2007, Defendants, working through

15   the Michael Philpot Agency as their enterprise, have engaged in the Illegal

16   Commission Scheme.  The Illegal Commission Scheme entails Defendants' offering

17   of and paying to certain complicit individuals, posing as legitimate potential insureds,

18   secret rebates and other monetary incentives, including advancing insurance premiums

19   due North American, in exchange for these individuals applying for UL policies with

20   North American, as well as for life insurance policies with other insurance companies.

21

22      37.   North American has learned, is informed, believes and upon these bases

23   alleges, that these insurance policies were applied for without any good faith intention

24   on the part of Defendants or the complicit individuals that the policies would actually

25   be maintained or that applicable premiums would be paid, as those policies were

26   designed or as the policies required.  The applications of these complicit individuals to

27   purchase these life insurance policies were subsequently submitted by Defendants to

28   North American and other insurance companies, using instrumentalities of interstate

1    commerce, specifically, by wire and mail.

2

3    38.    Then, as North American has learned, is informed, believes and upon

4    these bases alleges, Defendants either purchase these life insurance policies for the

5    complicit individuals by advancing premium payments or paying these complicit

6    individuals secret rebates for applying for these policies.  A single premium is paid for

7    each such policy in an amount equal to the minimum premium necessary for

8    Defendants to earn the maximum commission on the policy, an amount insufficient to

9    continue the policy in force for more than a few years.  Defendants then unlawfully

10    collect the up-front sales commissions paid to them by North American and other

11    insurance companies for these policies.  In addition, Defendants unlawfully collect

12    bonuses paid to them by their upline agents for the sales of these fraudulent policies.

13    These policies lapse with significant negative account values within three years of

14    their issue, long before collected premiums cover the costs and expenses incurred by

15    North American associated with these policies.

16

17    39.    As a result of the applications submitted by Defendants on behalf of the

18    individuals complicit in the Illegal Commission Scheme, said scheme being

19    unbeknownst to North American, North American subsequently processed these

20    applications and issued UL policies to certain policyholders.

21

22    40.    North American is informed, believes and on these bases alleges, that

23    Defendants submitted applications for life insurance to other insurance companies on

24    behalf of the individuals complicit in the Illegal Commission Scheme, said scheme

25    being unbeknownst to those insurance companies, and those companies subsequently

26    processed these applications and issued life insurance policies to Defendants' co-

27    conspirators in the Illegal Commission Scheme.  North American is informed,

28    believes and upon these bases, alleges, that the Illegal Commission Scheme is ongoing

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

and continuous and was and is done in the regular way that the Michael Philpot Agency did and does conduct its business.

41.     Based upon North American's historical data regarding policy lapse percentages and 122 years experience in the life insurance business, approximately 13 percent of UL policies it issues lapse before the end of the third year of the policy. However, of the 710 UL policies written through the Michael Philpot Agency since 2004, approximately 88 percent have lapsed by the end of the third year of the policy. Defendants were responsible for the sales of 291 of these UL policies, of which approximately 115 (or 40 percent) have already lapsed. This extraordinarily high level of lapsed policies is highly irregular for policies issued by North American and is evidence of the Illegal Commission Scheme.

42.     And more evidence of the Illegal Commission Scheme resides in the Custom Accumulator UL policies sold by Defendants. The Custom Accumulator UL includes a "return of premium" feature, appealing to insureds who intend to hold their policies for long periods of time. The return of premium feature provides the policyholder with a surrender amount after the 10th anniversary of the policy equal to the amount of premiums paid for the policy up to the date the policyholder surrenders the policy, less any rider costs. To qualify for the return of premium feature, a policyholder must pay a certain percentage of the guideline single premium for the policy, as indicated in the policy contract, within six months of the date the policy is issued.

43.     Not coincidentally, however, out of the 710 UL policies written by Defendants, not a single one qualified for the return of premium feature. For all other sales of the Custom Accumulator UL during the same period, 74 percent of the UL policies qualified for the return of premium feature. This indicates that out of the 710

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 19 –

1   UL policies sold by Defendants, none reflected a long term position on the part of the

2   policyholder. This is a fact that is irregular for policies issued by North American,

3   and is further evidence of the Illegal Commission Scheme.

4

5       44.   North American is informed, believes, and on these bases alleges, that the

6   inordinately high number of lapsed UL policies, the clear lapse pattern of these

7   policies, and the fact that none of the policies sold by Defendants qualified for the

8   return of premium feature, are all indicia of the Illegal Commission Scheme.

9

10       45.   North American is informed and believes, and on these bases alleges, that

11   the complicit individuals who had applied for and purchased life insurance policies

12   issued by North American sold to them by Defendants through the Michael Philpot

13   Agency enterprise, who never intended to maintain or pay premiums on the policies

14   written by Defendants, only applied and purchased said policies because of the Illegal

15   Commission Scheme, and specifically, because of Defendants' illicit payments to

16   them to do so.   Such aforementioned policies are collectively hereafter referred to as

17   "Sham Policies."

18

19       46.   North American is informed and believes, and on these bases alleges, that

20   as with the Sham Policies, the complicit individuals who had applied for and

21   purchased life insurance policies issued by other insurance companies sold to them by

22   Defendants through the Michael Philpot Agency enterprise, never intended to

23   maintain or pay premiums on the policies written by Defendants, only applied and

24   purchased said policies because of the Illegal Commission Scheme, and specifically,

25   of Defendants' illicit payments to them to do so.

26

27   **F.   North American Discovers The Illegal Commission Scheme And**

28   **Terminates Defendants And The Michael Philpot Agency, But Not Before**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**Suffering Substantial Financial Injury**

47.    Between May and June 2007, North American terminated Philpot and the network of sales agents working for him through the Michael Philpot Agency enterprise due to the indicia of the Illegal Commission Scheme referred to above, but not before it had already suffered serious financial damages at the hands of Defendants due to the Sham Policies and the Illegal Commission Scheme.

48.    Because it was unaware of the Sham Policies and the Illegal Commission Scheme, North American has paid approximately $24 million in commissions and bonuses to Defendants for the Sham Policies, pursuant to its standard commission structure discussed above.  Thus, as a result of the Illegal Commission Scheme, Defendants, through the Michael Philpot Agency enterprise, were able to wrongfully collect at least $19 million in unearned, ill-gotten up-front sales commissions from North American on the foregoing Sham Policies.

49.    As a further result of the Illegal Commission Scheme, North American incurred underwriting costs for the applications that were submitted related to the issuance of the Sham Policies in an amount to be proven at trial.

50.    Aside from the already discovered Sham Policies, approximately 344 UL policies written by Defendants and issued by North American remain in–force.  North American has paid approximately $15 million in commissions and bonuses to Defendants and other agents in the Michael Philpot Agency on these in-force policies. North American is informed, believes, and on these bases alleges, that most, if not all, of these policies were written as a part of the Illegal Commission Scheme and that said policies will lapse on or before August 1, 2010, causing North American further significant financial harm at the hands of Defendants in addition to the harm it has

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   already suffered.

2

3       51.    In order to redress the injuries sustained by North American to date due

4   to Defendants' Illegal Commission Scheme and Defendants' use of the Michael

5   Philpot Agency enterprise to perpetrate the same, as well as to prevent further

6   financial losses by North American, as well as by those other insurance companies for

7   whom Defendants continue to defraud and injure, because of the ongoing and

8   continuous pattern of illegal conduct effected by the Illegal Commission Scheme and

9   Defendants' use of the Michael Philpot Agency enterprise to perpetrate the same and

10  the harm to the public at large, the judicial intervention of this Court is necessary, and

11  North American therefore seeks the relief of this Court, as follows:

12

13                    **FIRST CLAIM FOR RELIEF**

14                       **UNFAIR COMPETITION**
                 **(California Business & Professions Code § 17200, et seq.)**
15

16      52.    North American realleges and incorporates herein, each and every

17  allegation contained in Paragraphs 1 through 51 above and 61-96 and 102-104 below.

18

19      53.    California Business and Professions Code Section 17200 prohibits unfair

20  competition in the form of any unlawful, unfair or fraudulent business act or practice.

21

22      54.    Business and Professions Code Section 17203 allows "orders or

23  judgments... as may be necessary to restore to any person in interest any money or

24  property, real or personal, which may have been acquired by means of such unfair

25  competition."

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

55.    Business and Professions Code Section 17204 allows "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition" to bring suit for unfair competition.

56.    North American is informed, believes and on these bases alleges, that from at least 2004 through the present, Defendants, all or part of Philpot's network of sales agents constituting the Michael Philpot Agency enterprise, engaged in the Illegal Commission Scheme.  The Illegal Commission Scheme, as described herein, involving Defendants' use of secret rebates, unearned discounts, the advancement of premium payments and other financial incentives to complicit applicants for life insurance policies, who never intended to maintain such policies as they were designed or as was required, in order to obtain from North American and other insurance companies unearned commissions and bonuses, constitutes unlawful, unfair and/or fraudulent business acts and practices in violation of Business and Professions Code Section 17200.

57.    To date, as a direct and proximate result of the Illegal Commission Scheme, Defendants, through the Michael Philpot Agency, were able to collect approximately $19 million in ill-gotten up-front sales commissions from North American on the afore-referenced Sham Policies, and, as a further result of the Illegal Commission Scheme, North American incurred underwriting costs on those policies in an amount to be proven at trial.

58.    Pursuant to Business and Professions Code Sections 17203, 17204 and 17208, North American is entitled to recover all amounts by which Defendants have been unjustly enriched from their unlawful, unfair, and fraudulent business acts and practices of unfair competition at North American's expense in the form of restitution, in an amount to be proven at trial.  North American is also entitled to recover any and

all ill-gotten gains obtained by Defendants with respect to the approximately 344 North American UL policies written by Defendants that are still in-force, but that ultimately lapse due to the Illegal Commission Scheme, according to proof.

59.    An order requiring Defendants to disgorge all of their ill-gotten commissions, and all of the profits and gains they have reaped and restore such profits and gains to North American and other insurance companies from which they were unlawfully taken by Defendants by way of the Illegal Commission Scheme, according to proof, should be granted, as well as North American's reasonable attorneys' fees and costs.

60.    Moreover, pursuant to Business and Professions Code Section 17203, an injunction is necessary and appropriate in order to prevent Defendants from obtaining further unearned commissions and bonuses from other insurance companies victimized by the Illegal Commission Scheme and the Michael Philpot Agency enterprise, due to their unlawful, unfair and/or fraudulent business acts and practices in violation of Business and Professions Code Section 17200, and which North American is informed, believes, and on these bases alleges, constitutes an ongoing, continuing pattern of illegal activity.

## SECOND CLAIM FOR RELIEF

## BREACH OF CONTRACT

61.    North American realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 51 above.

62.    Between 2004 through June 2007, Defendants breached the Defendant Agreements.

63.     Philpot breached the Philpot RM Agreement, the Philpot MO Agreement, and the Compliance Manual by using the Michael Philpot Agency to perpetrate and participate in the Illegal Commission Scheme between 2004 and May 2007.

64.     If Philpot had complied with his agreements and the Compliance Manual by not participating in Illegal Commission Scheme, North American would not have issued the Sham Policies and would not have paid Philpot millions of dollars in unearned and ill-gotten commissions nor incurred significant underwriting costs.

65.     As a result of Philpot's breach of the Philpot RM Agreement, the Philpot MO Agreement, and the Compliance Manual, North American paid millions of dollars in undeserved and ill-gotten commissions to Philpot and incurred underwriting costs, to its damage in a total amount to be proven at trial.

66.     From at least January 2004 through June 2007, defendant Hirsh breached her Producer Agreement by participating in the Illegal Commission Scheme as alleged herein.

67.     If defendant Hirsh had complied with her agreement by not participating in Illegal Commission Scheme, North American would not have issued the Sham Policies and would not have paid defendant Hirsh unearned and ill-gotten commissions or incurred significant underwriting costs.

68.     As a result of defendant Hirsh's breach of her Producer Agreement, North American paid approximately $863,000 in unearned and ill-gotten commissions and incurred significant underwriting costs, to its damage in a total amount to be proven at trial.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

69.     From at least January 2004 through June 2007, defendant Kuykendall breached his Producer Agreement by participating in the Illegal Commission Scheme as alleged herein.

70.     If defendant Kuykendall had complied with his agreement by not participating in Illegal Commission Scheme, North American would not have issued the Sham Policies and would not have paid defendant Kuykendall unearned and ill-gotten commissions or incurred significant underwriting costs.

71.     As a result of defendant Kuykendall's breach of his Producer Agreement, North American paid approximately $286,000 in unearned and ill-gotten commissions and incurred significant underwriting costs, to its damage in a total amount to be proven at trial.

72.     From at least January 2004 through June 2007, defendant Lacape breached his Producer Agreement by participating in the Illegal Commission Scheme as alleged herein.

73.     If defendant Lacape had complied with his agreement by not participating in Illegal Commission Scheme, North American would not have issued the Sham Policies and would not have paid defendant Lacape unearned and ill-gotten commissions or incurred significant underwriting costs.

74.     As a result of defendant Lacape's breach of his Producer Agreement, North American paid approximately $865,000 in unearned and ill-gotten commissions and incurred significant underwriting costs, to its damage in a total amount to be proven at trial.

COMPLAINT

75.    From at least August 2004 through June 2007, defendant McNamee breached his Producer Agreement by participating in the Illegal Commission Scheme as alleged herein.

76.    If defendant McNamee had complied with his agreement by not participating in Illegal Commission Scheme, North American would not have issued the Sham Policies and would not have paid defendant McNamee unearned and ill-gotten commissions or incurred significant underwriting costs.

77.    As a result of defendant McNamee's breach of his Producer Agreement, North American paid approximately $915,000 in unearned and ill-gotten commissions and incurred significant underwriting costs, to its damage in a total amount to be proven at trial.

78.    From at least January 2004 through June 2007, defendant Valdez breached his Producer Agreement by participating in the Illegal Commission Scheme as alleged herein.

79.    If defendant Valdez had complied with his agreement by not participating in Illegal Commission Scheme, North American would not have issued the Sham Policies and would not have paid defendant Valdez unearned and ill-gotten commissions or incurred significant underwriting costs.

80.    As a result of defendant Valdez's breach of his Producer Agreement, North American paid approximately $1,355,000 in unearned and ill-gotten commissions and incurred significant underwriting costs, to its damage in a total amount to be proven at trial.

81.    For its part, however, North American has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Defendants' Agreements.

82.    As a direct and proximate result of Defendants' breaches of contract, by participating in the Illegal Commission Scheme and inducing the issuance of the Sham Policies, North American has suffered millions of dollars in damages, including consequential and incidental damages, plus interest thereon, with the total amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

## BREACH OF THE IMPLIED COVENANT OF

## GOOD FAITH AND FAIR DEALING

83.    North American realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 82 above.

84.    Implied in the Defendants' Agreements and the Philpot Compliance Manual was a covenant by Defendants that they would act in good faith and deal fairly with North American, act solely for benefit of North American in matters covered by the Defendants' Agreements and Philpot's Compliance Manual, and to keep North American informed on all matters which may come to its attention pertaining to the subject matter of the Defendants' Agreements and Philpot's Compliance Manual.

85.    Defendants breached that covenant by failing to deal in good faith with North American by initiating, participating in and perpetuating the Illegal Commission Scheme.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

86.   If Defendants had adhered to their duty of good faith and fair dealing by not participating in the Illegal Commission Scheme, North American would not have issued the Sham Policies and would not have paid millions of dollars in commissions to them and bonuses to their uplines or incurred significant underwriting costs.

87.   Thus, as a direct result of Defendants' breach of the implied covenant of good faith and fair dealing, North American has suffered millions of dollars in damages, with the total amount to be proven at trial.

88.   Defendants, in doing the things herein alleged, acted intentionally, and with malice, oppression and fraud as those terms are defined in California Code of Civil Procedure Section 3294, and North American therefore is entitled to an award of exemplary and punitive damages against Defendants in such amount as will adequately punish Defendants and set an example so as to deter them and others from acting as alleged herein.

## FOURTH CLAIM FOR RELIEF
## FRAUD

89.   North American realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 51 above.

90.   From at least 2004 through the present, Defendants participated in the Illegal Commission Scheme, as described alleged herein. Defendants failed to reveal and suppressed the material fact of the Illegal Commission Scheme, which fact was known to Defendants at all times mentioned herein. The failure to disclose and suppression of Illegal Commission Scheme was likely to mislead North American and did in fact mislead North American, in light of Defendants' duty to inform North

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  American, as such duty is described in the Defendants' Agreements and Philpot's

2  Compliance Manual referenced herein.

3

4      91.    Defendants signed and submitted or otherwise delivered all of the UL

5  policy applications presented to North American in connection with the Illegal

6  Commission Scheme and the issuance of the Sham Policies.

7

8      92.    By signing and submitting or otherwise delivering these applications to

9  North American, Defendants certified to North American, the completeness of the

10  applications, including all of the material circumstances surrounding the submission

11  of such applications.  As such, Defendants had a duty to and was otherwise bound to

12  not suppress or conceal facts within his knowledge, which materially qualify the

13  aforementioned certification and other facts he stated to North American.  Thus,

14  Defendants had a duty to disclose the material fact of the Illegal Commission Scheme.

15

16      93.    The failure to disclose and suppression of the material fact of the Sham

17  Policies and larger Illegal Commission Scheme alleged herein, were made with the

18  intent to induce North American to issue the Sham Policies, pay the undeserved, ill-

19  gotten upfront commissions to Defendants, and causing North American to incur

20  underwriting costs, in reliance thereon.

21

22      94.    North American, at the time the failure to disclose and suppression of fact

23  occurred, and at the time North American took the actions herein alleged (*e.g.*, issued

24  the Sham Policies, paid the undeserved commissions to Defendants and incurred

25  underwriting costs) was ignorant of the existence of the Illegal Commission Scheme

26  that Defendants suppressed and failed to disclose.  If North American had been aware

27  of the existence of the Illegal Commission Scheme not disclosed by Defendants,

28  North American would not have, as it did, issued the Sham Policies, paid the

1  undeserved commissions to Defendants and bonuses to their uplines and incurred
2  underwriting costs thereon.

3

4      95.    As a proximate result of the fraudulent conduct of Defendants as herein
5  alleged, North American was fraudulently induced into issuing the Sham Policies,
6  paying the undeserved commissions to the Defendants and bonuses to their uplines,
7  and incurring underwriting costs thereon, by reason of which North American has
8  suffered millions of dollars in losses, with the total amount to be proven at trial.

9

10     96.    Defendants, in doing the things herein alleged, acted intentionally, and
11  with malice, oppression and fraud as those terms are defined in California Code of
12  Civil Procedure Section 3294, and North American therefore is entitled to an award of
13  exemplary and punitive damages against Defendants in such amount as will
14  adequately punish Defendants and set an example so as to deter them and others from
15  acting as alleged herein.

16

17                        **FIFTH CLAIM FOR RELIEF**
18                              **NEGLIGENCE**

19

20     97.    North American realleges and incorporates herein, each and every
21  allegation contained in Paragraphs 1 through 51 above.

22

23     98.    From at least January 2004 through the present, Defendants have
24  participated in the Illegal Commission Scheme.

25

26     99.    Defendants owed a duty to North American to abide by the Defendant
27  Agreements and Compliance Manual.

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    100.  Defendants negligently breached this duty of care by participating in the

2    Illegal Commission Scheme, so as to directly and legally cause the damages described

3    below.

4

5    101.  As a direct and legal result of the negligence of Defendants and each of

6    them, North American has lost millions of dollars in undeserved and ill-gotten

7    commissions and bonuses, as well as significant underwriting costs related to the

8    Sham Policies, and is entitled to recover these losses from Defendants.

9

10    ### SIXTH CLAIM FOR RELIEF

11    ### UNJUST ENRICHMENT

12

13    102.  North American realleges and incorporates herein, each and every

14    allegation contained in Paragraphs 1 through 101 above.

15

16    103.  Defendants were paid undeserved, upfront commissions and their uplines

17    were paid undeserved bonuses by North American for the Sham Policies, sold by

18    Defendants through the Michael Philpot Agency enterprise, as a result of the Illegal

19    Commission Scheme.  The payment of such commissions and bonuses by North

20    American as a result of Defendants' wrongful conduct unjustly enriched Defendants.

21

22    104.  North American is informed, believes and on that basis alleges that as a

23    result of Defendants' wrongful and unlawful conduct and their unjust enrichment

24    thereby at North American's expense, Defendants owe restitution and the

25    disgorgement of their ill-gotten profits, in a total amount to be proven at trial.

26

27    ### SEVENTH CLAIM FOR RELIEF

28    ### VIOLATION OF 18 U.S.C § 1962 (c)– CIVIL RICO

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

105.   North American realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 96 above and 102 to 104 below.

106.   Defendants, and each of them, are "persons" as defined under 18 U.S.C. § 1961(3).

107.   At all times relevant herein, Defendants were employed by, and/or associated and affiliated with the Michael Philpot Agency, a network of individual sales agents, an enterprise, located in this judicial district and elsewhere in California and other states, which is used to sell insurance products in interstate commerce, using interstate mail and wire, specifically.

108.   Defendants operated, managed and participated in the Michael Philpot Agency enterprise, supervised by Philpot and acting at his direction, are and have been employed by or associated with the Michael Philpot Agency enterprise, and conducted or participated, directly or indirectly, in the conduct of the enterprises' affairs, including, but not limited to, perpetuating the Illegal Commission Scheme, which involves using the Michael Philpot Agency to illegally obtain upfront sales commissions and bonuses paid to them for the sale of life insurance policies issued by North American and by other insurance companies through its sale of North American's and other insurance companies' life insurance products.

109.   Since 2004 and up to the present, Defendants have engaged in an ongoing pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1), through Defendants' use of the Michael Philpot Agency enterprise as a mechanism to perpetuate the Illegal Commission Scheme to obtain millions of dollars in undeserved and unearned commissions and bonuses.  This illegal activity includes offering and paying secret rebates and/or unearned discounts and/or advancing premium payments

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

COMPLAINT

to North American and other insurance companies to complicit individuals in exchange for such individuals applying for life insurance policies from North American and other companies, without any good faith intention of actually maintaining these policies or paying the premiums for them as those policies were designed or as these policies require. Defendants use instrumentalities of interstate commerce, specifically interstate wire and mail, to apply for said life insurance policies in the name of certain complicit individuals.

110. More specifically, Defendants either purchase these life insurance policies for the complicit individuals by advancing premium payments or paying these complicit individuals secret rebates for applying for these policies. A single premium is paid for each such policy in an amount equal to the minimum premium necessary for Defendants to earn the maximum commission on the policy, an amount insufficient to continue the policy in force for more than a few years. Defendants then unlawfully collect the up-front sales commissions paid to them by North American and other insurance companies for these policies. In addition, Defendants unlawfully collect bonuses paid to their upline agents for the sales of these policies. These policies lapse with significant negative account values within three years of their issue, long before collected premiums cover the costs and expenses associated with these policies to the detriment of North American and other insurance companies.

111. The conduct of Defendants in perpetrating the Illegal Commission Scheme sought the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics, to wit, to illegally obtain millions of dollars in commissions and bonuses from their victims -- North American and other insurance companies-- by way of the Illegal Commission Scheme described herein, resulting in the writing and issuance of the Sham Policies and other bogus policies issued by other insurance companies.

COMPLAINT

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

112.   Such conduct of Defendants, to wit, writing the Sham Policies, other bogus life insurance policies, submitting them to North American via the mail and wire, and otherwise perpetuating the Illegal Commission Scheme as alleged herein, constitutes mail and wire fraud under 18 U.S.C. § 1341 and 18 U.S.C. § 1342, respectively, as well as a pattern of racketeering activity under 18 U.S.C. § 1961 (1) and (5).  North American is informed, believes and upon these bases alleges, that the majority the over 700 policies written by the Michael Philpot Agency were fraudulently submitted to North American through the mail North American does not list all of the instances Defendants committed the predicate acts here, but as examples, and not exclusively, defendant Philpot submitted fraudulent policies LB00597230, LB00659630 and LB00697840 through the mail to North American on March 2, 2005, March 9, 2005 and July, 21, 2005, respectively; defendant Hirsh submitted fraudulent policies LB00505840, LB00506390 and B00504400 through the mail to North American on January 17, 2004, June 17, 2005 and June, 14, 2005, respectively; defendant Kuykendall submitted fraudulent policies LB00553040, LB00549650 and LB00552770 through the mail to North American on September 20, 2004, September 13, 2004 and September 30, 2004, respectively; defendant Lacape submitted fraudulent policies LB00511220, LB00511700 and LB00511720 through the mail to North American on June 28, 2004; defendant McNamee submitted fraudulent policies LB00506610 and  LB00506650 on June 18, 2004 and policy LB00512160 on June 28, 2004, through the mail to North American; and defendant Valdez submitted fraudulent policy LB00526290 on July 26, 2004,  and policies LB00527240 and LB00527220 on July 28, 2004, through the mail to North American.  These and other predicate acts and racketeering activity were committed and conducted by Defendants, through the Michael Philpot Agency enterprise, in interstate commerce, as alleged herein.

113.   North American is informed, believes, and on these bases alleges, that the aforementioned racketeering activity, to wit, the Illegal Commission Scheme, is

1   ongoing and continuous, insomuch as the Michael Philpot Agency still engages in the

2   same, continues to injure other insurance companies and consumers in this judicial

3   district and beyond by writing bogus life insurance policies. North American is

4   informed, believes, and upon these bases, alleges, that the Illegal Commission Scheme

5   is ongoing and continuous and was and is done in the regular way that the Michael

6   Philpot Agency did and does conduct its business.

7

8        114.   Defendants, and each of them, acted knowingly and with the specific

9   intent to engage in the Illegal Commission Scheme as alleged herein, and the activities

10  underlying the Michael Philpot Agency enterprise and misconduct alleged herein, and

11  Defendants, and each of them, aided and abetted in the violations of the Civil RICO

12  statute and offenses, as alleged herein.

13

14       115.   North American has suffered millions of dollars in damages as a result

15  of Defendants' RICO violations, including the Illegal Commission Scheme, as alleged

16  herein in an amount to be proven at the time of trial and trebled under 18 U.S.C. §

17  1964 (c), in addition to the grave damages suffered by other insurance companies and

18  the public at large.

19

20       116.   North American is also entitled to an award of their attorneys' fees under

21  18 U.S.C. § 1964 (c), in an amount to be proven at the time of trial.

22

23               **EIGHTH CLAIM FOR RELIEF**

24               **DECLARATORY RELIEF**

25

26       117.   North American realleges and incorporates herein, each and every

27  allegation contained in Paragraphs 1 through 116 above.

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 36 –

118. In or about March 2007, North American learned, was informed and believes, and on these bases alleges, that Philpot and certain other individual agents in the Michael Philpot Agency, supervised by Philpot and acting at his direction, are and have been involved in the Illegal Commission Scheme to use the Michael Philpot Agency, through its sale of North American's and other insurance companies' insurance products, to illegally obtain upfront sales commissions, bonuses and other payments paid to them for the sale of life insurance policies by North American and by other companies.

119. North American alleges that it has paid Defendants millions of dollars in undeserved and ill-gotten commissions as result of the Illegal Commission Scheme, and incurred significant closing costs on the Sham Policies, in a total amount to be proven at trial.

120. An actual controversy has risen and now exists in that North American contends, and Defendants deny, that Defendants are liable to North American for the damages herein alleged.

121. Therefore, it is necessary and appropriate for this Court to now declare the rights and duties of the parties, so that they may ascertain their respective obligations. North American hereby requests a declaration that by this Court that Defendants are liable for the damages suffered by North American due to the Illegal Commission Scheme, according to proof.

## NINTH CLAIM FOR RELIEF
## ACCOUNTING

122.   North American realleges and incorporates herein, each and every allegation contained in Paragraphs 1 through 121 above.

123.   North American is informed, believes, and on these bases alleges, that Defendants have engaged in unlawful, unfair, and fraudulent acts and practices, as described herein, the direct and proximate result of which is injury to North American.

124.   As a result, the Defendants, owe damages, restitution and the disgorgement of profits, in an amount unknown to North American, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Defendants, and each of them.

## **PRAYER FOR RELIEF**

WHEREFORE, North American prays for judgment against Defendants and each of them, as follows:

1.   On North American's First Claim for Relief (Unfair Competition under California Business and Professions Code §17200, *et seq.*): for disgorgement, restitution of Defendants' ill-gotten gains, and an injunction;

2.   On North American's Second Claim for Relief (Breach of Contract): compensatory damages and/or restitution in a total amount according to proof at trial;

3.   On North American's Third Claim for Relief (Breach of the Covenant of Good Faith and Fair Dealing): for restitution in a total amount according to proof at

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

trial, and exemplary and punitive damages pursuant to California Civil Code section 3294;

4. On North American's Fourth Claim for Relief (Fraud): for damages according to proof at trial, and exemplary and punitive damages pursuant to California Civil Code section 3294;

5. On North American's Fifth Claim for Relief (Negligence): for damages according to proof at trial;

6. On North American's Sixth Claim for Relief (Unjust Enrichment): for restitution in a total amount according to proof at trial;

7. On North American's Seventh Claim for Relief (Violation of 18 U.S.C. § 1962 (c)--Civil RICO): for damages according to proof at trial, and for treble damages pursuant to 18 U.S.C. section 1964 (c);

8. On North American's Eighth Claim (Declaratory Relief): for a declaration that Defendants engaged in the Illegal Commission Scheme and are therefore liable for the damages suffered by North American because of the same;

9. On North American's Ninth Claim for Relief (Accounting): for an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from and of Defendants, and each of them, to ascertain the exact amount of ill-gotten profits due to the Illegal Commission Scheme that is to be restituted and disgorged from Defendants, the exact amount of which is presently unknown to North American;

10.    For interest on North American's damages at the highest rate allowed by law;

11.    For attorneys fees as provided by law;

12.    For costs of suit herein; and

13.    For such other and further relief as the Court deems just and proper.

DATED:  February 13, 2008

REED SMITH LLP

By _____
Robert D. Phillips, Jr. (SBN 82639)
Miles M. Cooley (SBN 206783)
Attorneys for Plaintiff
North American Company For Life and Health Insurance

## **DEMAND FOR JURY TRIAL**

Plaintiff North American hereby demands a trial by jury.

DATED:  February 13, 2008

REED SMITH LLP

By _____
Robert D. Phillips, Jr. (SBN 82639)
Miles M. Cooley (SBN 206783)
Attorneys for Plaintiff
North American Company For Life and Health Insurance

COMPLAINT

**EXHIBIT 1**

FROM :                          FAX NO. : 19282443500          Jul. 26 2005 07:48AM P1

**North American Company**
for Life and Health Insurance
P.O. Box 97493 • Chicago, IL 60690-0459
A Member of the Sammons Financial Group



*O26211*

## DISTRIBUTOR CONTRACT APPLICATION AND AGREEMENT

| | |
|---|---|
| Agent N | **4L617** |
| | (Home Office Use Only) |

All Questions Must Be Completed.

Full Name: _Michael_ _L_ _PhilPot_
(First Name)   (Middle Name)   (Last Name)       Sex ☒ Male ☐ Female

Business Name: _____

Contract Type: ☒ Individual ☐ Corporation ☐ Other

Check box for desired mailing address
☐ Resident Address _941 STEWART & GRAY RD A 11A Downey CA 90241_
(Street, City, State, County, ZIP Code)
☒ Business Address _P.D. Box 728 LAKE Havasu City AZ 86405_
(Street, City, State, County, ZIP Code)

Resident Phone _928 453-3310_   Business Phone _928 453-3800_   Fax _928 244-3500_

E-Mail Address _MPhilpote frontiernet.net_   License # _____ (attach Photocopy)

Date of Birth _10/2/58_   Social Security # _571 270203_ or Taxpayer ID #

**PLEASE RESPOND TO ALL QUESTIONS FOR YOU PERSONALLY AND ANY ORGANIZATION OVER WHICH YOU HAVE EXERCISED CONTROL. IF YOU ANSWER "YES" TO ANY QUESTIONS, YOU MUST ATTACH AN EXPLANATION WITH ALL RELEVANT INFORMATION AND SUPPORTING DOCUMENTS.**

☐ Yes ☒ No   Have you ever had your insurance license or securities license suspended or revoked or have you ever had an application for an insurance license denied by any insurance department?
☐ Yes ☒ No   Have you ever had a complaint filed against you with any insurance department, NASD or other regulatory agency, or do you anticipate one being filed?
☐ Yes ☒ No   Has any claim ever been made against you, your surety company, or errors and omissions insurer arising out of insurance sales or practices or have you been refused surety bonding?
☐ Yes ☒ No   Has your contract or appointment ever been terminated involuntarily by an insurer?
☐ Yes ☒ No   Are you at the present involved in any litigation or are there any unsatisfied judgments or liens (including state or federal tax liens) against you?
☐ Yes ☒ No   Do you currently have a pending bankruptcy or have you ever declared bankruptcy?
☐ Yes ☒ No   Have you pled guilty or nolo contendere to or been found guilty of a felony or a crime including but not limited to crimes involving dishonesty, breach of trust, or a violation of any federal law or are you now under indictment?
☐ Yes ☒ No   Does any insurer, insured, or other person claim any indebtedness from you as a result of any insurance transactions or business?
☒ Yes ☐ No   Are you currently licensed in your resident state? If yes, please attach a copy of your resident license.
☒ Yes ☐ No   Are you currently licensed as a non-resident in any state? If yes and you would like to be appointed in that state, attach a copy of that license, and appointment fees.
☒ Yes ☐ No   I certify that I have received, understand and will conform with the procedures outlined in the brochures Partnering with You on Compliance Matters.
☒ Yes ☐ No   Do you have Errors & Omissions coverage? (Required by North American Company)
PLEASE PROVIDE COPY OF DECLARATION PAGE.

Please indicate other companies with which you are currently licensed: _____

Do you have a NASD license? ☐ Yes ☒ No   If yes, who is your Broker-Dealer? _____

What products do you sell? ☒ Life ☐ Variable ☐ LTC ☐ Group ☒ Disability ☐ Senior ☐ Small Business ☐ 403(b)

Annual Earnings: _675,000_

C-2521                                    1                                    R1  10/03

1

FROM :                    FAX NO. : 19282443500        Jul. 26 2005 07:49AM P2


*C28212*

CONDITIONS AND AGREEMENTS—By signing this application, I hereby acknowledge I have read a specimen copy of the proposed Contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American). If this application is approved by North American, I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, the terms of which are incorporated into this application by reference. I agree not to solicit business until I have been notified by North American that I am authorized to do so, either by mail or North American's Solicitation Guidelines.

Any marketing materials which have not been provided by North American must be approved by North American prior to their use. I understand that any specimen sales brochures and material I have received are provided only for my personal examination of product provisions and rates.

I understand that the Fair Credit Reporting Act requires North American to notify me that, as a routine part of processing my contract application, a consumer report may be obtained which may include information bearing on my credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living. I authorize North American or any of its affiliates[1] to obtain a consumer report and Vector One report in connection with this application. I further authorize North American or any of its affiliates or their duly authorized representative to contact any organization or individual who has knowledge of my employment history, credit history, financial status, or record of any illegal activity in order to obtain a record of such history, status or activities; and I hereby authorize the release of such information by such organization or individual about any debit balance I may incur to Vector One, its successors, or any organization designated to replace Vector One. I understand that by providing the fax/mail information above, I hereby consent to receive communications sent by or on behalf of Sammons Financial Group.

[1]Affiliate means any company owned, directly or indirectly, by Sammons Financial Group, Inc.

I hereby certify that all information and answers given by me on this application are true, and correct without any consequential omissions of any kind.

Signature
Distributor: _____    4L617        7/20/05

Printed Name: MAXX FINANCIAL PARTNERS, LLC _____    Agent Number 4N103

By: _____
                                    (Authorized Signature)

North American Company for Life and Health Insurance Approval:

By: _____
                                    (Authorized Signature)

Title: _____

Effective Date of Agreement: _____ JUL 2 9 2005 _____

The North American Companies endorse and support the concepts in the Principles and Code of Ethical Market Conduct established by the Insurance Marketplace Standards Association (IMSA).

Return pages 1 and 2 for approval by North American. North American will return an executed copy to you upon approval.

Retain pages 3 through 8 for your records.

O-2621                          2                          R1 10/03

2

 **North American Company**
for Life and Health Insurance
P. O. Box 87452 • Chicago, IL 60680-0452
Administrative Office: P. O. Box 5088 • Sioux Falls, SD 57117-5088
A Member of the Sammons Financial Group



## DISTRIBUTOR CONTRACT APPLICATION AND AGREEMENT

☐ MGA    ☐ IMC    ☐ RM

Agent Number _____
(Home Office Use Only)

All Questions Must Be Completed.

Full Name _____    Sex: ☐ Male ☐ Female
(First Name)          (Middle Name)          (Last Name)

Business Name _____

Contract Type: ☐ Individual ☐ Corporation ☐ Other _____

Check box for desired mailing address
☐ Resident Address _____
(Street, City, State, County, ZIP Code)

☐ Business Address _____
(Street, City, State, County, ZIP Code)

Resident Phone (____) _____    Business Phone (____) _____    Fax (____) _____

E-Mail Address _____    License # _____ (attach Photocopy)

Date of Birth _____    Social Security # _____    or Taxpayer ID # _____

**PLEASE RESPOND TO ALL QUESTIONS FOR YOU PERSONALLY AND ANY ORGANIZATION OVER WHICH YOU HAVE EXERCISED CONTROL. IF YOU ANSWER "YES" TO ANY QUESTIONS, YOU MUST ATTACH AN EXPLANATION WITH ALL RELEVANT INFORMATION AND SUPPORTING DOCUMENTS.**

☐ Yes ☐ No    Have you ever had your insurance license or securities license suspended or revoked or have you ever had an application for an insurance license denied by any insurance department?

☐ Yes ☐ No    Have you ever had a complaint filed against you with an insurance department, NASD or other regulatory agency, or do you anticipate one being filed?

☐ Yes ☐ No    Has any claim ever been made against you, your surety company, or errors and omissions insurer arising out of insurance sales or practices or have you been refused surety bonding?

☐ Yes ☐ No    Has your contract or appointment ever been terminated involuntarily by an insurer?

☐ Yes ☐ No    Are you at the present involved in any litigation or are there any unsatisfied judgments or liens (including state or federal tax liens) against you?

☐ Yes ☐ No    Do you currently have a pending bankruptcy or have you ever declared bankruptcy?

☐ Yes ☐ No    Have you pled guilty or nolo contendere to or been found guilty of a felony or a crime including but not limited to crimes involving dishonesty, breach of trust, or a violation of any federal law or are you now under indictment?

☐ Yes ☐ No    Does any insurer, insured, or other person claim any indebtedness from you as a result of any insurance transactions or business?

☐ Yes ☐ No    Are you currently licensed in your resident state? If yes, please attach a copy of your resident license.

☐ Yes ☐ No    Are you currently licensed as a non-resident in any state? If yes and you would like to be appointed in that state, attach a copy of that license, and appointment fees.

☐ Yes ☐ No    I certify that I have received, understand and will conform with the procedures outlined in the brochures Partnering with You on Compliance Matters.

☐ Yes ☐ No    Do you have Errors & Omissions coverage? (Required by North American Company)
**PLEASE PROVIDE COPY OF DECLARATION PAGE.**

Please indicate other companies with which you are currently licensed: _____

Do you have a NASD license? ☐ Yes ☐ No    If yes, who is your Broker-Dealer? _____

What products do you sell? ☐ Life ☐ Variable ☐ LTC ☐ Group ☐ Disability ☐ Senior ☐ Small Business ☐ 403(b)

Annual Earnings: _____

SPECIMEN

*3*

CONDITIONS AND AGREEMENTS—By signing this application, I hereby acknowledge I have read a specimen copy of the proposed Contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American). If this application is approved by North American, I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, the terms of which are incorporated into this application by reference. I agree not to solicit business until I have been notified by North American that I am authorized to do so, either by mail or North American's Solicitation Guidelines.

Any marketing materials which have not been provided by North American must be approved by North American prior to their use. I understand that any specimen sales brochures and material I have received are provided only for my personal examination of product provisions and rates.

I understand that the Fair Credit Reporting Act requires North American to notify me that, as a routine part of processing my contract application, a consumer report may be obtained which may include information bearing on my credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living. I authorize North American or any of its affiliates[1] to obtain a consumer report and Vector One report in connection with this application. I further authorize North American or any of its affiliates or their duly authorized representative to contact any organization or individual who has knowledge of my employment history, credit history, financial status, or record of any illegal activity in order to obtain a record of such history, status or activities; and I hereby authorize the release of such information by such organization or individual about any debit balance I may incur to Vector One, its successors, or any organization designated to replace Vector One. I understand that by providing the fax/mail information above, I hereby consent to receive communications sent by or on behalf of Sammons Financial Group.

[1]Affiliate means any company owned, directly or indirectly, by Sammons Financial Group, Inc.

I hereby certify that all information and answers given by me on this application are true, and correct without any consequential omissions of any kind.

Signature _____　Date _____

**Distributor:**

Printed Name: _____　Agent Number _____

By: _____
　　　　　　　　　　　　　　　　　　　(Authorized Signature)

**North American Company for Life and Health Insurance Approval:**

By: _____
　　　　　　　　　　　　　　　　　　　(Authorized Signature)

Title: _____

Effective Date of Agreement: _____

The North American Companies endorse and support the concepts in the Principles and Code of Ethical Market Conduct established by the Insurance Marketplace Standards Association (IMSA).

**Return pages 1 and 2 for approval by North American. North American will return an executed copy to you upon approval.**

**Retain pages 3 through 8 for your records.**

O-2621　　　　　　　　　　　　　　　　　　　2　　　　　　　　　　　　　　　　　　　R1  10/03

**NORTH AMERICAN COMPANY FOR LIFE & HEALTH INSURANCE'S**

**DISTRIBUTOR CONTRACT**

1. **RELATIONSHIPS**

The Distributor ("you" or "your") may represent North American Company For Life and Health Insurance ("NACOLAH", "Company", "we", "us", or "its") as set forth in this Distributor Contract ("Contract"). The Distributor will act in the good faith when dealing with NACOLAH's policyholders and acknowledges that all policies are the property of NACOLAH. The Distributor is an independent contractor for NACOLAH and not an employee of NACOLAH. Nothing in this contract shall be construed to make you an employee of NACOLAH. You shall be free to exercise your own judgment as to the persons from whom you will solicit applications and as to the time and place of solicitation, subject to the Company's rules and regulations. You may represent other insurance companies while this Contract is in force, provided, however, that while doing so you may not hold yourself out in any manner as acting on behalf of the Company. You agree that your compensation is determined by the terms of this Contract or addendums to the Contract. You are not eligible to participate in any employee benefit programs, including but not limited to, any employee welfare or pension benefit plan for employees of the Company.

2. **AUTHORITY**

   a) The Distributor agrees to:

      1. procure applications for policies underwritten by NACOLAH as applicable,

      2. recruit and recommend qualified Distributors and Producers, as defined by the applicable Distributor or Producer Contract, for NACOLAH appointment in your hierarchy,

      3. promptly forward all applications and initial premiums to NACOLAH,

      4. take all reasonable steps to deliver or ensure that all policies issued by NACOLAH are delivered to the policyowner within 30 days in accordance with NACOLAH's underwriting guidelines and published rules and procedures, in the event policy delivery is not possible then you must return the policies immediately to NACOLAH's underwriting office,

      5. make reasonable efforts to maintain NACOLAH's policies and provide reasonable assistance to NACOLAH's policyholders,

      6. operate in compliance with all applicable laws and regulations,

      7. supervise and be responsible for keeping your Distributors informed of NACOLAH's published rules, guidelines, procedures, and practices which NACOLAH provides to you,

      8. exercise reasonable due care for the faithful performance, fidelity and honesty of your employees, and Distributors and maintain responsibility for all funds collected and business done by or entrusted to you and your employees,

      9. promptly report to NACOLAH, in writing, any known or alleged misappropriation of funds by any Distributor, or employee regardless of whether such known or alleged misappropriation is with respect to funds of NACOLAH or funds of any other person or company,

      10. fully cooperate with NACOLAH in any investigation or proceeding of any federal, state or other regulatory or governmental body, or court, if it is determined by NACOLAH that the investigation or proceeding affects matters covered by or arising out of this Contract,

      11. immediately notify NACOLAH if served with any legal document received by you through any medium or if you have knowledge of any legal or administrative action, and

      12. maintain any and all state insurance licenses and be in good standing with all applicable state and regulatory authorities,

      13. keep full and accurate records of the business transacted by you under this Contract and forward records to the Company as we may prescribe,

      14. notify the Company in writing of the Producer or Distributor Commission Schedule that will govern the compensation to be received by them, and

      15. have and maintain reasonable and effective policies and procedures for the detection and prevention of illegal activity, including anti-money laundering and anti-terrorism financing procedures and controls.

   b) The Distributor may:

      1. solicit, personally and through Distributors and Producers, applications for NACOLAH insurance policies, and annuities as described in the Schedule of Commissions, and

      2. collect the full initial premium for the NACOLAH policies, subject to the restrictions listed on the Company's Temporary Insurance Agreement or Conditional receipt. Checks, money orders, or other forms of payment from policy owners and applicants shall be made payable to the order of the Company and shall not be commingled with your funds. You are not authorized to collect other premiums.

3. **LIMITATION OF AUTHORITY**

The Distributor may not:

   a) make, alter or discharge any NACOLAH policy, contract, Temporary Insurance Agreement or other NACOLAH agreement,

   b) pay any premium personally, or rebate premium to any policyowner,

   c) waive or modify any terms of any NACOLAH policy or contract, including rates or conditions of limitation,

   d) execute any documents on behalf of a proposed NACOLAH insured or policyholder,

O-2621                                        3                                    R1 10/03

e)  approve evidence of insurability,

f)  bind or commit NACOLAH to any policy, contract, risk or otherwise, except to NACOLAH's Temporary Insurance Agreement,

g)  deliver to a NACOLAH applicant any policy where the health of the applicant at the time of the delivery has changed since underwriting and is other than as stated in NACOLAH's application for insurance,

h)  receive any premiums after the initial premium,

i)  extend time for any premium payment or reinstate any lapsed policy,

j)  approve, imply approval, adjust or settle any claim,

k)  retain any issued NACOLAH policy beyond thirty (30) days of issue,

l)  enter into any legal proceedings pertaining to NACOLAH or obligate NACOLAH for any expenses with respect to such proceedings,

m)  use or cause to be used any letters, advertising of any character or medium, or promotion of any kind, descriptive of products, services, procedures, or other information about the Company unless first approved, in writing, by the Company. You shall not use the Company's name or logo without Company prior written approval. The Company shall provide you with printed materials that relate to the Company and its products on the Company website, illustration software, or material in any other medium and you may distribute such materials at your expense,

n)  exercise any authority on behalf of NACOLAH other than as authorized by Section 2 of this Contract,

o)  waive any outstanding debts of your Distributors or Producers,

p)  incur any expenses not authorized by the Company, and

q)  act as Trustee or Fiduciary on behalf of an applicant, insured or policyowner of insurance with the Company.

4.  **NACOLAH'S RIGHTS**
NACOLAH at any time may:

a)  discontinue any policy form in any state,

b)  change any policy form or premium rate,

c)  determine maximum or minimum policy limits,

d)  change the conditions under which any policy may be offered,

e)  change, delete or add any NACOLAH procedures, guidelines or practices,

f)  cease doing business in any state,

g)  unilaterally amend the payment of commissions, bonuses, and benefits under this Contract as to amount, conditions, and vesting of payment that shall include all Supplements and addendums to this Contract and the Company's procedures, guidelines or practices. These amendments will be effective upon mailing of such notice addressed to you at Your last known address and will be prospective in effect.

h)  determine whether to accept any applications and determine underwriting standards with respect to any application,

i)  choose not to contract or appoint any Distributor recommended by you for any reason,

j)  reject applications for insurance submitted by you or your Distributors or Producers without specifying the cause,

k)  examine your records of the business transacted by you or your Distributors or Producers under this contract at any time prior to and/or after termination of this Contract and to make copies of such records as we may deem necessary, and

l)  appoint as Producers and Distributors those persons recruited by you who are deemed acceptable by the Company.

5.  **COMPENSATION**
The Distributor agrees that:

a)  the compensation from NACOLAH as specified in this Contract, applicable supplements, Schedule of Commissions and Addendums is your sole compensation for all matters covered under this Contract,

b)  commissions will be paid at the commission rates in effect at the time a NACOLAH application is submitted to us according to the "Schedule of Commissions" and payment method as determined by the Company,

c)  the Company will pay you override commissions on first year and renewal premiums where applicable on policies written by your Distributors or producers and received by the Company while this Distributor or Producer Contract is in effect,

d)  the Company may adjust each of your Distributors' or Producers' commissions in your hierarchy in accordance with the provisions of that Distributor's or Producer's Contract. Your commissions may increase or decrease as a result of such adjustment,

e)  the Company may charge back commissions including overrides to you in the event of rescission or cancellation, if commissions were paid in error, or if there are unearned commissions, which include but are not limited to the following: if the policy was not taken out for any reason, or when there is a change in billing mode, or the policy was surrendered or lapsed in the first year, for any reason, and

f)  commissions and/or overrides are not earned on premiums being waived under any non-forfeiture or Waiver of Premium provision of any NACOLAH policy, including retroactively waived premiums.

SPECIMEN

O-2621                                    4                                    R1  10/03

6

6. **VESTING**
The Distributor agrees that:

a)  except as provided herein, all first year and renewal commissions will vest immediately,

b)  service fees, if applicable, are not vested,

c)  vesting, if any, applies only to business remaining in force after termination of this Contract,

d)  if you are terminated for cause, all commissions no longer vested,

e)  if, after termination other than for cause, commissions are less than $600 in any calendar year, NACOLAH shall have the option of paying you the "present value" of those commissions and no further commissions shall be due to you under this Contract. "Present Value" as used here means the value of such commissions determined by NACOLAH on the basis of accepted actuarial practices,

f)  if you are appointed as a sole proprietorship and this Contract is terminated by your death or physical disability at a time when commissions are payable to you,

    i)  the Company will continue to pay, for the vesting period specified in this section, such commissions to your legal surviving spouse during his or her life and,

    ii)  thereafter to such persons as your spouse may appoint by will or, in default of appointment, to your spouse's legal representative, and

g)  if this Contract is terminated by your mental disability or if you die leaving no legal surviving spouse, such commissions will be payable to your legal representative or estate.

7. **INDEBTEDNESS**
You are liable and shall repay the company for any indebtedness resulting from your marketing activities or transactions under sub-section A below, or resulting from the activities of your Producers or Distributors under sub-section B below. Any liability as defined by your Indemnity obligations in Section 10 is also a legal debt. Any such indebtedness is a legal debt, due and payable upon the Company and shall constitute and become a first lien upon any and all compensation due under this contract or any successor contracts. The Company is not limited to this means of collection and may at any time pursue additional means as necessary to satisfy their then-outstanding indebtedness.

a)  You are personally liable for any debts arising from your own marketing activities or transactions that result in an indebtedness to the Company, or from the payment of any unearned commissions or bonuses if applicable to you.

b)  You are personally liable for any debts arising from your Distributor's or Producer's business activities, including but not limited to Distributor's or Producer's marketing activities or transactions that result in an indebtedness to the Company, or from the payment of any unearned commissions or bonuses to the Producer or Distributor. In addition, you are liable for the indebtedness to the extent you have guaranteed such indebtedness by separate Guarantee.

c)  To the extent you are liable for any Producer's or Distributor's indebtedness, the Company is free to seek satisfaction and/or offset of the debt from you at any time and is not obligated first to seek satisfaction or offset from the Distributor or Producer involved.

You shall be responsible for your and your employees' present and future indebtedness to NACOLAH. The Company may offset such indebtedness from compensation otherwise due to the Distributor from NACOLAH. Any unsatisfied indebtedness to NACOLAH shall accrue interest at a rate equal to NACOLAH's current practice rate and shall be payable upon demand together with all collection costs incurred by NACOLAH.

8. **TERRITORY**
The Distributor has not been assigned an exclusive territory or market segment.

9. **ASSIGNMENT**
NACOLAH, by any of its officers or designated employees, must approve in writing any assignment of this Contract or any current or future compensation assignment under this Contract. NACOLAH does not assume any responsibility for the validity, sufficiency, or tax consequences of any assignment. No assignment shall be effective until any indebtedness to NACOLAH incurred prior to, or subsequent to, such assignment is satisfied.

10. **INDEMNITY AND ERRORS AND OMISSIONS INSURANCE**

a)  The Distributor will indemnify and hold NACOLAH harmless from all expenses (including reasonable attorneys' fees incurred by the Company), loss or damages (including punitive and extra contractual damages) suffered by NACOLAH because of violation of, or refusal or failure to comply with the terms of this Contract or with any federal or state laws, rules or regulations, or resulting from unauthorized acts or transactions, errors or omissions by the Distributor or Producer or their employees in the performance of its services under this Contract.

b)  NACOLAH will indemnify and hold the Distributor harmless for all non-commission related expenses, loss or damage suffered by the Distributor resulting from any intentional act or omission by the Company or any of its employees contrary to the terms and provisions of this Contract. However, NACOLAH will not be liable to the Distributor for any legal or other expense the Distributor chooses to incur, solely on its own, in connection with any such error.

c)  The Distributor shall maintain Errors & Omissions liability insurance coverage in such amount during the term of this Contract and in such terms as NACOLAH may from time to time determine. Distributor shall provide evidence of such coverage with submission of contract.

SPECIMEN

7

d) Additionally, the Distributor will communicate that the Company requires all Distributors to have and maintain Errors and Omissions liability insurance covering themselves during the term of this Contract and also submit proof and subsequent renewal of coverage each year.

## 11. PRIVACY AND CONFIDENTIALITY

You shall follow the Company's published Privacy Policy. This includes, but is not limited to:

a) We require you protect the confidentiality of the underwriting information received by an applicant for insurance.

b) You will maintain and dispose of all personal information in a secured manner as required by federal and state law. You will disclose all underwriting information only to us.

c) You will maintain physical, electronic, and procedural safeguards that comply with federal and state standards.

d) You will allow only designated personnel or service providers to have access to such information for our underwriting purposes.

## 12. TERMINATION

Termination of this Contract will automatically include termination of all supplements, amendments, addendums, and guarantees. The Distributor agrees that:

a) this Contract may be terminated without cause at any time by mutual agreement, or by you or the Company by written notice in regular U.S. mail addressed to the last known address of the other party at least 30 days prior to the date of such termination,

b) if the Distributor is a corporation, corporate dissolution or cessation of doing business will cause immediate termination of this Contract,

c) if the Distributor is a partnership, death of one of the partners will cause immediate termination of this Contract,

d) if the Distributor is an individual, his or her death, will cause immediate termination of this Contract,

e) if the Distributor is an individual or corporation, bankruptcy or commission of any act of bankruptcy, will cause immediate termination for cause of this Contract,

f) NACOLAH at any time also may terminate this Contract immediately for cause. "For cause" includes, but is not limited to:

   1) any determination by NACOLAH that the Distributor has breached this Contract, Company rules, guidelines or procedures, or state or federal law of regulation:

   2) becoming involved in any legal or regulatory proceeding which might impair its ability to perform its obligation,

   3) committing or attempting to commit, an illegal or fraudulent act,

   4) inducing or attempting to induce to replace, lapse or otherwise terminate their policies with the Company,

   5) acting detrimentally towards NACOLAH or its policyholders,

   6) withholding funds or documents from NACOLAH or its policyholders,

   7) misrepresenting NACOLAH's products or services,

   8) or misrepresenting, falsifying or omitting (or has encouraged or attempted to misrepresent, falsify, or omit) material information furnished to NACOLAH on any applicable license or bond or if the applicable license or bond is refused, canceled, or not renewed,

g) upon termination, the Distributor and or their legal representatives will immediately cease acting on behalf of NACOLAH, will return all of NACOLAH's property, and will promptly account to NACOLAH for all funds held on behalf of NACOLAH, and

h) termination will not dismiss or reduce any indebtedness you owe the Company. Any indebtedness you have becomes due in full upon termination of this contract. The indebtedness includes but is not limited to any debts arising from your own or your agents marketing activities or transactions that result in an indebtedness to the Company, or from the payment of any unearned commissions or bonuses.

## 13. CONSTRUCTION AND EFFECT

The Distributor and NACOLAH agree that:

a) as used in the Contract, the term "Distributor" includes the Distributor and the Distributor's employees,

b) the term "Contract" includes any NACOLAH policy, certificate, endorsement, rider, Temporary Insurance Agreement, addendum or Distributor agreement,

c) all notices under this Contract must be delivered by regular mail addressed to the last address of record by either party to this Contract to the other, and

d) Illinois law governs this Contract.

## 14. NON WAIVER

Failure of the Company to require strict compliance with any of the terms of this Contract shall not constitute a waiver of such terms or conditions nor affect the right of the Company thereafter to require such compliance.

## 15. SEPARABILITY

The provisions of this Contract will be considered to be separable and independent from each other, and in the event any provision of this Contract is found to be invalid, it will not affect the validity or effectiveness of the remaining provisions.

## 16. SUPPLEMENTS, ADDENDUMS, AND AMENDMENTS

Supplements, Addendums and Amendments to this Contract shall run concurrently with it and are subject to the terms and conditions of the Contract thereof, except as specifically modified by the Supplement, Addendum or Amendment.

SPECIMEN

8

**17. MEDIATION AND ARBITRATION OF DISPUTES**

Any disputes or controversies between you and the Company arising out of or relating to your contract may, upon written demand of either party, be submitted to mediation and non-binding arbitration administered by the American Arbitration Association or a similar arbitration organization agreed upon by you and the Company, under the organization's then-applicable mediation and arbitration rules. This clause in no way limits or restricts the rights of you or the Company to obtain relief in a court of competent jurisdiction.

**18. ENTIRETY OF CONTRACT**

This Contract and any supplements, amendments, addendums, or guarantees plus the Distributor Contract Application and Agreement form the complete contract between you and the Company. Any amendment, supplement, or addendum to this contract must be in writing. Your signed Contract on file with the Company will control as to form and content.

SPECIMEN

O-2621                                          7                                          R1  10/03

*9*

**NOTICE REGARDING CONSUMER REPORTS**

In connection with your application for a Distributor Contract with North American Company for Life and Health Insurance Company (North American), North American may obtain one or more reports regarding your credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, and/or mode of living from a consumer reporting agency. If North American plans to use any information in a consumer report in a decision not to contract with you or to make any other adverse contracting decision regarding you, it will provide you with a copy of the credit report upon which its decision was based and a written summary of your rights under the Fair Credit Reporting Act before it takes any adverse action. If any adverse action is taken against you based upon a consumer report, North American will notify you that the action has been taken and that the consumer report was the reason for the action.

SPECIMEN

O-2621                                           8                                    R1  10/03

*10*

Compliance Manual

**North American Companies**

# Partnering

# With You

# On

# Compliance

# Matters



**North American Company**

We're Here for Life™

**North American Company**
for Life and Health Insurance
Since 1886

One West Van Buren
Chicago, Illinois 60607
1-312-786-4000
www.nacolah.com

**North American Company**
for Life and Health Insurance
of New York

880 Third Avenue, Suite 26a
Garden City, New York 11530
1-800-735-5882
www.nacolah.com

For Agent Use only. Not Intended For Consumer Solicitation Purposes.

## Introduction

The North American Companies endorse and support the concepts in the Principles and Code of Ethical Market Conduct established by the Insurance Marketplace Standards Association (IMSA). As a representative of the North American Companies, you must agree:

- ❏ To conduct business according to standards of honesty and fairness;

- ❏ To provide service to the customers which, in the same circumstance, you would apply or demand for yourself;

- ❏ To provide competent and customer focused sales, based on an analysis of the insurable needs and financial objectives of the customer;

- ❏ To engage in active and fair competition;

- ❏ To provide advertising and sales materials that are clear as to purpose and honest and fair as to content;

- ❏ To provide fair and expeditious handling of consumer complaints and disputes;

- ❏ To comply with all applicable laws, regulations, and company requirements;

- ❏ To report any activities of which you are aware that may be in violation of this code.

## The North American Commitment

North American Company is committed to fair and ethical sales practices for all its customers. We are also committed to complying with applicable laws and regulations, the IMSA Principles of Ethical Market Conduct and the Company's Policy Statement Concerning Fair Competition. We will maintain and enforce policies and procedures to reasonably assure compliance, including a system for communicating all company requirements and monitoring sales practices. Representatives and employees of North American Company are expected to uphold these principles and guidelines. A violation of these guidelines by a representative or employee will result in disciplinary action, including, if appropriate, termination of the relationship with the Company.

## Policy Statement Concerning Fair Competition

North American Company will engage in active and fair competition and believes that such competition is the most effective and efficient means of providing products and services to customers. Such competition, however, must be carried out in compliance with applicable laws. Federal and state laws exist to preserve a competitive economy in which free-enterprise can flourish. North American Company supports the purposes of these statutes and laws and insists that its employees and agents are in full compliance with applicable federal and state statutes governing trade practices, antitrust, and restraint of trade. In furtherance of this policy, North American Company employees and associates will:

- ❏ Comply with applicable state and federal laws fostering fair competition.

1

2

*12*

## *P*olicy Statement Concerning Fair Competition *(cont.)*

☐ Refrain from using or making any misrepresentation or false advertising regarding insurance products including any misrepresentation of the benefits, advantages, conditions, or terms of any insurance policy; interest, dividends or surplus to be received on any insurance policy; using any name or title misrepresenting the true nature of an insurance product.

☐ Refrain from making, publishing, disseminating or circulating, directly or indirectly, or aiding, abetting or encouraging the making, publishing, disseminating or circulating of, any oral or written statement which is false or maliciously critical of, or derogatory to, the financial condition of an insurer, for the purposes of injuring any person or insurer engaged in the business of insurance.

☐ Refrain from entering into any agreement to commit or by any concerted action committing, any boycott, coercion or intimidation resulting in an unreasonable restraint or monopoly, in the business of insurance.

☐ Make no agreement or understanding with competitors to fix or control prices, to allocate products, markets or territories, to boycott certain customers or suppliers, or refrain from or limit the sale of any product.

☐ Avoid replacing existing life insurance policies and annuity contracts without meeting the requirements of applicable federal and state law, and providing information to the customer that he or she needs in order to ascertain whether replacement of existing policies or contracts may be in his or her best interest.

Except as set forth above in order to meet the requirements of applicable state and federal law, North American will compete freely and actively in markets or market segmentation determined by its

3

## *P*olicy Statement Concerning Fair Competition *(cont.)*

management to be appropriate and consistent with its marketing plans and goals, both financially and in the marketplace. A violation of the above guidelines by any employee or agent will result in disciplinary action including, if appropriate, termination.

## *P*rivacy Notice

**N**orth American Company is committed to maintaining the confidentiality, integrity and security of personal information entrusted to us by current and prospective customers. The following is our Privacy Policy.

Right to know

Customers have a right to know what we do with the personal and confidential information we collect in the normal course of business offering, processing administering and maintaining the insurance and financial product purchased from North American Company. Because we value the integrity of our customer relationships, we want to assure you and your customers that we are properly safeguarding this important information.

Personal Information We Collect

We need accurate, current health and financial information about your customers so that we can determine their needs at a fair price. We collect personal information that is provided to us on applications, other forms and in interviews. In addition, we maintain information about their transactions with us, such as policy coverage, premiums and payment history. We may obtain additional information from third parties which may include agents, employers, other insurers, consumer reporting agencies or health care providers in the course of processing, underwriting or administering their annuity contract.

4

*13.*

## *Privacy Notice (cont.)*

Information We May Disclose

We may share their personal financial and health information on a confidential basis only with authorized employees, representatives and third parties whose services are required to assure the highest level of service. We may cooperate with other financial institutions in order to bring additional products and services to their attention. We will disclose only financial information that is necessary to such individuals or companies who perform marketing services on our behalf, or to other financial institutions with whom we have agreements.

We will not disclose any non-public personal information about your customers or about any other customers or former customers except as authorized by law, as described in th Privacy Notice or as otherwise communicated to your customers. Because we respect and share their concern for privacy, we will not provide their health information to anyone outside of our Companies except as described above. we will notify them if we make any material change in this Privacy Notice. We may share selected financial information about them with our affiliated companies in order to better serve them and to offer them worthwhile products and services.

Protection of Your Information

Reasonable care will be taken to keep pertinent records current, complete and accurate. If their are any inaccuracies in their statements, or in any other communication from us, we would appreciate their assistance in making corrections by contacting us.

We will protect all information collected about your customers, and we will restrict access to non-public personal information by maintaining physical, electronic and procedural safeguards. We will restrict access to protected data only to individuals who

5

## *Privacy Notice (cont.)*

must use it in the performance of their job-related duties. Employees who violate our Privacy Policy will be subject to disciplinary action, which may include termination.

Above all, we value your customer's trust and confidence in our ability to manage and protect their important personal information. If you have any questions or concerns about our Privacy Notice, please call our Compliance Officer.

## USA PATRIOT Act

**T**he Uniting and Strengthening America by providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) was signed into law by President George W. Bush on October 26, 2001. This law, enacted in response to the terrorist attacks of September 11, 2001 strengthens the nations ability to combat terrorism and detect and prevent money-laundering activities. The Treasury has broad authority to interpret and enforce these anti-money laundering laws. Under the USA PATRIOT Act financial institutions, including life insurers and broker/dealers are required to establish or enhance anti-money laundering policies and procedures. Know Your Customer—As a normal part of the application process for insurance products, agents and registered representatives collect personal and financial information about proposed insureds. Information collected includes:

❑ The name, address, telephone number, age and social security number of the contract owner and annuitant.

❑ The names of any beneficiaries to the contracts and their relationship to the contract owner.

❑ Information regarding occupation, employer, financial status, tax status and investment objective for variable products.

6

*14*

## USA PATRIOT Act (cont.)

Prior to accepting an application, the agent/registered representative typically meets personally with the proposed owner and witnesses his or her signature. In addition, the agent/registered representative is required to document how long he or she has known the applicant and the source of the referral. This information is gathered in order to determine the suitability of the recommended product and enables the agent/registered representative and North American Company to make a determination that the product purchased represents a transaction that is reasonable for the customer and reflects a legitimate business purpose.

Some suspicious activities which indicate that a transaction may not reflect a legitimate business purpose include:

❑ The purchase of a single lump sum contract by a customer whose previous product experience is with smaller, regular payment products;

❑ Payments for contracts by a third-party check;

❑ A customer who shows no concern for the product performance, but much concern for the surrender or early cancellation of the contract;

❑ Payment by cash, when this type of business transaction would normally be handled by checks or other payment instructions;

❑ Lump sum payments with foreign currency or foreign wire transfers;

❑ Purchases beyond the customer's apparent means;

❑ Purchases where the source of funds is unclear;

❑ Borrowing from a single premium policy shortly after paying for the policy;

7

## USA PATRIOT Act (cont.)

❑ Early cancellation of a single premium sum contract;

❑ Payment by multiple bank checks or money orders.

If an agent/registered representative or employee suspects that a transaction does not represent a legitimate business purpose, contact Meg Taylor, Vice President and Chief Compliance Officer at 800-800-3656 Ext. 87712 or Tracy Michels, Assistant Vice President ext. 87648.

## *Provide Competent and Customer Focused Sales*

Competent and customer focused sales are based on an analysis of the customer's insurable needs and financial objectives. You should carefully consider each customer's circumstance and future expectation when making product recommendations. You should review all the proposed policy features with the customer, including values and benefits, premium structure, expenses, surrender charges, and existing coverage.

Products change quickly in today's marketplace. Make sure you understand the features and mechanics of the products that you are recommending. Make clear and competent presentations to be sure your customer understands how the product you are recommending works and how it will address his or her insurable needs and financial objectives.

North American Company encourages the use of needs analysis tools to assist you in determining your customer's insurable needs and objectives.

Insurance products recommendations will be made only upon having reasonable information to determine such recommendations are appropriate and

8

*15*

## Special Needs of the Senior Market

The senior market can be a good market for the life and annuity producer. With a record number of baby boomers beginning to retire, there is a need for conservative retirement products such as fixed annuities. This market will continue to grow with the ageing of our population. With more sales opportunities, there are also some things to consider when dealing with the senior market. Although this is not a comprehensive list of senior market guidelines, it does illustrate some points to consider when dealing with this market.

Full Fact Finding and Documentation is Very Important: Documentation is key to proper compliance in any market, but is especially important in senior market sales. Suitability is extremely important and is often scrutinized in this market.

Need to Error on Side of Being Conservative: Seniors are conservative by nature. Whenever you have a doubt, it is always best to rely to less aggressive strategies and recommendations.

"Buyers Remorse": Many people, including seniors, go through this phenomenon after making a major financial decision. Again, proper documentation, a conservative strategy, and making sure that client fully understands what they have purchased will help overcome this issue.

Some Clients May Be Less Sophisticated Than They Appear: Seniors may give the impression of being "market-savvy" because they might have owned several stock/bonds or mutual funds in the past, but realistically have little or no market knowledge. Agents must not assume that seniors understand annuity concepts without proper instruction.

Seniors Often Work Closely With Other Advisors: Most seniors have other advisors, such as a CPA, a tax advisor, an attorney or even family members. These advisors may have different options and/or motives for the senior client.

9

## Special Needs of the Senior Market

Broad Protection of Elder Abuse Laws: Elder abuse legislation has gained momentum in recent years. With the emerging senior population, often courts will favor on the conservative side with the senior client.

Beneficiaries Sometimes Have Different Objectives than the Contract Holder: A senior client's beneficiary may have a different financial objective and opinion than the senior did at the time of sale. Again, documentation is the key to keeping a record of the client's objectives and intentions at the time of the annuity purchase.

These are just a few points to consider when dealing with the senior market. Please consult your elder law attorney for questions or clarifications.

## Financial Planning

Terms such as "financial planner", "investment advisor", and "financial consultant" may not be used in a way to imply that an agent is involved in an advisory business in which compensation is fee-based. Some states require special licensing as an investment advisor for those providing financial planning services. A majority of states require such licensing if a separate fee is charge for such services. The best method of avoiding problems is to be certain that the client understands that you are acting as a life insurance agent. In this regard, state life insurance solicitation regulations require that you inform the prospective purchaser, prior to commencing the sales presentation, that you are a life insurance agent and identify your full name.

You should encourage your client to consult with other professionals (e.g. legal or tax advice) on matters that you are not qualified or licensed to discuss.

10

## Wills, Trusts & Medicaid Planning

Caution should be taken when using Living Trusts as a financial planning tool. Litigation has been generated against marketers of living trusts, insurance companies and agents where the living trust concept was marketed on a mass basis in connection with the sale of financial products like annuities. While we believe that, in the appropriate circumstances, a living trust can be a valuable planning device, mass distribution of this concept is not appropriate. Please also be aware that annuities offered by North American Company are not designed for use in "Medicaid-friendly" annuity programs.

North American Company does not provide tax or legal advice and we strongly encourage your clients to consult their tax advisor prior to establishing a living trust or purchasing any financial product in connection with a living trust.

## Advertising Guidelines

The Compliance Department is pleased to announce enhanced, streamlined procedures for submitting your advertising to our Department for review and approval. Start taking advantage of this ease of doing business by e-mailing your ad to compliance@nacolah.com or faxing it to our dedicated fax number: 312-648-7780. These new methods will expedite the review and approval process and have you selling more. . . faster!

For easy reference, please refer to the advertising checklist found below to assist you in complying with state regulations and market conduct standards. For additional questions, please contact Terri Silvius at 800-800-3656 ext. 27858 or Tracy Michels at ext. 87648.

11

## Advertising Guidelines (cont.)

**Advertising Checklist:**

Advertisements must have prior written approval by the Company. Advertising would include any material, written or electronic, that is designed for distribution to the general public, including but not limited to:

- ❑ Print, radio, TV and any form of media advertising (newspaper, magazine)

- ❑ Product brochures, circulars, pamphlets and published articles

- ❑ Sales presentations, prepared sales talks, seminar texts, telemarketing scripts and materials

- ❑ Newsletters, research and performance reports or summaries

- ❑ Prospecting, target market and form letters

- ❑ Business cards and letterhead

- ❑ Agent recruiting material

- ❑ Third party software

- ❑ Internet and internet websites or home pages and any other forms of e-commerce

If you are uncertain whether or not something falls within the definition of "advertising", please contact the Compliance Department for guidance. Without exception, all consumer advertising mentioning North American Company or referencing any of our products and services must be approved by Compliance prior to use. This includes products reference by name, description, rate or features. To ensure your materials are reviewed expeditiously, the following procedures should be taken into consideration. We suggest you review these guidelines prior to submitting any piece of advertising for approval.

12

17

## *Advertising Guidelines (cont.)*

❑ When an ad is submitted for approval, Compliance will notify you of the form number assigned to the ad. This form number is to be printed in the lower left hand corner of the ad.

❑ Advertisements may need to be filed with state departments and/or the NASD, which will add to the approval turnaround time. You will be notified if this is the case.

❑ Due to the changing nature of regulations governing advertisements and sales materials, compliance approval is valid for up to 12 months. This time period may be shorter if interest rates are referenced in the ad. Upon expiration, you must resubmit the ad for approval if you continue using the ad.

❑ If revisions to your ad are required, you must submit a final copy of the ad with the revisions to Compliance for final approval and filing (if necessary).

❑ Include your agency's name as it appears on your agent's license. Foe example, if an agent is licensed as "John Doe" but is doing business as "City Insurance Agency","John Doe" must appear on the ad.

❑ Always indicate the licensed agent as the contact person. All consumer ads must have the name of the agent, agency (if applicable), address and phone number. If the advertisement will be distributed in the state of California, you are also required to include your state license number.

❑ If a variable product is featured, the agent must be identified as a Registered Representative and the name of and relationship to the Broker/Dealer must be disclosed. "Joe Agent is a Registered Representative of Sammons Securities Company, LLC member NASD/SIPC".

13

## *Advertising Guidelines (cont.)*

❑ The product being advertised must clearly be identified as a life insurance policy or annuity contract.

❑ The term no cost, disappearing or vanishing may not be used in any advertising materials. In addition, a life policy cannot be billed as an "investment" or "retirement" vehicle.

❑ Do not refer to premium payments as "deposits".

❑ Indicate all product names registered with a service mark or registered trademark as applicable.

❑ If an ad is intended for agent use only, be sure to indicate :For Agent/Broker Use Only. Not Intended for Consumer Solicitation Purposes".

❑ Any ad promoting one of our products must describe the policy type, form number and issuing company. A typical disclosure is as follows: Marketing Name℠ is issued on form XXXX (group certificate) or Form XXXX (individual contract) or state variations by North American Company for Life and Health Insurance, Chicago, IL. This product, its features and riders may not be available in all states.

❑ If a reference is made to any withdrawal feature of the product, include the disclosure, "Withdrawals prior to age $59^{1/2}$ may be subject to IRS penalties".

❑ If reference is made to specific interest rates, include the statement, "Interest rates are based on current rates and are subject to change without notice".

❑ Reference to any commercial rating—A.M. Best, for example—must incorporate a complete description of the rating: "Rated 'A' (Excellent) for financial strength and overall operating performance when compared to the norms of the life/health

14

*18*

## *Advertising Guidelines (cont.)*

industry". Also include a statement about the number of categories that a rating service would use to rank a company and where a particular ranking would fall within the total number of categories: "An 'A' (Excellent) rating by A.M. Best Company is the third highest rating out of fifteen categories". If you decide to include rating information on your website be sure to provide full disclosure, or simply link to our website for this information.

❑ Any use of statistics or references to any information from an outside source must clearly identify the source of the information including the name and date of the report or publication.

**Internet Advertising:**

Internet advertising includes home pages and all related pages in an agency/agent website. To submit your site and/or page for approval, complete and submit an Advertising Submission Form along with copies of all relevant web pages including all links and instructions for accessing the site online. Note that approval must be received prior to any website "going live". Regulations that apply to print Advertising also apply to Internet advertising. Since a website is accessible to all consumers, regardless of where they live, Internet advertising must comply with the advertising requirements of all states.

❑ Many websites, including those that market insurance products, may be identified by a marketing name that is different from the name shown on the "official" license for the agency or agent. Please note that a marketing name can easily be construed as a DBA (doing business as) and as such could require that the name be filed with the respective secretary of state office(s) and/or state insurance department(s).

❑ Since information contained on a website can be

15

## *Advertising Guidelines (cont.)*

viewed by virtually anyone, anywhere in the world, include where you are licensed to do business and that you are a domestic U.S. agent/agency. For example: "John Smith, DBA XYZ Life Insurance Agency Inc., a domestic U.S. insurance agency licensed to do business in (states)", or "licensed to do business in all states except (states)".

❑ When including product information that is for agent use only, please provide the Internet address, User ID and password.

## *Record Retention*

It is important that you maintain client files and documentation properly for future reference. Certain documents should always be maintained. These include:

❑ Original sales proposals;

❑ A copy of any needs analysis completed during the solicitation;

❑ A copy of any sales material used during the sales process;

❑ Any written correspondence to or from the policyowner regarding the solicitation, issuance of the policy, or subsequent service of the policy;

❑ Documentation of phone calls to or from the policyowner addressing the above issues;

❑ Notes from meetings with the policyowner.

State regulations vary regarding the amount of time that client files are to be maintained. However, a general rule of thumb is to maintain all active client files indefinitely and all in-active files for seven years.

16

*19*

## Complaint Handling

**C**onsumer complaints generally fall into one of three categories:

☐ State Insurance Department Complaints, meaning those that are forwarded directly from the state to North American Company or to you as the agent;

☐ Executive Complaints, meaning those that are directed to the Chairman, President or other Senior Officer of the Company; and

☐ Direct Complaints, meaning those that are submitted directly to you or to North American Company for response.

It is possible that a consumer complaint may be a combination of all three. If North American Company receives a complaint regarding a policy written by you and the complaint is regarding the sales or servicing of the policy, you will be contacted for your written response. Your written response must address all charges made in the complaint. You will be asked to include copies of any documentation available to support your position. It is very important that you submit your written response within the specified number of days. Because many state insurance departments impose a deadline for the Company's response, the receipt of your written response in a timely manner is essential.

If you receive a complaint directly, develop a written response addressing the issues. If you need assistance in formulating the response, please contact the Compliance Department. If the complaint involves a state insurance department, an attorney, or another regulatory agency, contact the Compliance Department immediately for consultation before any reply is submitted.

17

## Complaint Handling (cont.)

**I**t is inappropriate and unacceptable for any agent to initiate any discussion of a settlement to a complaint without consulting with and gaining permission from the Home Office. In any settlement, a release form approved by the Home Office must be used.

North American Company is committed to fair and ethical treatment of all policyholders. As such, all consumer complaints are taken seriously. If you believe that the allegations are incorrect, we will assist you in defending that position and we will investigate thoroughly. Results can be serious, including state penalties, law suits, policy recisions, commission reversal, or termination of the producer contract.

North American Company is committed to assisting you in these circumstances. Questions relating to customer relations and complaints should be directed to the Compliance Officer.

## Application Guidelines

**T**he application is a part of the insurance contract. If the answers on the application are incorrect, incomplete, or untrue, North American Company may have the right to deny benefits or rescind coverage. Therefore, it is important that the application be filled out completely and accurately.

Be sure your client understands that by signing the completed application forms, he or she is attesting that the information is accurate and complete. Never ask your client to sign a blank application or other document.

18

20

## *Application Guidelines (cont.)*

**T**he application is to be submitted to North American Company exactly as completed at the point of sale. The applicant must initial modifications to the application or other sales material subsequent to the signature of the application. Any modification to the application, replacement form, authorization, checks, or other material secured at the point of sale without the approval or knowledge of the applicant is an unethical sales practice, may be illegal, and could result in civil or criminal liability.

Your signature on the application is your personal assurance that the information supplied is, to the best of your knowledge, given voluntarily by an eligible applicant in a complete and accurate manner. Only the licensed agent(s) writing the business should sign the application. The signing of the application by any other producer is a prohibited practice.

Should the client qualify for conditional coverage, do not accept money in excess of the amount specified in the conditional receipt. Remember that, in most states, a conditional receipt provides conditional coverage and should only be referred to as such. Conditional coverage should never be referred to as a binder.

Finally, remember that it is your responsibility to protect the privacy and confidentiality of the information obtained during the underwriting process. Personal information intended to be transmitted to North American Company should be kept in the utmost confidence.

## *Replacements*

**R**eplacements are and continue to be one of the most heavily regulated transactions. Depending on the circumstance, a replacement may or may not be in the best interest of your client. You have a responsibility to make sure that your client has all of the necessary facts in order to determine if the replacement is in his or her best interest. A replacement may be in the client's best interest:

❑ If the benefit amount can be increased for the same or similar premium;

❑ If the policy can remain in force longer for the same or similar premium;

❑ If the accumulation value will increase for the same or similar premium;

❑ If the premium payment period is shorter for the same or similar premium;

❑ If the customer can purchase the same benefits for a lower premium.

Comparisons between an existing product and a proposed product must accurately and fairly describe the policies' provisions and values. You should discuss the advantages and disadvantages of any potential replacement with your client. Remember to address:

❑ Any required evidence of insurability;

❑ The contestability and suicide provisions of the existing and proposed policy;

❑ The loan provision and loan interest rate of both policies;

❑ Any surrender charges and/or expense fees associated with both policies;

*21*

## *R*eplacements *(cont.)*

❑  The premium requirements of the proposed policy;

❑  The present and future values of both policies;

❑  The current interest and mortality charges of both policies;

❑  The potential tax treatment of the replacement and whether the replacement can qualify as a Section 1035 exchange.

The definition of replacement goes beyond the surrender of one policy and subsequent purchase of another policy. As an agent, you should be aware of all of the transactions that are considered a replacement. For example, a replacement may occur when a policy has been or is to be:

❑  Lapsed, forfeited, surrendered, or otherwise terminated;

❑  Converted to reduced paid-up insurance, continued as extended term insurance or otherwise reduced by the use of nonforfeiture benefits;

❑  Reduced in value through a withdrawal or partial surrender;

❑  Reissued with a reduction in cash value;

❑  Pledged as collateral or subjected to borrowing where the aggregate loan exceeds a state specified percentage of the loan value of the existing policy; or

❑  Amended by reducing or eliminating ancillary benefits, such as waiver of premium or accidental death benefits.

21

## *R*eplacements *(cont.)*

A replacement can be internal or external. An internal replacement occurs when an existing policy is exchanged for a new policy from the same insurer. An external replacement occurs when a policy is replaced by another insurer. Only you and your client can decide if the replacement if suitable. When a replacement is appropriate, be certain to use the appropriate replacement disclosure forms.

Monitoring Activities – North American Company recognizes that replacement activity varies by product type. For example, carriers with a high volume of term business often experience a higher percentage of replacement activity due to the increasingly lower premium rates available in the marketplace. North American Company monitors replacement activity on an ongoing basis for trend analysis purposes. Should the level of replacement activity for an agent or agency present a concern, the Compliance Officer will investigate the issue further and discuss the issue with the agent and/or agency.

## *P*olicy Delivery

The issued policy should be delivered to the owner within 15 days from the date North American Company mails it to you. Policies should never be kept in an agent's file. In addition, you should be aware of all outstanding delivery requirements and assist your client in completing the necessary documents. Remember that the policy is not in force until all delivery requirements have been submitted to North American Company. Failing to return delivery requirements can jeopardize your client's coverage.

22

*22*

## Licensing and Contracting

North American Company follows all state licensing regulations regarding agent licensing and appointments. Your license to sell insurance with North American Company requires that you abide by all of the laws, rules, and regulations of any state in which you are licensed to conduct business. In some states, agents are not allowed to take an application prior to licensing and/or appointment.

You should check with your Licensing and Contracting Analyst for state specific rules.

## Errors and Omissions Coverage

In the event that a claim is presented against you, your Errors and Omissions carrier should be notified within 24 hours of your receipt of the information. You are accountable for making this notification.

## Continuing Education

North American Company believes that continuing education about products, industry, and regulatory issues is critical to being able to provide competent and customer focused sales and service. A variety of resources are available for obtaining this information, including the company, professional trade groups, and independent third party vendors. Specific information regarding the resources that are available can be obtained by calling the Marketing Department.

23

## Questions and Concerns

For questions and concerns regarding market conduct, ethical sales practices, compliance with laws and regulations, or the IMSA Principles and Code, please contact:

*Meg Taylor, Chief Compliance Officer*
*312-648-7712*
*or*
*Tracy Michels, Compliance Officer*
*312-648-7648*

For questions and concerns regarding consumer complaints, please contact the Compliance Officer or, for North American Company for Life and Health Insurance and North American Company for Life and Health of New York:

*Cheryl Ziegler*
*Compliance-Consumer Affairs*
*605-335-5700, ext. 32423*
*or*
*Tracy Michels, Compliance Officer*
*312-648-7648*

For assistance from the Marketing Department, please contact your Sales Coordinator. For North American Company for Life and Health Insurance, please contact:

*312-648-7600, ext. 10411*

Or, for North American Company for Life and Health Insurance of New York, please contact:

*516-228-8899, ext. 21608*

NOTE: Ongoing compliance information is provided to each Managing General Agency. It is the responsibility of the Managing General Agency to disseminate this information to its producers.

24

*23*

**EXHIBIT 3**

FROM :                          FAX NO. : 19282443500        Jul. 26 2005 07:48AM P1

 **North American Company for Life and Health Insurance**
P.O. Box 67458 • Chicago, IL 60680-0458
A Member of the Sammons Financial Group


*O26211*

## DISTRIBUTOR CONTRACT APPLICATION AND AGREEMENT

Agent N.

**4L617**
(Home Office Use Only)

**All Questions Must Be Completed.**

Full Name _Michael_ _L_ _Philpot_     Sex [X] Male [ ] Female
(First Name)   (Middle Name)   (Last Name)

Business Name _____

Contract Type: [X] Individual [ ] Corporation [ ] Other _____

Check box for desired mailing address
[ ] Resident Address _7941 STEWART + GRAY RD44 Downey CA 90241_
(Street, City, State, County, ZIP Code)
[X] Business Address _P.O. Box 728 Lake Havasu City AZ 86405_
(Street, City, State, County, ZIP Code)

Resident Phone _928 453-3310_   Business Phone _928 453-3800_   Fax _928 244-3500_

E-Mail Address _MPhilpot@frontiernet.net_   License # _____ (attach Photocopy)

Date of Birth _10/2/58_   Social Security # _571 27 0203_ or Taxpayer ID # _____

**PLEASE RESPOND TO ALL QUESTIONS FOR YOU PERSONALLY AND ANY ORGANIZATION OVER WHICH YOU HAVE EXERCISED CONTROL. IF YOU ANSWER "YES" TO ANY QUESTIONS, YOU MUST ATTACH AN EXPLANATION WITH ALL RELEVANT INFORMATION AND SUPPORTING DOCUMENTS.**

[ ] Yes [X] No  Have you ever had your insurance license or securities license suspended or revoked or have you ever had an application for an insurance license denied by any insurance department?

[ ] Yes [X] No  Have you ever had a complaint filed against you with an insurance department, NASD or other regulatory agency, or do you anticipate one being filed?

[ ] Yes [X] No  Has any claim ever been made against you, your surety company, or errors and omissions insurer arising out of insurance sales or practices or have you been refused surety bonding?

[ ] Yes [X] No  Has your contract or appointment ever been terminated involuntarily by an insurer?

[ ] Yes [X] No  Are you at the present involved in any litigation or are there any unsatisfied judgments or liens (including state or federal tax liens) against you?

[ ] Yes [X] No  Do you currently have a pending bankruptcy or have you ever declared bankruptcy?

[ ] Yes [X] No  Have you pled guilty or nolo contendere to or been found guilty of a felony or a crime including but not limited to crimes involving dishonesty, breach of trust, or a violation of any federal law or are you now under indictment?

[ ] Yes [X] No  Does any insurer, insured, or other person claim any indebtedness from you as a result of any insurance transactions or business?

[X] Yes [ ] No  Are you currently licensed in your resident state? If yes, please attach a copy of your resident license.

[X] Yes [ ] No  Are you currently licensed as a non-resident in any state? If yes and you would like to be appointed in that state, attach a copy of that license, and appointment fees.

[X] Yes [ ] No  I certify that I have received, understand and will conform with the procedures outlined in the brochures Partnering with You on Compliance Matters.

[X] Yes [ ] No  Do you have Errors & Omissions coverage? (Required by North American Company)
**PLEASE PROVIDE COPY OF DECLARATION PAGE.**

Please indicate other companies with which you are currently licensed. _____

Do you have a NASD license? [ ] Yes [X] No   If yes, who is your Broker-Dealer? _____

What products do you sell? [X] Life [ ] Variable [ ] LTC [ ] Group [X] Disability [ ] Senior [ ] Small Business [ ] 403(b)

Annual Earnings: _675,000_

O-2621                          1                          R1  10/03

24

FROM :

FAX NO. : 19282443500

Jul. 26 2005 07:49AM P2



*C26212*

CONDITIONS AND AGREEMENTS—By signing this application, I hereby acknowledge I have read a specimen copy of the proposed Contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American). If this application is approved by North American, I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, the terms of which are incorporated into this application by reference. I agree not to solicit business until I have been notified by North American that I am authorized to do so, either by mail or North American's Solicitation Guidelines.

Any marketing materials which have not been provided by North American must be approved by North American prior to their use. I understand that any specimen sales brochures and material I have received are provided only for my personal examination of product provisions and rates.

I understand that the Fair Credit Reporting Act requires North American to notify me that, as a routine part of processing my contract application, a consumer report may be obtained which may include information bearing on my credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living. I authorize North American or any of its affiliates[1] to obtain a consumer report and Vector One report in connection with this application. I further authorize North American or any of its affiliates or their duly authorized representative to contact any organization or individual who has knowledge of my employment history, credit history, financial status, or record of any illegal activity in order to obtain a record of such history, status or activities; and I hereby authorize the release of such information by such organization or individual about any debit balance I may incur to Vector One, its successors, or any organization designated to replace Vector One. I understand that by providing the fax/mail information above, I hereby consent to receive communications sent by or on behalf of Sammons Financial Group.

[1]Affiliate means any company owned, directly or indirectly, by Sammons Financial Group, Inc.

I hereby certify that all information and answers given by me on this application are true, and correct without any consequential omissions of any kind.

Signature: _____    4L617    7/29/05

Distributor:

Printed Name: **MAXX FINANCIAL PARTNERS, LLC**    Agent Number **4N103**

By: _____
(Authorized Signature)

North American Company for Life and Health Insurance Approval:

By: _____
(Authorized Signature)

Title: _____

Effective Date of Agreement: ____ JUL 2 9 2005 ____

The North American Companies endorse and support the concepts in the Principles and Code of Ethical Market Conduct established by the Insurance Marketplace Standards Association (IMSA).

Return pages 1 and 2 for approval by North American. North American will return an executed copy to you upon approval.

Retain pages 3 through 8 for your records.

O-2621

2

R1 10/03

25

 **North American Company**
for Life and Health Insurance
P. O. Box 87452 • Chicago, IL 60680-0452
Administrative Office: P. O. Box 5088 • Sioux Falls, SD 57117-5088
A Member of the Sammons Financial Group



## DISTRIBUTOR CONTRACT APPLICATION AND AGREEMENT

☐ MGA    ☐ IMC    ☐ RM

Agent Number _____
(Home Office Use Only)

All Questions Must Be Completed.

Full Name _____    Sex: ☐ Male ☐ Female
        (First Name)        (Middle Name)        (Last Name)

Business Name _____

Contract Type: ☐ Individual ☐ Corporation ☐ Other _____

Check box for desired mailing address
☐ Resident Address _____
                                    (Street, City, State, County, ZIP Code)
☐ Business Address _____
                                    (Street, City, State, County, ZIP Code)

Resident Phone (____) _____    Business Phone (____) _____    Fax (____) _____

E-Mail Address _____    License # _____ (attach Photocopy)

Date of Birth _____    Social Security # _____    or Taxpayer ID # _____

**PLEASE RESPOND TO ALL QUESTIONS FOR YOU PERSONALLY AND ANY ORGANIZATION OVER WHICH YOU HAVE EXERCISED CONTROL. IF YOU ANSWER "YES" TO ANY QUESTIONS, YOU MUST ATTACH AN EXPLANATION WITH ALL RELEVANT INFORMATION AND SUPPORTING DOCUMENTS.**

☐ Yes ☐ No    Have you ever had your insurance license or securities license suspended or revoked or have you ever had an application for an insurance license denied by any insurance department?

☐ Yes ☐ No    Have you ever had a complaint filed against you with an insurance department, NASD or other regulatory agency, or do you anticipate one being filed?

☐ Yes ☐ No    Has any claim ever been made against you, your surety company, or errors and omissions insurer arising out of insurance sales or practices or have you been refused surety bonding?

☐ Yes ☐ No    Has your contract or appointment ever been terminated involuntarily by an insurer?

☐ Yes ☐ No    Are you at the present involved in any litigation or are there any unsatisfied judgments or liens (including state or federal tax liens) against you?

☐ Yes ☐ No    Do you currently have a pending bankruptcy or have you ever declared bankruptcy?

☐ Yes ☐ No    Have you pled guilty or nolo contendere to or been found guilty of a felony or a crime including but not limited to crimes involving dishonesty, breach of trust, or a violation of any federal law or are you now under indictment?

☐ Yes ☐ No    Does any insurer, insured, or other person claim any indebtedness from you as a result of any insurance transactions or business?

☐ Yes ☐ No    Are you currently licensed in your resident state? If yes, please attach a copy of your resident license.

☐ Yes ☐ No    Are you currently licensed as a non-resident in any state? If yes and you would like to be appointed in that state, attach a copy of that license, and appointment fees.

☐ Yes ☐ No    I certify that I have received, understand and will conform with the procedures outlined in the brochures Partnering with You on Compliance Matters.

☐ Yes ☐ No    Do you have Errors & Omissions coverage? (Required by North American Company)
            **PLEASE PROVIDE COPY OF DECLARATION PAGE.**

Please indicate other companies with which you are currently licensed: _____

Do you have a NASD license? ☐ Yes ☐ No    If yes, who is your Broker-Dealer? _____

What products do you sell? ☐ Life ☐ Variable ☐ LTC ☐ Group ☐ Disability ☐ Senior ☐ Small Business ☐ 403(b)

Annual Earnings: _____

SPECIMEN

O-2621                                    1                            R1  10/03

26

CONDITIONS AND AGREEMENTS—By signing this application, I hereby acknowledge I have read a specimen copy of the proposed Contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American). If this application is approved by North American, I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, the terms of which are incorporated into this application by reference. I agree not to solicit business until I have been notified by North American that I am authorized to do so, either by mail or North American's Solicitation Guidelines.

Any marketing materials which have not been provided by North American must be approved by North American prior to their use. I understand that any specimen sales brochures and material I have received are provided only for my personal examination of product provisions and rates.

I understand that the Fair Credit Reporting Act requires North American to notify me that, as a routine part of processing my contract application, a consumer report may be obtained which may include information bearing on my credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living. I authorize North American or any of its affiliates[1] to obtain a consumer report and Vector One report in connection with this application. I further authorize North American or any of its affiliates or their duly authorized representative to contact any organization or individual who has knowledge of my employment history, credit history, financial status, or record of any illegal activity in order to obtain a record of such history, status or activities; and I hereby authorize the release of such information by such organization or individual about any debit balance I may incur to Vector One, its successors, or any organization designated to replace Vector One. I understand that by providing the fax/mail information above, I hereby consent to receive communications sent by or on behalf of Sammons Financial Group.

[1]Affiliate means any company owned, directly or indirectly, by Sammons Financial Group, Inc.

I hereby certify that all information and answers given by me on this application are true, and correct without any consequential omissions of any kind.

Signature _____    Date _____

**Distributor:**

Printed Name: _____    Agent Number _____

By: _____
(Authorized Signature)

**North American Company for Life and Health Insurance Approval:**

By: _____
(Authorized Signature)

Title: _____

Effective Date of Agreement: _____

The North American Companies endorse and support the concepts in the Principles and Code of Ethical Market Conduct established by the Insurance Marketplace Standards Association (IMSA).

**Return pages 1 and 2 for approval by North American. North American will return an executed copy to you upon approval.**

**Retain pages 3 through 8 for your records.**

O-2621                                    2                       R1  10/03

27

## NORTH AMERICAN COMPANY FOR LIFE & HEALTH INSURANCE'S
## DISTRIBUTOR CONTRACT

1. **RELATIONSHIPS**

   The Distributor ("you" or "your") may represent North American Company For Life and Health Insurance ("NACOLAH", "Company", "we", "us", or "its") as set forth in this Distributor Contract ("Contract"). The Distributor will act in the good faith when dealing with NACOLAH's policyholders and acknowledges that all policies are the property of NACOLAH. The Distributor is an independent contractor for NACOLAH and not an employee of NACOLAH. Nothing in this contract shall be construed to make you an employee of NACOLAH. You shall be free to exercise your own judgment as to the persons from whom you will solicit applications and as to the time and place of solicitation, subject to the Company's rules and regulations. You may represent other insurance companies while this Contract is in force, provided, however, that while doing so you may not hold yourself out in any manner as acting on behalf of the Company. You agree that your compensation is determined by the terms of this Contract or addendums to the Contract. You are not eligible to participate in any employee benefit programs, including but not limited to, any employee welfare or pension benefit plan for employees of the Company.

2. **AUTHORITY**

   a) The Distributor agrees to:

   1. procure applications for policies underwritten by NACOLAH as applicable,

   2. recruit and recommend qualified Distributors and Producers, as defined by the applicable Distributor or Producer Contract, for NACOLAH appointment in your hierarchy,

   3. promptly forward all applications and initial premiums to NACOLAH,

   4. take all reasonable steps to deliver or ensure that all policies issued by NACOLAH are delivered to the policyowner within 30 days in accordance with NACOLAH's underwriting guidelines and published rules and procedures, in the event policy delivery is not possible then you must return the policies immediately to NACOLAH's underwriting office,

   5. make reasonable efforts to maintain NACOLAH's policies and provide reasonable assistance to NACOLAH's policyholders,

   6. operate in compliance with all applicable laws and regulations,

   7. supervise and be responsible for keeping your Distributors informed of NACOLAH's published rules, guidelines, procedures, and practices which NACOLAH provides to you,

   8. exercise reasonable due care for the faithful performance, fidelity and honesty of your employees, and Distributors and maintain responsibility for all funds collected and business done by or entrusted to you and your employees,

   9. promptly report to NACOLAH, in writing, any known or alleged misappropriation of funds by any Distributor, or employee regardless of whether such known or alleged misappropriation is with respect to funds of NACOLAH or funds of any other person or company,

   10. fully cooperate with NACOLAH in any investigation or proceeding of any federal, state or other regulatory or governmental body, or court, if it is determined by NACOLAH that the investigation or proceeding affects matters covered by or arising out of this Contract,

   11. immediately notify NACOLAH if served with any legal document received by you through any medium or if you have knowledge of any legal or administrative action, and

   12. maintain any and all state insurance licenses and be in good standing with all applicable state and regulatory authorities,

   13. keep full and accurate records of the business transacted by you under this Contract and forward records to the Company as we may prescribe,

   14. notify the Company in writing of the Producer or Distributor Commission Schedule that will govern the compensation to be received by them, and

   15. have and maintain reasonable and effective policies and procedures for the detection and prevention of illegal activity, including anti-money laundering and anti-terrorism financing procedures and controls.

   b) The Distributor may:

   1. solicit, personally and through Distributors and Producers, applications for NACOLAH insurance policies, and annuities as described in the Schedule of Commissions, and

   2. collect the full initial premium for the NACOLAH policies, subject to the restrictions listed on the Company's Temporary Insurance Agreement or Conditional receipt. Checks, money orders, or other forms of payment from policy owners and applicants shall be made payable to the order of the Company and shall not be commingled with your funds. You are not authorized to collect other premiums.

3. **LIMITATION OF AUTHORITY**

   The Distributor may not:

   a) make, alter or discharge any NACOLAH policy, contract, Temporary Insurance Agreement or other NACOLAH agreement,

   b) pay any premium personally, or rebate premium to any policyowner,

   c) waive or modify any terms of any NACOLAH policy or contract, including rates or conditions of limitation,

   d) execute any documents on behalf of a proposed NACOLAH insured or policyholder,

O-2621 3 R1 10/03

*28*

e) approve evidence of insurability,

f) bind or commit NACOLAH to any policy, contract, risk or otherwise, except to NACOLAH's Temporary Insurance Agreement,

g) deliver to a NACOLAH applicant any policy where the health of the applicant at the time of the delivery has changed since underwriting and is other than as stated in NACOLAH's application for insurance,

h) receive any premiums after the initial premium,

i) extend time for any premium payment or reinstate any lapsed policy,

j) approve, imply approval, adjust or settle any claim,

k) retain any issued NACOLAH policy beyond thirty (30) days of issue,

l) enter into any legal proceedings pertaining to NACOLAH or obligate NACOLAH for any expenses with respect to such proceedings,

m) use or cause to be used any letters, advertising of any character or medium, or promotion of any kind, descriptive of products, services, procedures, or other information about the Company unless first approved, in writing, by the Company. You shall not use the Company's name or logo without Company prior written approval. The Company shall provide you with printed materials that relate to the Company and its products on the Company website, illustration software, or material in any other medium and you may distribute such materials at your expense,

n) exercise any authority on behalf of NACOLAH other than as authorized by Section 2 of this Contract,

o) waive any outstanding debts of your Distributors or Producers,

p) incur any expenses not authorized by the Company, and

q) act as Trustee or Fiduciary on behalf of an applicant, insured or policyowner of insurance with the Company.

4. **NACOLAH'S RIGHTS**

NACOLAH at any time may:

a) discontinue any policy form in any state,

b) change any policy form or premium rate,

c) determine maximum or minimum policy limits,

d) change the conditions under which any policy may be offered,

e) change, delete or add any NACOLAH procedures, guidelines or practices,

f) cease doing business in any state,

g) unilaterally amend the payment of commissions, bonuses, and benefits under this Contract as to amount, conditions, and vesting of payment that shall include all Supplements and addendums to this Contract and the Company's procedures, guidelines or practices. These amendments will be effective upon mailing of such notice addressed to you at Your last known address and will be prospective in effect.

h) determine whether to accept any applications and determine underwriting standards with respect to any application,

i) choose not to contract or appoint any Distributor recommended by you for any reason,

j) reject applications for insurance submitted by you or your Distributors or Producers without specifying the cause,

k) examine your records of the business transacted by you or your Distributors or Producers under this contract at any time prior to and/or after termination of this Contract and to make copies of such records as we may deem necessary, and

l) appoint as Producers and Distributors those persons recruited by you who are deemed acceptable by the Company.

5. **COMPENSATION**

The Distributor agrees that:

a) the compensation from NACOLAH as specified in this Contract, applicable supplements, Schedule of Commissions and Addendums is your sole compensation for all matters covered under this Contract,

b) commissions will be paid at the commission rates in effect at the time a NACOLAH application is submitted to us according to the "Schedule of Commissions" and payment method as determined by the Company,

c) the Company will pay you override commissions on first year and renewal premiums where applicable on policies written by your Distributors or producers and received by the Company while this Distributor or Producer Contract is in effect,

d) the Company may adjust each of your Distributors' or Producers' commissions in your hierarchy in accordance with the provisions of that Distributor's or Producer's Contract. Your commissions may increase or decrease as a result of such adjustment,

e) the Company may charge back commissions including overrides to you in the event of rescission or cancellation, if commissions were paid in error, or if there are unearned commissions, which include but are not limited to the following: if the policy was not taken out for any reason, or when there is a change in billing mode, or the policy was surrendered or lapsed in the first year, for any reason, and

f) commissions and/or overrides are not earned on premiums being waived under any non-forfeiture or Waiver of Premium provision of any NACOLAH policy, including retroactively waived premiums.

SPECIMEN

4

*29*

6.  **VESTING**

The Distributor agrees that:

a)  except as provided herein, all first year and renewal commissions will vest immediately,

b)  service fees, if applicable, are not vested,

c)  vesting, if any, applies only to business remaining in force after termination of this Contract,

d)  if you are terminated for cause, all commissions no longer vested,

e)  if, after termination other than for cause, commissions are less than $600 in any calendar year, NACOLAH shall have the option of paying you the "present value" of those commissions and no further commissions shall be due to you under this Contract. "Present Value" as used here means the value of such commissions determined by NACOLAH on the basis of accepted actuarial practices,

f)  if you are appointed as a sole proprietorship and this Contract is terminated by your death or physical disability at a time when commissions are payable to you,

    i)  the Company will continue to pay, for the vesting period specified in this section, such commissions to your legal surviving spouse during his or her life and,

    ii)  thereafter to such persons as your spouse may appoint by will or, in default of appointment, to your spouse's legal representative, and

g)  if this Contract is terminated by your mental disability or if you die leaving no legal surviving spouse, such commissions will be payable to your legal representative or estate.

7.  **INDEBTEDNESS**

You are liable and shall repay the company for any indebtedness resulting from your marketing activities or transactions under sub-section A below, or resulting from the activities of your Producers or Distributors under sub-section B below. Any liability as defined by your Indemnity obligations in Section 10 is also a legal debt. Any such indebtedness is a legal debt, due and payable upon the Company and shall constitute and become a first lien upon any and all compensation due under this contract or any successor contracts. The Company is not limited to this means of collection and may at any time pursue additional means as necessary to satisfy your then-outstanding indebtedness.

a)  You are personally liable for any debts arising from your own marketing activities or transactions that result in an indebtedness to the Company, or from the payment of any unearned commissions or bonuses if applicable to you.

b)  You are personally liable for any debts arising from your Distributor's or Producer's business activities, including but not limited to Distributor's or Producer's marketing activities or transactions that result in an indebtedness to the Company, or from the payment of any unearned commissions or bonuses to the Producer or Distributor. In addition, you are liable for the indebtedness to the extent you have guaranteed such indebtedness by separate Guarantee.

c)  To the extent you are liable for any Producer's or Distributor's indebtedness, the Company is free to seek satisfaction and/or offset of the debt from you at any time and is not obligated first to seek satisfaction or offset from the Distributor or Producer involved.

You shall be responsible for your and your employees' present and future indebtedness to NACOLAH. The Company may offset such indebtedness from compensation otherwise due to the Distributor from NACOLAH. Any unsatisfied indebtedness to NACOLAH shall accrue interest at a rate equal to NACOLAH's current practice rate and shall be payable upon demand together with all collection costs incurred by NACOLAH.

8.  **TERRITORY**

The Distributor has not been assigned an exclusive territory or market segment.

9.  **ASSIGNMENT**

NACOLAH, by any of its officers or designated employees, must approve in writing any assignment of this Contract or any current or future compensation assignment under this Contract. NACOLAH does not assume any responsibility for the validity, sufficiency, or tax consequences of any assignment. No assignment shall be effective until any indebtedness to NACOLAH incurred prior to, or subsequent to, such assignment is satisfied.

10.  **INDEMNITY AND ERRORS AND OMISSIONS INSURANCE**

a)  The Distributor will indemnify and hold NACOLAH harmless from all expenses (including reasonable attorneys' fees incurred by the Company), loss or damages (including punitive and extra contractual damages) suffered by NACOLAH because of violation of, or refusal or failure to comply with the terms of this Contract or with any federal or state laws, rules or regulations, or resulting from unauthorized acts or transactions, errors or omissions by the Distributor or Producer or their employees in the performance of its services under this Contract.

b)  NACOLAH will indemnify and hold the Distributor harmless for all non-commission related expenses, loss or damage suffered by the Distributor resulting from any intentional act or omission by the Company or any of its employees contrary to the terms and provisions of this Contract. However, NACOLAH will not be liable to the Distributor for any legal or other expense the Distributor chooses to incur, solely on its own, in connection with any such error.

c)  The Distributor shall maintain Errors & Omissions liability insurance coverage in such amount during the term of this Contract and in such terms as NACOLAH may from time to time determine. Distributor shall provide evidence of such coverage with submission of contract.

SPECIMEN

30

d) Additionally, the Distributor will communicate that the Company requires all Distributors to have and maintain Errors and Omissions liability insurance covering themselves during the term of this Contract and also submit proof and subsequent renewal of coverage each year.

## 11. PRIVACY AND CONFIDENTIALITY

You shall follow the Company's published Privacy Policy. This includes, but is not limited to:

a) We require you protect the confidentiality of the underwriting information received by an applicant for insurance.

b) You will maintain and dispose of all personal information in a secured manner as required by federal and state law. You will disclose all underwriting information only to us.

c) You will maintain physical, electronic, and procedural safeguards that comply with federal and state standards.

d) You will allow only designated personnel or service providers to have access to such information for our underwriting purposes.

## 12. TERMINATION

Termination of this Contract will automatically include termination of all supplements, amendments, addendums, and guarantees. The Distributor agrees that:

a) this Contract may be terminated without cause at any time by mutual agreement, or by you or the Company by written notice in regular U.S. mail addressed to the last known address of the other party at least 30 days prior to the date of such termination,

b) if the Distributor is a corporation, corporate dissolution or cessation of doing business will cause immediate termination of this Contract,

c) if the Distributor is a partnership, death of one of the partners will cause immediate termination of this Contract,

d) if the Distributor is an individual, his or her death, will cause immediate termination of this Contract,

e) if the Distributor is an individual or corporation, bankruptcy or commission of any act of bankruptcy, will cause immediate termination for cause of this Contract,

f) NACOLAH at any time also may terminate this Contract immediately for cause. "For cause" includes, but is not limited to:

  1) any determination by NACOLAH that the Distributor has breached this Contract, Company rules, guidelines or procedures, or state or federal law of regulation:

  2) becoming involved in any legal or regulatory proceeding which might impair its ability to perform its obligation,

  3) committing or attempting to commit, an illegal or fraudulent act,

  4) inducing or attempting to induce to replace, lapse or otherwise terminate their policies with the Company,

  5) acting detrimentally towards NACOLAH or its policyholders,

  6) withholding funds or documents from NACOLAH or its policyholders,

  7) misrepresenting NACOLAH's products or services,

  8) or misrepresenting, falsifying or omitting (or has encouraged or attempted to misrepresent, falsify, or omit) material information furnished to NACOLAH on any applicable license or bond or if the applicable license or bond is refused, canceled, or not renewed,

g) upon termination, the Distributor and or their legal representatives will immediately cease acting on behalf of NACOLAH, will return all of NACOLAH's property, and will promptly account to NACOLAH for all funds held on behalf of NACOLAH, and

h) termination will not dismiss or reduce any indebtedness you owe the Company. Any indebtedness you have becomes due in full upon termination of this contract. The indebtedness includes but is not limited to any debts arising from your own or your agents marketing activities or transactions that result in an indebtedness to the Company, or from the payment of any unearned commissions or bonuses.

## 13. CONSTRUCTION AND EFFECT

The Distributor and NACOLAH agree that:

a) as used in the Contract, the term "Distributor" includes the Distributor and the Distributor's employees,

b) the term "Contract" includes any NACOLAH policy, certificate, endorsement, rider, Temporary Insurance Agreement, addendum or Distributor agreement,

c) all notices under this Contract must be delivered by regular mail addressed to the last address of record by either party to this Contract to the other, and

d) Illinois law governs this Contract.

## 14. NON WAIVER

Failure of the Company to require strict compliance with any of the terms of this Contract shall not constitute a waiver of such terms or conditions nor affect the right of the Company thereafter to require such compliance.

## 15. SEPARABILITY

The provisions of this Contract will be considered to be separable and independent from each other, and in the event any provision of this Contract is found to be invalid, it will not affect the validity or effectiveness of the remaining provisions.

## 16. SUPPLEMENTS, ADDENDUMS, AND AMENDMENTS

Supplements, Addendums and Amendments to this Contract shall run concurrently with it and are subject to the terms and conditions of the Contract thereof, except as specifically modified by the Supplement, Addendum or Amendment



O-2621                                                                6                                                                10/03

31

17. **MEDIATION AND ARBITRATION OF DISPUTES**

Any disputes or controversies between you and the Company arising out of or relating to your contract may, upon written demand of either party, be submitted to mediation and non-binding arbitration administered by the American Arbitration Association or a similar arbitration organization agreed upon by you and the Company, under the organization's then-applicable mediation and arbitration rules. This clause in no way limits or restricts the rights of you or the Company to obtain relief in a court of competent jurisdiction.

18. **ENTIRETY OF CONTRACT**

This Contract and any supplements, amendments, addendums, or guarantees plus the Distributor Contract Application and Agreement form the complete contract between you and the Company. Any amendment, supplement, or addendum to this contract must be in writing. Your signed Contract on file with the Company will control as to form and content.

SPECIMEN

*32*

### NOTICE REGARDING CONSUMER REPORTS

In connection with your application for a Distributor Contract with North American Company for Life and Health Insurance Company (North American), North American may obtain one or more reports regarding your credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, and/or mode of living from a consumer reporting agency. If North American plans to use any information in a consumer report in a decision not to contract with you or to make any other adverse contracting decision regarding you, it will provide you with a copy of the credit report upon which its decision was based and a written summary of your rights under the Fair Credit Reporting Act before it takes any adverse action. If any adverse action is taken against you based upon a consumer report, North American will notify you that the action has been taken and that the consumer report was the reason for the action.

SPECIMEN

33

 **North American Company**
for Life and Health Insurance
P. O. Box 87452 • Chicago, IL 60680-0452
Administrative Office: P. O. Box 5088 • Sioux Falls, SD 57117-5088
A Member of the Sammons Financial Group



## North American Producer Contracting Application
*Transition from Clarica to North American*

By signing this application, I hereby acknowledge I have read a specimen copy of the proposed contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American) which are attached. I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, a fully executed copy of which will be subsequently forwarded to me by North American.

I understand that during 2003 North American will continue to honor bonus provisions that have been available to my organization through my Clarica contract. During 2003, any North American business produced under this North American contract will be included in determining these bonus awards. Production under any other North American contracts will not be included.

After 2003, bonuses that are determined in whole or in part on prior production will be based on business written under this North American contract as well as the in-force block of business assumed from Clarica by Midland National Life, as applicable. Any other production with Midland National Life will not count toward these bonus calculations under this North American contract. The calculations and methodologies used in determining bonus awards are pursuant to this North American contract.

**I agree not to solicit business until I have been notified by North American that I am authorized to do so.**

Printed Name: _____

By: _____ Date: _____
        **(Authorized signature)**

North American Company for Life and Health Insurance

By: _____ Date: _____
        **(Authorized signature)**

SPECIMEN

*34*

EXHIBIT 5

 **North American Company**
for Life and Health Insurance
P. O. Box 87452 • Chicago, IL 60680-0452
Administrative Office: P. O. Box 5088 • Sioux Falls, SD 57117-5088
A Member of the Sammons Financial Group


*02622*

## PRODUCER CONTRACT APPLICATION AND AGREEMENT

Agent Number _____
(Home Office Use Only)

All Questions Must Be Completed.

Full Name _____    Sex: ☐ Male  ☐ Female
    (First Name)        (Middle Name)        (Last Name)

Business Name _____

Contract Type: ☐ Individual  ☐ Corporation  ☐ Other _____

Check box for desired mailing address
☐ Resident Address _____
               (Street, City, State, County, ZIP Code)

☐ Business Address _____
               (Street, City, State, County, ZIP Code)

Resident Phone (____) _____  Business Phone (____) _____  Fax (____) _____

E-Mail Address _____  License # _____ (attach Photocopy)

Date of Birth _____  Social Security # _____  or Taxpayer ID # _____

**PLEASE RESPOND TO ALL QUESTIONS FOR YOU PERSONALLY AND ANY ORGANIZATION OVER WHICH YOU HAVE EXERCISED CONTROL. IF YOU ANSWER "YES" TO ANY QUESTIONS, YOU MUST ATTACH AN EXPLANATION WITH ALL RELEVANT INFORMATION AND SUPPORTING DOCUMENTS.**

☐ Yes  ☐ No    Have you ever had your insurance license or securities license suspended or revoked or have you ever had an application for an insurance license denied by any insurance department?

☐ Yes  ☐ No    Have you ever had a complaint filed against you with an insurance department, NASD or other regulatory agency, or do you anticipate one being filed?

☐ Yes  ☐ No    Has any claim ever been made against you, your surety company, or errors and omissions insurer arising out of insurance sales or practices or have you been refused surety bonding?

☐ Yes  ☐ No    Has your contract or appointment ever been terminated involuntarily by an insurer?

☐ Yes  ☐ No    Are you at the present involved in any litigation or are there any unsatisfied judgments or liens (including state or federal tax liens) against you?

☐ Yes  ☐ No    Do you currently have a pending bankruptcy or have you ever declared bankruptcy?

☐ Yes  ☐ No    Have you pled guilty or nolo contendere to or been found guilty of a felony or a crime including but not limited to crimes involving dishonesty, breach of trust, or a violation of any federal law or are you now under indictment?

☐ Yes  ☐ No    Does any insurer, insured, or other person claim any indebtedness from you as a result of any insurance transactions or business?

☐ Yes  ☐ No    Are you currently licensed in your resident state? If yes, please attach a copy of your resident license.

☐ Yes  ☐ No    Are you currently licensed as a non-resident in any state? If yes and you would like to be appointed in that state, attach a copy of that license, and appointment fees.

☐ Yes  ☐ No    I certify that I have received, understand and will conform with the procedures outlined in the brochures Partnering with You on Compliance Matters.

☐ Yes  ☐ No    Do you have Errors & Omissions coverage? (Required by North American Company)
             **PLEASE PROVIDE COPY OF DECLARATION PAGE.**

Please indicate other companies with which you are currently licensed: _____

Do you have a NASD license? ☐ Yes  ☐ No    If yes, who is your Broker-Dealer? _____

What products do you sell? ☐ Life  ☐ Variable  ☐ LTC  ☐ Group  ☐ Disability  ☐ Senior  ☐ Small Business  ☐ 403(b)

Annual Earnings: _____

O-2622                    1                    REV 10/03

SPECIMEN

35

CONDITIONS AND AGREEMENTS—By signing this application, I hereby acknowledge I have read a specimen copy of the proposed Contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American). If this application is approved by North American, I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, the terms of which are incorporated into this application by reference. I agree not to solicit business until I have been notified by North American that I am authorized to do so either by mail or North American's Solicitation Guidelines.

Any marketing materials which have not been provided by North American must be approved by North American prior to their use. I understand that any specimen sales brochures and material I have received are provided only for my personal examination of product provisions and rates.

I understand that the Fair Credit Reporting Act requires North American to notify me that, as a routine part of processing my contract application, a consumer report may be obtained which may include information bearing on my credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living. I authorize North American or any of its affiliates[1] to obtain a consumer report and Vector One report in connection with this application. I further authorize North American or any of its affiliates or their duly authorized representative to contact any organization or individual who has knowledge of my employment history, credit history, financial status, or record of any illegal activity in order to obtain a record of such history, status or activities; and I hereby authorize the release of such information by such organization or individual about any debit balance I may incur to Vector One, its successors, or any organization designated to replace Vector One. I understand that by providing the fax/mail information above, I hereby consent to receive communications sent by or on behalf of Sammons Financial Group.

[1]Affiliate means any company owned, directly or indirectly, by Sammons Financial Group, Inc.

I hereby certify that all information and answers given by me on this application are true, and correct without any consequential omissions of any kind.

Signature _____    Date _____

**Distributor:/Producer**

Printed Name: _____    Agent Number _____

By: _____
(Authorized Signature)

**North American Company for Life and Health Insurance Approval:**

By: _____
(Authorized Signature)

Title: _____

Effective Date of Agreement: _____

The North American Companies endorse and support the concepts in the Principles and Code of Ethical Market Conduct established by the Insurance Marketplace Standards Association (IMSA).

**Return pages 1 and 2 for approval by North American. North American will return an executed copy to you upon approval.**

**Retain pages 3 through 8 for your records.**

O-2622                                                        2                                              R     0/03



## NORTH AMERICAN COMPANY FOR LIFE & HEALTH INSURANCE'S
## PRODUCER'S CONTRACT

**1. RELATIONSHIPS**

The ATTACHED CONTRACT is made by and between North American Company For Life and Health Insurance ("NACOLAH", "Company", "we", "us", or "its"), the undersigned Producer ("Producer", "you", "your"), and the undersigned Distributor. The Producer shall act in good faith when dealing with NACOLAH's policyholders and acknowledges that all policies and the information contained therein are the property of NACOLAH. The Producer is an independent contractor for NACOLAH and not an employee of NACOLAH. Nothing in this contract shall be construed to make you an employee of NACOLAH. You shall be free to exercise your own judgment as to the persons from whom you will solicit applications and as to the time and place of solicitation, subject to the Company's rules and regulations. You may represent other insurance companies while this Contract is in force, provided, however, that while doing so you may not hold yourself out in any manner as acting on behalf of the Company. You agree that your compensation is determined by the terms of this Contract or addendums to the contract. You are not eligible to participate in any employee benefit programs, including but not limited to, any employee welfare or pension benefit plan for employees of the Company.

**2. AUTHORITY**

a) The Producer agrees to:

1) procure applications for policies underwritten by NACOLAH and, if applicable, recommend qualified Producers for NACOLAH appointment in your hierarchy,

2) promptly forward all applications and initial premiums to NACOLAH,

3) take all reasonable steps to ensure that all policies issued by NACOLAH are delivered to the policyholder within 30 days in accordance with NACOLAH's underwriting guidelines and published rules and procedures; in the event policy delivery is not possible then you must return the policies immediately to NACOLAH's home office,

4) make reasonable efforts to maintain NACOLAH's policies and provide reasonable assistance to NACOLAH's policyholders,

5) operate in compliance with all applicable laws and regulations,

6) supervise and be responsible for keeping your producers of NACOLAH's published rules, guidelines, procedures, and practices provided by your Distributor or published by NACOLAH,

7) exercise reasonable due diligence for the faithful performance, fidelity and honesty of your employees and Producers and maintain responsibility for all funds collected and business done by or entrusted to you and your employees,

8) promptly report to NACOLAH, in writing, any known or alleged misappropriation of funds by any Producer or employee regardless of whether such known or alleged misappropriation is with respect to funds of NACOLAH or funds of any other person or company,

9) fully cooperate with NACOLAH in any investigation or proceeding of any federal, state or other regulatory or governmental body, or court, if it is determined by NACOLAH that the investigation or proceeding affects matters covered by or arising out of this Contract,

10) immediately notify NACOLAH if served with any legal document received by you through any medium or if you have knowledge of any legal or administrative action,

11) maintain any and all state insurance licenses and be in good standing with all applicable state and regulatory authorities.

12) keep full and accurate records of the business transacted by you under this Contract and forward records to the Company as we may prescribe,

13) notify the Company in writing of the Producer Commission Schedule that will govern the compensation to be received by them, and

14) have and maintain reasonable and effective policies and procedures for the detection and prevention of illegal activity, including anti-money laundering and anti-terrorism financing procedures and controls.

b) The Producer may:

1. solicit, personally and through other Producers, applications for NACOLAH insurance policies, and annuities as described in the Schedule of Commissions, and

2. collect the full initial premium for the NACOLAH policies, subject to the restrictions listed on the Company's Temporary Insurance Agreement or Conditional receipt. Checks, money orders, or other forms of payment from policy owners and applicants shall be made payable to the order of the Company and shall not be commingled with your funds. You are not authorized to collect other premiums.

**3. LIMITATION OF AUTHORITY**

The Producer may not:

a) make, alter or discharge any NACOLAH policy, contract, Temporary Insurance Agreement or other NACOLAH agreement,

b) pay any premium personally or rebate premium to any policyholder,

c) waive or modify any terms of any NACOLAH policy or contract, including rates or conditions of limitation,

d) execute any documents on behalf of a proposed NACOLAH insured or policyholder,

O-2622                                                      3                                      SPECIMEN                  10/03

*37*

e) approve evidence of insurability,

f) bind or commit NACOLAH to any policy, contract, risk or otherwise, except to NACOLAH's Temporary Insurance Agreement,

g) deliver to a NACOLAH applicant any policy where the health of the applicant at the time of the delivery is other than as stated in NACOLAH's application for insurance,

h) receive any premiums after the initial premium,

i) extend time for any premium payment or reinstate any lapsed policy,

j) approve, imply approval, adjust or settle any claim,

k) retain any issued NACOLAH policy beyond thirty (30) days of issue,

l) enter into any legal proceedings pertaining to NACOLAH or obligate NACOLAH for any expenses with respect to such proceedings,

m) use or cause to be used any letters, advertising of any character or medium, or promotion of any kind, descriptive of products, services, procedures, or other information about the Company unless first approved, in writing, by the Company. You shall not use the Company's name or logo without Company prior written approval. The Company shall provide you with printed materials that relate to the Company and its products on the Company website, illustration software, or material in any other medium and you may distribute such materials at your expense.

n) exercise any authority on behalf of NACOLAH other than as authorized by Section 2 of this Contract,

o) waive any outstanding debts of you or your Producers,

p) incur any expenses not authorized by the Company, and

q) act as Trustee or Fiduciary on behalf of an applicant, insured or policyowner of insurance with the Company.

4. **NACOLAH'S RIGHTS**
NACOLAH at any time may:

a) discontinue any policy form in any state,

b) change any policy form or premium rate,

c) determine maximum or minimum policy limits,

d) change the conditions under which any policy may be offered,

e) change, delete or add any NACOLAH procedure, guideline or practices,

f) cease doing business in any state,

g) unilaterally amend the payment of commissions, bonuses, and benefits under this Contract as to amount, conditions, and vesting of payment that shall include all Supplements to this Contract and the Company's procedures, guidelines or practices. These amendments will be effective upon mailing of such notice addressed to you at Your last known address and will be prospective in effect.

h) determine whether to accept any applications and determine underwriting standards,

i) recapture from the producer vendor expenses for underwriting requirements when applications for life insurance are not received and when inappropriate underwriting requirements are ordered by the producer.

j) terminate any producer for any reason with appropriate notice,

k) choose not to contract or appoint any producer recommended by you for any reason,

l) reject applications for insurance submitted by you or your Producers without specifying the cause,

m) examine your records of the business transacted by you or your Producers under this Contract at any time prior to and/or after termination of this Contract and to make copies of such records as we may deem necessary, and

n) appoint as Producers those persons recruited by you who are deemed acceptable by the Company.

5. **COMPENSATION**
The Producer agrees that:

a) the compensation from NACOLAH as specified in this Contract, applicable supplements, Schedule of Commissions and Addendums is your sole compensation for all matters covered under this Contract,

b) commissions will be paid at the commission rate in effect at the time a NACOLAH application is submitted to us according to the "Schedule of Commissions" and payment method as determined by the Company,

c) the Company will pay your override commissions on first year and renewal premiums where applicable on policies written by your Producers and received by the Company while this Producer contract is in effect,

d) the Company may adjust each of your Producer's commissions in accordance with the provisions of that Producer's contract. Your percentage of commissions may increase or decrease as a result of such adjustment,

e) the Company may charge back commissions including overrides to you in the event of rescission or cancellation, if commissions were paid in error, or if there are unearned commissions, which include but are not limited to the following: if the policy was not taken for any reason, or when there is a change in billing mode, or the policy was surrendered or lapsed in the first year, for any reason, and

f) commissions and/or overrides are not earned on premiums being waived under any non-forfeiture or Waiver of Premium provision of any NACOLAH policy, including retroactively waived premium.

SPECIMEN

*38*

6.  **VESTING**

The Producer agrees that:

a)  except as provided herein, all first year and renewal commissions will vest immediately, according to the contract held by your Distributor or your Producer,

b)  vesting, if any, applies only to business remaining in force after termination of this Contract,

c)  if you are terminated for cause, all commissions no longer vest,

d)  if, after termination other than by cause, commissions are less than $600 in any calendar year, NACOLAH shall have the option of paying you the "present value" of those commissions and no further commissions shall be due to you under this Contract. "Present Value" as used here means the value of such commissions determined by NACOLAH on the basis of accepted actuarial practices,

e)  if you are appointed as a sole proprietorship and this Agreement is terminated by your death or physical disability at a time when commissions are payable to you,

    i)  the Company will continue to pay, for the vesting period specified in this section, such commissions to your legal surviving spouse during his or her life, and,

    ii)  thereafter to such persons as your spouse may appoint by will or, in default of appointment, to your spouse's legal representative, and

f)  if this Agreement is terminated by your mental disability or if you die leaving no legal surviving spouse, such commissions will be payable to your legal representative.

7.  **INDEBTEDNESS**

a)  You shall repay the Company for any indebtedness arising from the marketing activities or transactions from you or your Producers or from the payment of any unearned commissions or bonuses if applicable to you. Any indebtedness owed by you or your Producers to the Company is a legal debt. The Company is hereby given a first lien upon any amounts due you, your estate, successors, or assignments under this or any other agreement with the Company or its affiliates as security for payment of any indebtedness owed to the Company by you. Your indebtedness may be offset by any sum due to you or thereafter becoming due from the Company for the satisfaction of the debt. The Company at any time may pursue additional means to satisfy your then outstanding indebtedness to the Company, and may assign its right to collect this debt to your Distributor or overriding Producer.

b)  To the extent you are liable for any Producer's or Distributor's indebtedness, the company is free to seek satisfaction and/or offset of the debt from you at any time and is not obligated first to seek satisfaction or offset from the Distributor or Producer involved.

c)  You shall be responsible for your and your employees' present and future indebtedness to NACOLAH. The Company may offset such indebtedness from compensation otherwise due to the Distributor from NACOLAH. Any unsatisfied indebtedness to NACOLAH shall accrue interest at a rate equal to NACOLAH's current practice rate and shall be payable upon demand together with all collection costs incurred by NACOLAH.

d)  Transactions that may result in your indebtedness to the Company include, but are not limited to, the following:

    1.  The advance payment of commissions or payment of commissions to you that are not earned due to any of the following:

        a)  a policy cancellation under a "free look" provision,

        b)  a policy surrender, lapse, or a change in the frequency of premium payment,

        c)  a policy not being accepted by the applicant after commission is paid,

        d)  a refund of premium or rescission of the policy by the Company for any reason, or

        e)  change in billing mode.

    2.  The payment of a death benefit, which would have been denied but for your prior knowledge a material misrepresentation had been made;

    3.  Cancellation fees charged to you when a policy was delivered more than 30 days from the date of issue and the policy is subsequently canceled or refused;

    4.  Causing the Company expense in defending against a charge that you, your employee, or your Producer violated an insurance law or regulation;

    5.  Causing the Company expense in settling a consumer complaint arising out of alleged negligent, fraudulent, illegal, or unauthorized acts or transactions by you, your employee, or your agent, or

    6.  Any other transactions or activity by you, your employee or your agent, which results in your indebtedness to the Company.

8.  **TERRITORY**

The Producer has not been assigned an exclusive territory or market segment.

9.  **ASSIGNMENT**

NACOLAH, by any of its officers or designated employees, must approve in writing any assignment of this Agreement or any current or future compensation assignment under this Agreement. NACOLAH does not assume any responsibility for the validity, sufficiency, or tax consequences of any assignment. No assignment shall be effective until any indebtedness to NACOLAH incurred prior to, or subsequent to, such assignment is satisfied.

SPECIMEN

39

10. **INDEMNITY AND ERRORS & OMISSIONS INSURANCE**

   a) The Producer will indemnify and hold NACOLAH harmless from all expenses (including reasonable attorneys' fees incurred by the Company), loss or damages (including punitive and extra contractual damages) suffered by NACOLAH because of violation of, or refusal or failure to comply with the terms of this Contract or with any federal or state laws, rules or regulations, or resulting from unauthorized acts or transactions, errors or omissions by the Producer or the Producer's employees in the performance of its services under this Contract.

   b) NACOLAH will indemnify and hold the Producer harmless for all non-commission related expenses, loss or damage suffered by the Producer resulting from any intentional act or omission by the Company or any of its employees contrary to the terms and provisions of this Agreement. However, NACOLAH will not be liable to the Producer for any legal or other expense the Producer chooses to incur, solely on its own, in connection with any such error.

   c) The Producer shall maintain Errors & Omissions liability insurance coverage in such amount during the term of this Agreement and in such terms as NACOLAH may from time to time determine. The Producer shall provide evidence of such coverage with submission of contract and subsequent renewal of coverage each year.

   d) Additionally, the Producer will communicate that the Company requires all producers and brokers to have and maintain Errors and Omissions liability insurance covering themselves during the term of this Contract and also provide evidence of such coverage with submission of contract and subsequent renewal of coverage each year.

11. **PRIVACY AND CONFIDENTIALITY**
   You shall follow the Company's published Privacy Policy. This includes, but is not limited to:

   a) We require you protect the confidentiality of the underwriting information received by an applicant for insurance.

   b) You will maintain and dispose of all personal information in a secured manner as required by federal and state law. You will disclose all underwriting information only to us.

   c) You will maintain physical, electronic, and procedural safeguards that comply with federal and state standards.

   d) You will allow only designated personnel or service providers to have access to such information for our underwriting purposes.

12. **TERMINATION**
   Termination of this Contract will automatically include termination of all supplements, amendments, addendums, and guarantees. The Producer agrees that:

   a) this Contract may be terminated without cause at any time by mutual agreement, or by you or the Company by depositing written notice in regular U.S. mail addressed to the last known address of the other party at least 30 days prior to the date of such termination,

   b) if the Producer is a corporation, corporate dissolution or cessation of doing business will cause immediate termination of this Contract,

   c) if the Producer is a partnership, death of one of the partners will cause immediate termination of this Contract,

   d) if the Producer is an individual, his or her death will cause immediate termination of this Contract,

   e) if the Producer is an individual or corporation, bankruptcy or commission of any act of bankruptcy will cause immediate termination for cause of this Contract,

   f) NACOLAH at any time also may terminate this Contract immediately for cause. "For cause" includes, but is not limited to, any determination by NACOLAH that the Producer:

      1. has breached this Contract, Company rules, guidelines or procedures, or state or federal law or regulation,

      2. has become involved in any legal or regulatory proceeding which might impair its ability to perform its obligation,

      3. has committed, or attempted to commit, an illegal or fraudulent act,

      4. has encouraged, induced or attempted to induce the replacement, lapse, or other termination of NACOLAH policies,

      5. has acted detrimentally towards NACOLAH or its policyholders,

      6. has withheld funds or documents from NACOLAH or its policyholders,

      7. has misrepresented NACOLAH's products or services, or

      8. has misrepresented, falsified or omitted (or has encouraged or attempted to misrepresent, falsify, or omit) material information furnished to NACOLAH on any applicable license or bond or if the applicable license or bond is refused, canceled, or not renewed,

   g) upon termination, the Producer and/or their legal representatives will immediately cease acting on behalf of NACOLAH, will return all of NACOLAH's property, and will promptly account to NACOLAH for all funds held on behalf of NACOLAH, and

   h) commissions will continue to vest as provided in Section 6 of this Contract.

13. **CONSTRUCTION AND EFFECT**
   The Producer and NACOLAH agree that:

   a) as used in the Contract, the term "Producer" includes the Producer and the Producer's employees,

   b) the term "contract" includes any NACOLAH policy, certificate, endorsement, rider, Temporary Insurance Agreement, addendum or agent Contract,

   c) all notices under this Contract must be delivered by regular mail, addressed to the last address furnished in writing to either party to this Contract to the other,

   d) Illinois law governs this Contract.

O-2622                                         6                                    R1 10/03

SPECIMEN

40

14. **NON WAIVER**  Failure of the Company to require strict compliance with any of the terms of this Contract shall not constitute a waiver of such terms or conditions nor affect the right of the Company thereafter to require such compliance.

15. **SEPARABILITY**  The provisions of this Contract will be considered to be separable and independent from each other, and in the event any provision of this Contract is found to be invalid, it will not affect the validity or effectiveness of the remaining provisions.

16. **SUPPLEMENTS, ADDENDUMS, AND AMENDMENTS**  Supplements, Addendums and Amendments to this Contract shall run concurrently with it and are subject to the terms and conditions of the contract thereof, except as specifically modified by the Supplement, Addendum or Amendment.

17. **MEDIATION AND ARBITRATION OF DISPUTES**  Any disputes or controversies between you and the Company arising out of or relating to your contract may, upon written demand of either party, be submitted to mediation and non-binding arbitration administered by the American Arbitration Association or a similar arbitration organization agreed upon by you and the Company, under the organization's then-applicable mediation and arbitration rules. This clause in no way limits or restricts the rights of you or the Company to obtain relief in a court of competent jurisdiction.

18. **ENTIRETY OF CONTRACT**  This Contract and any supplements, amendments, addendums, or guarantees plus the producer contract application and agreement form the complete contract between you and the Company. Any amendment, supplement, or addendum to this contract must be in writing. Your signed Contract on file with the Company will control as to form and content.

SPECIMEN

Rev 10/03

41

**NOTICE REGARDING CONSUMER REPORTS**

In connection with your application for a Producers Contract with North American Company for Life and Health Insurance Company (North American), North American may obtain one or more reports regarding your credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, and/or mode of living from a consumer reporting agency. If North American plans to use any information in a consumer report in a decision not to contract with you or to make any other adverse contracting decision regarding you, it will provide you with a copy of the credit report upon which its decision was based and a written summary of your rights under the Fair Credit Reporting Act before it takes any adverse action. If any adverse action is taken against you based upon a consumer report, North American will notify you that the action has been taken and that the consumer report was the reason for the action.

SPECIMEN

O-2622                                     8                                     R1  10/03

42

**EXHIBIT 6**



# NORTH AMERICAN COMPANY FOR LIFE & HEALTH INSURANCE'S

## PRODUCER'S AGREEMENT

**1.   RELATIONSHIPS**

The ATTACHED AGREEMENT is made by and between North American Company For Life and Health Insurance ("NACOLAH", "Company" or "its"), the undersigned Producer ("Producer", "you", "your"), and the undersigned Managing General Agent ("General Agent"). The Producer shall act in the good faith when dealing with NACOLAH's policyholders and acknowledges that all policies and the information contained therein are the property of NACOLAH. The Producer is an independent contractor for NACOLAH and not an employee of NACOLAH.

Incorporated into this Agreement as an integral part is Commission Schedule Form # L - _____.

(Indicate the selected Commission Schedule form number.)

This Agreement shall be effective on the date indicated below.

**Producer:** _____ **Code:** _____

Agency Name: _____

Agent (please print): _____

By: _____

(Authorized signature)

Social Security or Tax Identification Number: _____

**Managing General Agent:** _____ **Code:** _____

Printed Name: _____

By: _____

(Authorized signature)

**North American Company for Life and Health Insurance**

By: _____

(Authorized signature)

Title: _____

Effective Date: _____

**2.   AUTHORITY**

a)   The Producer agrees to:

1.   procure applications for policies written by NACOLAH and, if applicable, recommend qualified solicitors, agents and/or brokers for NACOLAH appointment,

2.   promptly forward all applications and initial premiums to NACOLAH,

3.   take all reasonable steps to deliver policies issued by NACOLAH in accordance with NACOLAH's underwriting guidelines and agent bulletins; in the event policy delivery is not possible then you must return the policies immediately to NACOLAH's home office,

4.   make reasonable efforts to maintain NACOLAH's policies and provide reasonable assistance to NACOLAH's policyholders,

5.   operate in strict compliance with all applicable laws and regulations,

6.   supervise and be responsible for keeping your agents and brokers informed of NACOLAH's published rules, guidelines, procedures, and practices which your General Agent provides to you,

7.   exercise reasonable due care for the faithful performance, fidelity and honesty of your employees, agents and brokers and to maintain responsibility for all funds collected and business done by, or entrusted to you and your employees,

8.   promptly report to NACOLAH, in writing, any known or alleged misappropriation of funds by any agent, broker or employee regardless of whether such known or alleged misappropriation is with respect to funds of NACOLAH or funds of any other person or company,

L-2189                                                      1                                                      R7 3/01

SPECIMEN

43

9. fully cooperate with NACOLAH in any investigation or proceeding of any federal, state or other regulatory or governmental body, or court, if it is determined by NACOLAH that the investigation or proceeding affects matters covered by or arising out of this Agreement,

10. immediately notify NACOLAH if it is served with any legal document received by you through any medium or if you have knowledge of any legal or administrative action, and

11. maintain any and all state insurance licenses and to be in good standing with all applicable state and regulatory authorities.

b) The Producer may:

1. solicit, personally and through brokers and agents, applications for NACOLAH insurance policies described in the Schedule of Commissions, and

2. collect the full initial premium for the NACOLAH policies.

## 3. LIMITATION OF AUTHORITY

The Producer may not:

a) make, alter or discharge any NACOLAH policy, contract, temporary insurance agreement or other NACOLAH agreement,

b) pay any premium personally or rebate premium to any policyholder,

c) waive or modify any terms of any NACOLAH policy or contract, including rates or conditions of limitation,

d) execute any documents on behalf of a proposed NACOLAH insured or policyholder,

e) approve evidence of insurability,

f) bind or commit NACOLAH to any policy, contract, risk or otherwise, except to NACOLAH's temporary insurance agreement,

g) deliver to a NACOLAH applicant any policy where the health of the applicant at the time of the delivery is other than as stated in NACOLAH's application for insurance,

h) receive any premiums after the initial premium,

i) extend time for any premium payment or reinstate any lapsed policy,

j) adjust or settle any claim,

k) retain any issued NACOLAH policy beyond thirty (30) days of issue,

l) enter into any legal proceedings pertaining to NACOLAH or obligate NACOLAH for any expenses with respect to such proceedings,

m) publish or circulate any advertisement, sales literature, policy analysis, proposal (other than Company provided illustration software), or other printed material referring to NACOLAH or its products without NACOLAH's prior written consent.

n) exercise any authority on behalf of NACOLAH other than as authorized by Section 2 of this Agreement,

o) waive any forfeiture outstanding debts, and

p) incur any expenses not authorized by the Company.

## 4. NACOLAH'S RIGHTS

NACOLAH at any time may:

a) discontinue any policy form in any state,

b) change any policy form or premium rate,

c) determine maximum or minimum policy limits,

d) change the conditions under which any policy may be offered,

e) change, delete or add any NACOLAH procedure, guideline or practice,

f) cease doing business in any state,

g) change compensation for new business without your consent but announced in a General Agent bulletin,

h) determine whether to accept any applications and determine underwriting standards with respect to any application,

i) recapture underwriting expenses in accordance with NACOLAH's New Business Department's standards and guidelines,

j) terminate any agent or broker for any reason with appropriate notice, and

k) choose not to contract or appoint any agent or broker recommended by you for any reason.

## 5. COMPENSATION

The Producer agrees that:

a) you shall accept such compensation from NACOLAH as your sole compensation for all matters covered in this Agreement and under your "Schedule of Commissions",

b) no compensation or financial benefits shall be payable to you by NACOLAH under this Agreement that are not expressly provided for in this Agreement and in your "Schedule of Commissions",

c) your compensation shall consist of commissions earned on premiums paid on policies issued by NACOLAH on applications obtained by you or your producers in accordance with this Agreement.

2

SPECIMEN

44

d) commission rates shown on your "Schedule of Commissions" are effective as of the effective date stated on the applicable schedule,

e) your compensation will be paid at the commission rates in effect at the time a NACOLAH application is submitted to us according to the "Schedule of Commissions" and payment method agreement,

f) commissions shall not be paid on premiums being waived under any non-forfeiture or waiver of premium provision of any NACO-LAH policy, including retroactively waived premium,

g) in the event of the rescission or cancellation by us of any policy, or if commission is paid to you in error, all such compensation paid to you and/or to your agents or brokers shall be promptly refunded by you to us,

h) commissions may be paid for certain internal replacements, to the extent that new commissions exceed previous commission payments, depending upon the types of policies involved and the age of the replaced policy. A lapse or surrender of a policy from six months before to six months after the issue of a new policy is construed to be a replacement. Commission will be adjusted appropriately,

i) for all riders, unless otherwise announced, the rates of commission are the same as the policy to which they are attached if they are added at the time of issue. If riders are added after the first year, the renewal commissions rates, if any, will apply,

j) target premium is the maximum amount on which first year commissions are paid. On certain products target premium equals base premium or extra interest premium. Excess premium is the amount over the target premium on which excess commissions are paid. Certain universal life policies have maximum commissionable target premiums. Refer to your "Schedule of Commissions" for details,

k table ratings and permanent flat extras receive full commissions on term policies and most universal life policies, subject to maximum commissionable premium, and

6. **VESTING**

The Producer agrees that:

a) except as provided herein, all first year and renewal commissions will vest immediately,

b) vesting, if any, applies only to business remaining in force after termination of this Agreement,

c) if this Agreement is terminated by NACOLAH for cause, commissions from the date of termination are excluded from vesting.

d) if, after termination other than by cause, commissions are less than $600 in any calendar year, NACOLAH shall have the option of purchasing from the Producer any future commission payable for their present value. "Present Value" as used here means the value of such commissions determined by NACOLAH on the basis of accepted actuarial practices,

e) if you are appointed as a sole proprietorship and this Agreement is terminated by your death or physical disability at a time when commissions are payable to you,

    i) the Company will continue to pay, for the vesting period specified in this section, such commissions to your legal surviving spouse during his or her life, and,

    ii) thereafter to such persons as your spouse may appoint by will or, in default of appointment, to your spouse's legal representative, and

f) if this Agreement is terminated by your mental disability or if you die leaving no legal surviving spouse, such commissions will be payable to your legal representative.

7. **INDEBTEDNESS**

You shall be responsible for your and your employees' present and future indebtedness to NACOLAH. The Company may offset such indebtedness from compensation otherwise due to the Producer from NACOLAH. Any unsatisfied indebtedness to NACOLAH shall accrue interest at a rate equal to NACOLAH's current practice rate and shall be payable upon demand together with all collection costs incurred by NACOLAH.

8. **TERRITORY**

The General Agent has not been assigned an exclusive territory or market segment.

9. **ASSIGNMENT**

NACOLAH, by any of its officers or designated employees, must approve in writing any assignment of this Agreement or any current or future compensation assignment under this Agreement. NACOLAH does not assume any responsibility for the validity, sufficiency, or tax consequences of any assignment. No assignment shall be effective until any indebtedness to NACOLAH incurred prior to, or subsequent to, such assignment is satisfied.

10. **INDEMNITY**

a) The Producer will indemnify and hold NACOLAH harmless from all expenses (including reasonable attorneys' fees incurred by the Company), loss or damages (including punitive and extra contractual damages) suffered by NACOLAH because of violation of, or refusal or failure to comply with the terms of this Agreement or with any federal or state laws, rules or regulations, or resulting from unauthorized acts or transactions, errors or omissions by the Producer or the Producer's employees in the performance of its services under this Agreement.

SPECIMEN

3

4/5

b) NACOLAH will indemnify and hold the Producer harmless for all non-commission related expenses, loss or damage suffered by the Producer resulting from any intentional act or omission by the Company or any of its employees contrary to the terms and provisions of this Agreement, or any claim under or in connection with the issuance or sale of products provided that such claim does not arise out of an act or omission by Producer contrary to the terms of this Agreement. However, NACOLAH will not be liable to the Producer for any legal or other expense the Producer chooses to incur, solely on its own, in connection with any such error.

c) The Producer shall maintain Errors & Omissions liability insurance coverage and a Bond of Indemnity in such amount during the term of this Agreement and in such terms as NACOLAH may from time to time determine. The Producer shall provide evidence of such coverage when requested by NACOLAH.

d) Additionally, the Producer will communicate that the Company requires all agents and brokers to have and maintain Errors and Omissions liability insurance covering themselves during the term of this Agreement.

## 11. RECORDS AND CONFIDENTIALITY

The Producer shall keep full and true records of all business transacted by such Producer and by producers appointed by the Producer. NACOLAH may, during regular business hours, examine any of these records pertaining to NACOLAH's business which are reasonably necessary to show compliance with this Agreement or meet regulatory requirements. All records, books, and papers supplied by NACO-LAH shall be and remain the property of NACOLAH and shall be delivered to NACOLAH upon demand.

## 12. TERMINATION

The Producer agrees that:

a) this Agreement may be terminated by any party to the Agreement upon thirty (30) days written notice by certified mail, return receipt requested,

b) if the Producer is a corporation, corporate dissolution or cessation of doing business will cause immediate termination of this Agreement,

c) if the Producer is a partnership, death of one of the partners will cause immediate termination of this Agreement,

d) if the Producer is an individual, his or her death, will cause immediate termination of this Agreement,

e) if the Producer is an individual or corporation, bankruptcy or commission of any act of bankruptcy, will cause immediate termination for cause of this Agreement,

f) NACOLAH at any time also may terminate this Agreement immediately for cause. "For cause" includes any determination by NACOLAH that the Producer:

　i) has breached this Agreement,

　ii) has become involved in any legal or regulatory proceeding which might impair its ability to perform its obligation,

　iii) has committed, or attempted to commit, an illegal or fraudulent act,

　iv) has encouraged the replacement of NACOLAH policies,

　v) has acted detrimentally towards NACOLAH or its policyholders,

　vi) has withheld funds or documents from NACOLAH or its policyholders,

　vii) has misrepresented NACOLAH's products or services,

　viii) or has misrepresented, falsified or omitted (or has encouraged or attempted to misrepresent, falsify, or omit) material information furnished to NACOLAH on any applicable license or bond or if the applicable license or bond is refused, canceled, or not renewed,

g) upon termination, the Producer or its legal representative will immediately cease acting on behalf of NACOLAH, will return all of NACOLAH's property, and will promptly account to NACOLAH for all funds held on behalf of NACOLAH, and

h) commissions will continue to vest as provided in Section 6 of this Agreement.

## 13. CONSTRUCTION AND EFFECT

The Producer and NACOLAH agree that:

a) as used in the Agreement, the term "Producer" includes the Producer and the Producer's employees,

b) the term "contract" includes any NACOLAH policy, certificate, endorsement, rider, temporary insurance agreement, addendum or agent agreement,

c) this Agreement constitutes the entire understanding between NACOLAH, the General Agent, and the Producer and supersedes all prior agreements,

d) failure to exercise any right in this Agreement will not constitute a waiver,

e) any written notice under this Agreement must be delivered by certified mail, return receipt requested and postage prepaid, to the last address furnished in writing by either party to this Agreement to the other,

f) Illinois law governs this Agreement.



4

46



**North American Company**
for Life and Health Insurance
P.O. Box 87483 • Chicago, IL 60680-0483
Administrative Office: P.O. Box 5088 • Sioux Falls, SD 57117-5088
A Member of the Sammons Financial Group



## North American Producer Contracting Application
*Transition from Clarica to North American*

By signing this application, I hereby acknowledge I have read a specimen copy of the proposed contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American) which are attached. I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, a fully executed copy of which will be subsequently forwarded to me by North American.

I understand that during 2003 North American will continue to honor bonus provisions that have been available to my organization through my Clarica contract. During 2003, any North American business produced under this North American contract will be included in determining these bonus awards. Production under any other North American contracts will not be included.

After 2003, bonuses that are determined in whole or in part on prior production will be based on business written under this North American contract as well as the in-force block of business assumed from Clarica by Midland National Life, as applicable. Any other production with Midland National Life will not count toward these bonus calculations under this North American contract. The calculations and methodologies used in determining bonus awards are pursuant to this North American contract.

**I agree not to solicit business until I have been notified by North American that I am authorized to do so.**

Printed Name: VIRGINIA B HIRSH 3I 443

By: *Virginia B Hirsh*    Date: 1/4/04
(Authorized signature)


North American Company for Life and Health Insurance

By: *James C Nelson*    Date: 2/19/04
(Authorized signature)

AGA SERVICES

2004 JAN 20 PM 3:01

RECEIVED

imc 14946
0-2632    gold
Richard
Wire & Atta

9/03

47

**EXHIBIT 8**

AUG-21-2006 08:37A FROM:MARKETING PARTNERSHI 9282443500          TO:19282443500          P.2
Aug 18 06 10:58a     BRENT KUYKENDALL          1858 547 8059          p.1



**North American Company**
for Life and Health Insurance
P. O. Box 87452 • Chicago, IL 60680-0452
Administrative Office P. O. Box 5088 • Sioux Falls, SD 57117-5088
A Member of the Sammons Financial Group



## PRODUCER CONTRACT APPLICATION AND AGREEMENT

**4V323**

Agent Number _____
(Home Office Use Only)

All Questions Must Be Completed.

Full Name  JOHN   BRENT   KUYKENDALL          Sex: ☑ Male ☐ Female
(First Name)     (Middle Name)     (Last Name)

Business Name _____

Contract Type: ☑ Individual ☐ Corporation ☐ Other _____

Check box for desired mailing address
☑ Resident Address   11711 ANGELIQUE STREET SAN DIEGO CA 92131
(Street, City, State, County, ZIP Code)

☐ Business Address _____
(Street, City, State, County, ZIP Code)

Resident Phone (619) 540-9906   Business Phone (619) 683.5704   858 547.8059
Fax ( )

E-Mail Address JBKBRENTJBK@YAHOO.COM   License # OE16283   (attach Photocopy)

Date of Birth 9-19-1966   Social Security # 527 50 2258   or Taxpayer ID # _____

**PLEASE RESPOND TO ALL QUESTIONS FOR YOU PERSONALLY AND ANY ORGANIZATION OVER WHICH YOU HAVE EXERCISED CONTROL. IF YOU ANSWER "YES" TO ANY QUESTIONS, YOU MUST ATTACH AN EXPLANATION WITH ALL RELEVANT INFORMATION AND SUPPORTING DOCUMENTS.**

☐ Yes ☑ No   Have you ever had your insurance license or securities license suspended or revoked or have you ever had an application for an insurance license denied by any insurance department?

☐ Yes ☑ No   Have you ever had a complaint filed against you with an insurance department, NASD or other regulatory agency, or do you anticipate one being filed?

☐ Yes ☑ No   Has any claim ever been made against you, your surety company, or errors and omissions insurer arising out of insurance sales or practices or have you been refused surety bonding?

☐ Yes ☑ No   Has your contract or appointment ever been terminated involuntarily by an insurer?

☐ Yes ☑ No   Are you at the present involved in any litigation or are there any unsatisfied judgments or liens (including state or federal tax liens) against you?

☐ Yes ☐ No   Do you currently have a pending bankruptcy or have you ever declared bankruptcy?

☐ Yes ☐ No   Have you pled guilty or nolo contendere to or been found guilty of a felony or a crime including but not limited to crimes involving dishonesty, breach of trust, or a violation of any federal law or are you now under indictment?

☐ Yes ☑ No   Does any insurer, insured, or other person claim any indebtedness from you as a result of any insurance transactions or business?

☑ Yes ☐ No   Are you currently licensed in your resident state? If yes, please attach a copy of your resident license.

☐ Yes ☑ No   Are you currently licensed as a non-resident in any state? If yes and you would like to be appointed in that state, attach a copy of that license, and appointment fees.

☑ Yes ☐ No   I certify that I have received, understand and will conform with the procedures outlined in the brochures Partnering with You on Compliance Matters.

☑ Yes ☐ No   Do you have Erro's & Omissions coverage? (Required by North American Company)
PLEASE PROVIDE COPY OF DECLARATION PAGE.

Please indicate other companies with which you are currently licensed: NORTH AMERICAN

Do you have a NASD license? ☐ Yes ☑ No   If yes, who is your Broker-Dealer? _____

What products do you sell? ☑ Life ☐ Variable ☐ LTC ☐ Group ☐ Disability ☐ Senior ☐ Small Business ☐ 403(b)

Annual Earnings: 350,000  100,000 _____

O-2822                                          1                                R1 10/03

3T455-A

48

CONDITIONS AND AGREEMENTS—By signing this application, I hereby acknowledge I have read a specimen copy of the proposed Contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American). If this application is approved by North American, I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, the terms of which are incorporated into this application by reference. I agree not to solicit business until I have been notified by North American that I am authorized to do so either by mail or North American's Solicitation Guidelines.

Any marketing materials which have not been provided by North American must be approved by North American prior to their use. I understand that any specimen sales brochures and material I have received are provided only for my personal examination of product provisions and rates.

I understand that the Fair Credit Reporting Act requires North American to notify me that, as a routine part of processing my contract application, a consumer report may be obtained which may include information bearing on my credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living. I authorize North American or any of its affiliates[1] to obtain a consumer report and Vector One report in connection with this application. I further authorize North American or any of its affiliates or their duly authorized representative to contact any organization or individual who has knowledge of my employment history, credit history, financial status, or record of any illegal activity in order to obtain a record of such history, status or activities; and I hereby authorize the release of such information by such organization or individual about any debit balance I may incur to Vector One, its successors, or any organization designated to replace Vector One. I understand that by providing the fax/mail information above, I hereby consent to receive communications sent by or on behalf of Sammons Financial Group.

[1]Affiliate means any company owned, directly or indirectly, by Sammons Financial Group, Inc.

I hereby certify that all information and answers given by me of ~~~~~~~~~~~ are true and correct without any consequential omissions of any kind.

Signature _____    4V323    Date 8/18/06

Distributor/Producer

Printed Name: _Michael L Philgot_    Agent Number _46 617_

By: _____
                    (Authorized Signature)

North American Company for Life and Health Insurance Approval:

By. _____
                    (Authorized Signature)

Title. _____

                    AUG 2 1 2006

Effective Date of Agreement: _____

The North American Companies endorse and support the concepts in the Principles and Code of Ethical Market Conduct established by the Insurance Marketplace Standards Association (IMSA).

Return pages 1 and 2 for approval by North American. North American will return an executed copy to you upon approval.

Retain pages 3 through 8 for your records.

O-2622                                    2                                    R1 10/03

49

FROM : MARKETING PARTNERSHIPS        FAX NO. : 19282443500        Jun. 29 2004 11:09AM P1

01/06/2002 19:22   8775958256        NACOLAH AGCY SVCS        PAGE  01/01

3T447



### North American Producer Contracting Application
*Transition from Clarica to North American*

By signing this application, I hereby acknowledge I have read a specimen copy of the proposed contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American) which are attached. I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, a fully executed copy of which will be subsequently forwarded to me by North American.

I understand that during 2003 North American will continue to honor bonus provisions that have been available to my organization through my Clarica contract. During 2003, any North American business produced under this North American contract will be included in determining these bonus awards. Production under any other North American contracts will not be included.

After 2003, bonuses that are determined in whole or in part on prior production will be based on business written under this North American contract as well as the in-force block of business assumed from Clarica by Midland National Life, as applicable. Any other production with Midland National Life will not count toward these bonus calculations under this North American contract. The calculations and methodologies used in determining bonus awards are pursuant to this North American contract.

I agree not to solicit business until I have been notified by North American that I am authorized to do so.

Printed Name: Rene Lacape

By: _____   Date: 10/1/04
         (Authorized signature)


North American Company for Life and Health Insurance

By: _____   Date: _____
         (Authorized signature)

03412                                                                 9/03

50

FROM :                                    FAX NO. : 19282443500              Jun. 02 2005 02:14PM P2
06/02/2005 10:30 FAX                                                        + Mike Philpot    @002

 **North American Company for Life and Health Insurance**
P.O. Box 67452 • Chicago, IL 60680-0452
A Member of the Sammons Financial Group

RECEIVED
2005 JUN -5

 *Q26221*

## PRODUCER CONTRACT APPLICATION AND AGREEMENT

All Questions Must Be Completed.

Agent Number __4R932__
(Home Office Use Only)

| Full Name | RENE | | LACAPE | Sex: ☒ Male ☐ Female |
|---|---|---|---|---|
| | (First Name) | (Middle Name) | (Last Name) | |

Business Name _____

Contract Type: ☒ Individual ☐ Corporation ☐ Other _____

Check box for desired mailing address
☐ Resident Address

(Street, City, State, County, ZIP Code)
☒ Business Address __2131 SHELTER ISLAND DR SUITE A   SANDIEGO , CA   92105__
(Street, City, State, County, ZIP Code)

Resident Phone __(619) 347 5633__   Business Phone __(619) 222 7212__   Fax __(619) 2218545__

E-Mail Address __rlacape@san.rr.com__   License # _____ (attach Photocopy)

Date of Birth __6/12/75__   Social Security# __618 27 5958__, or Taxpayer ID # _____

PLEASE RESPOND TO ALL QUESTIONS FOR YOU PERSONALLY AND ANY ORGANIZATION OVER WHICH YOU HAVE EXERCISED CONTROL. IF YOU ANSWER "YES" TO ANY QUESTIONS, YOU MUST ATTACH AN EXPLANATION WITH ALL RELEVANT INFORMATION AND SUPPORTING DOCUMENTS.

☐ Yes ☒ No   Have you ever had your insurance license or securities license suspended or revoked or have you ever had an application for an insurance license denied by any insurance department?

☐ Yes ☒ No   Have you ever had a complaint filed against you with an insurance department, NASD or other regulatory agency, or do you anticipate one being filed?

☐ Yes ☒ No   Has any claim ever been made against you, your surety company, or errors and omissions insurer arising out of insurance sales or practices or have you been refused surety bonding?

☐ Yes ☒ No   Has your contract or appointment ever been terminated involuntarily by an insurer?

☐ Yes ☒ No   Are you at the present involved in any litigation or are there any unsatisfied judgments or liens (including state or federal tax liens) against you?

☐ Yes ☒ No   Do you currently have a pending bankruptcy or have you ever declared bankruptcy?

☐ Yes ☒ No   Have you pled guilty or nolo contendere to or been found guilty of a felony or a crime including but not limited to crimes involving dishonesty, breach of trust, or a violation of any federal law or are you now under indictment?

☐ Yes ☒ No   Does any insurer, insured, or other person claim any indebtedness from you as a result of any insurance transactions or business?

☒ Yes ☐ No   Are you currently licensed in your resident state? If yes, please attach a copy of your resident license.

☐ Yes ☒ No   Are you currently licensed as a non-resident in any state? If yes and you would like to be appointed in that state, attach a copy of that license, and appointment fees.

☒ Yes ☐ No   I certify that I have received, understand and will conform with the procedures outlined in the brochure Partnering with You on Compliance Matters.

☒ Yes ☐ No   Do you have Errors & Omissions coverage? (Required by North American Company)
PLEASE PROVIDE COPY OF DECLARATION PAGE.

Please indicate other companies with which you are currently licensed: __IRP, WCL, GE, AIG__

Do you have a NASD license? ☐ Yes ☒ No   If yes, who is your Broker-Dealer? _____

What products do you sell? ☒ Life ☐ Variable ☐ LTC ☐ Group ☐ Disability ☐ Senior ☐ Small Business ☐ 403(b)

Annual Earnings: _____

C-2622                                        1                                        R1 10/03

New Business Underwriting Service Center • 250 East Broad Street, 4th Floor, Columbus, OH 43215 • P.O. Box 182041, Columbus, OH 43218-2041
Administrative Office • P.O. Box 5088 • Sioux Falls, SD 57117-5088

*51*

FROM :                          FAX NO. : 19282443500          Jun. 02 2006 02:14PM  P3
00/02/2006 10:30 FAX                                        → Mike Philpot      ☐003



CONDITIONS AND AGREEMENTS—By signing this application, I hereby acknowledge I have read a specimen copy of the proposed Contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American). If this application is approved by North American, I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, the terms of which are incorporated into this application by reference. I agree not to solicit business until I have been notified by North American that I am authorized to do so either by mail or North American's Solicitation Guidelines.

Any marketing materials which have not been provided by North American must be approved by North American prior to their use. I understand that any specimen sales brochures and material I have received are provided only for my personal examination of product provisions and rates.

I understand that the Fair Credit Reporting Act requires North American to notify me that, as a routine part of processing my contract application, a consumer report may be obtained which may include information bearing on my credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living. I authorize North American or any of its affiliates[1] to obtain a consumer report and Vector One report in connection with this application. I further authorize North American or any of its affiliates or their duly authorized representative to contact any organization or individual who has knowledge of my employment history, credit history, financial status, or record of any illegal activity in order to obtain a record of such history, status or activities; and I hereby authorize the release of such information by such organization or individual about any debit balance I may incur to Vector One, its successors, or any organization designated to replace Vector One. I understand that by providing the faxmail information above, I hereby consent to receive communications sent by or on behalf of Sammons Financial Group.

[1]Affiliate means any company owned, directly or indirectly, by Sammons Financial Group, Inc.

I hereby certify that all information and answers given by me on th'                    iout any consequential omissions of any kind.

| Signature | _____ 4R932 _____ | Date | 6/1/06 |

Distributor/Producer

Printed Name: _Michael L Philpot_          Agent Number: _OOPOO4L617_

By: _____
(Authorized Signature)

North American Company for Life and Health Insurance Approval:

By: _____
(Authorized Signature)

Title: _____

Effective Date of Agreement: _____ JUN 0 5 2006

The North American Companies endorse and support the concepts in the Principles and Code of Ethical Market Conduct established by the Insurance Marketplace Standards Association (IMSA).

Return pages 1 and 2 for approval by North American. North American will return an executed copy to you upon approval.

Retain pages 3 through 8 for your records.

O-2922                                        2                                        R1 10/03

52

**EXHIBIT 10**



**North American Company**
**for Life and Health Insurance**

**3V 324**

P. O. Box 466 • Chicago, Illinois 60690

☐ General Agent
☑ Agent

## CONFIDENTIAL HISTORY REPORT

CONTRACT NAME  *C. RICHIE MCNAMEE*

☑ Individual   ☐ DBA   ☐ Sole Proprietorship   ☐ Partnership   ☐ Corporation

Date of Birth: *11·28·33*   Sex: *M*   Tax ID No.: *350·30·8296*   Soc. Sec. No.: *350·30·8296*

Business Address (if using P.O. Box, include street address): *12342 MONTANA AVE.*

Home Address: *SAME*

Phone Number: *(310) 820·5422*   Fax Number: *(310) 820·1494*

Email Address: _____   Driver's License #: *N236862*

If you are a partnership or corporation, please list all partners or officers with their social security numbers and dates of birth:

_____

_____

### LICENSES

In which states do you currently have a license? *CA, AZ, FL*

In which states do you plan to write business for North American Company for Life and Health Insurance?
*CA — FL*

**[Attach a current copy of license(s)]**

1. Have you ever had a license for any insurance company refused, revoked, or suspended?  ☐ Yes  ☑ No
2. Have you ever been fined by an insurance regulatory authority?  ☐ Yes  ☑ No
3. Are you indebted to any insurance company, its management, or general agent for an unpaid balance?  ☐ Yes  ☑ No
4. Have you ever filed for bankruptcy?  ☑ Yes  ☐ No   *1998 — DISCHARGED*
5. Have you ever been refused a bond?  ☐ Yes  ☑ No
6. Any liens within last 5 years (tax, property, other)?  ☐ Yes  ☑ No
   If yes, are they released and paid?  ☐ Yes  ☐ No
7. Have you ever had any civil judgments entered against you?  ☐ Yes  ☑ No
8. Have you ever been charged with, convicted, pled guilty or nolo contender to a felony or misdemeanor? If yes, attach a copy of the court records.
   ☐ Yes  ☑ No

NOTE: If you answered yes to any of questions 1 through 8, please attach a letter of explanation.

### CONDITIONS AND AGREEMENTS

By signing this application, I hereby acknowledge I have read the proposed contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (NACOLAH). I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, an endorsed copy to which will be subsequently forwarded to me by NACOLAH or my general agent. I agree not to solicit business until I have been notified by NACOLAH that I am authorized to do so. I represent and warrant that all information and answers to questions are true and complete.

Any marketing materials which have not been provided by NACOLAH must be approved by NACOLAH prior to their use. I understand that any specimen sales brochures and material I have received are provided only for my personal examination of product provisions and rates.

I understand that the Fair Credit Reporting Act requires NACOLAH to notify me that, as a routine part of processing my contract application, a consumer report may be obtained which may include information bearing on my credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living. I authorize NACOLAH to obtain a consumer report and Vector One report in connection with this contract application. I further authorize NACOLAH or its duly authorized representative to contact any organization or individual who has knowledge of my employment history, credit history, financial status, or record of any illegal activity to (a) obtain a record of such history, status or activities and (b) hereby authorize the release of such information by such organization or individual in connection with this application and (c) authorize NACOLAH to release information about any debt balance I may incur to Vector One, its successors, or any organization designated to replace Vector One. A photocopy of this authorization shall be as valid as the original, regardless of the date it was signed.

Agent Signature: _____   Date: *6·2·04*

Contracting Agent's Typed or Printed Name *C. RICHIE MCNAMEE*   Contracting Agent's Number: _____

*53*

FROM : MARKETING PARTNERSHIPS          FAX NO. : 19282443500          Jun. 19 2004  03:39PM  P4



# NORTH AMERICAN COMPANY FOR LIFE & HEALTH INSURANCE'S
## PRODUCER'S AGREEMENT

**1.   RELATIONSHIPS**

The ATTACHED AGREEMENT is made by and between North American Company For Life and Health Insurance ("NACOLAH", "Company" or "its"), the undersigned Producer ("Producer", "you", "your"), and the undersigned Managing General Agent ("General Agent"). The Producer shall act in the good faith when dealing with NACOLAH's policyholders and acknowledges that all policies and the information contained therein are the property of NACOLAH. The Producer is an independent contractor for NACOLAH and not an employee of NACOLAH.

Incorporated into this Agreement as an integral part is Commission Schedule Form # L - _2194_
(indicate the selected Commission Schedule form number)

This Agreement shall be effective on the date indicated below.

Producer:                                                                              Code: _2W400-020_

Agency Name: _Mike Philpot  3W400-0 203_

Agent (please print): _C  George Walkmes_

By: _Cleo_
(Authorized signature)

Social Security or Tax Identification Number: _350 30 8296_

Managing General Agent:                                                  Code: _3W400_

Printed Name: _Michael L Philpot_

By: _____
(Authorized signature)

North American Company for Life and Health Insurance

By: _____
(Authorized signature)

Title: _____

Effective Date: _____

**2.   AUTHORITY**

a)   The Producer agrees to:

1.   procure applications for policies written by NACOLAH and, if applicable, recommend qualified solicitors, agents and/or brokers for NACOLAH appointment,

2.   promptly forward all applications and initial premiums to NACOLAH,

3.   take all reasonable steps to deliver policies issued by NACOLAH in accordance with NACOLAH's underwriting guidelines and agent bulletins; in the event policy delivery is not possible then you must return the policies immediately to NACOLAH's home office,

4.   make reasonable efforts to maintain NACOLAH's policies and provide reasonable assistance to NACOLAH's policyholders,

5.   operate in strict compliance with all applicable laws and regulations,

6.   supervise and be responsible for keeping your agents and brokers informed of NACOLAH's published rules, guidelines, procedures, and practices which your General Agent provides to you,

7.   exercise reasonable due care for the faithful performance, fidelity and honesty of your employees, agents and brokers and to maintain responsibility for all funds collected and business done by or entrusted to you and your employees,

8.   promptly report to NACOLAH, in writing, any known or alleged misappropriation of funds by any agent, broker or employee regardless of whether such known or alleged misappropriation is with respect to funds of NACOLAH or funds of any other person or company.

1

54

9. fully cooperate with NACOLAH in any investigation or proceeding of any federal, state or other regulatory or governmental body, or court, if it is determined by NACOLAH that the investigation or proceeding affects matters covered by or arising out of this Agreement,

10. immediately notify NACOLAH if it is served with any legal document received by you through any medium or if you have knowledge of any legal or administrative action, and

11. maintain any and all state insurance licenses and to be in good standing with all applicable state and regulatory authorities,

b) The Producer may:

   1. solicit, personally and through brokers and agents, applications for NACOLAH insurance policies described in the Schedule of Commissions, and

   2. collect the full initial premium for the NACOLAH policies.

## 3. LIMITATION OF AUTHORITY

The Producer may not:

a) make, alter or discharge any NACOLAH policy, contract, temporary insurance agreement or other NACOLAH agreement,

b) pay any premium personally or rebate premium to any policyholder,

c) waive or modify any terms of any NACOLAH policy or contract, including rates or conditions of limitation,

d) execute any documents on behalf of a proposed NACOLAH insured or policyholder,

e) approve evidence of insurability,

f) bind or commit NACOLAH to any policy, contract, risk or otherwise, except to NACOLAH's temporary insurance agreement,

g) deliver to a NACOLAH applicant any policy where the health of the applicant at the time of the delivery is other than as stated in NACOLAH's application for insurance,

h) receive any premiums after the initial premium,

i) extend time for any premium payment or reinstate any lapsed policy,

j) adjust or settle any claim,

k) retain any issued NACOLAH policy beyond thirty (30) days of issue,

l) enter into any legal proceedings pertaining to NACOLAH or obligate NACOLAH for any expenses with respect to such proceedings,

m) publish or circulate any advertisement, sales literature, policy analysis, proposal (other than Company provided illustration software), or other printed material referring to NACOLAH or its products without NACOLAH's prior written consent,

n) exercise any authority on behalf of NACOLAH other than as authorized by Section 2 of this Agreement,

o) waive any forfeiture outstanding debts, and

p) incur any expenses not authorized by the Company.

## 4. NACOLAH'S RIGHTS

NACOLAH at any time may:

a) discontinue any policy form in any state,

b) change any policy form or premium rate,

c) determine maximum or minimum policy limits,

d) change the conditions under which any policy may be offered,

e) change, delete or add any NACOLAH procedure, guideline or practice,

f) cease doing business in any state,

g) change compensation for new business without your consent but announced in a General Agent bulletin,

h) determine whether to accept any applications and determine underwriting standards with respect to any application,

i) recapture underwriting expenses in accordance with NACOLAH's New Business Department's standards and guidelines,

j) terminate any agent or broker for any reason with appropriate notice, and

k) choose not to contract or appoint any agent or broker recommended by you for any reason.

## 5. COMPENSATION

The Producer agrees that:

a) you shall accept such compensation from NACOLAH as your sole compensation for all matters covered in this Agreement and under your "Schedule of Commissions",

b) no compensation or financial benefits shall be payable to you by NACOLAH under this Agreement that are not expressly provided for in this Agreement and in your "Schedule of Commissions",

c) your compensation shall consist of commissions earned on premiums paid on policies issued by NACOLAH on applications obtained by you or your producers in accordance with this Agreement.

    d) commission rates shown on your "Schedule of Commissions" are effective as of the effective date stated on the applicable schedule,

    e) your compensation will be paid at the commission rates in effect at the time a NACOLAH application is submitted to us according to the "Schedule of Commissions" and payment method agreement,

    f) commissions shall not be paid on premiums being waived under any non-forfeiture or waiver of premium provision of any NACO-LAH policy, including retroactively waived premium,

    g) in the event of the rescission or cancellation by us of any policy, or if commission is paid to you in error, all such compensation paid to you and/or to your agents or brokers shall be promptly refunded by you to us,

    h) commissions may be paid for certain internal replacements, to the extent that new commissions exceed previous commission payments, depending upon the types of policies involved and the age of the replaced policy. A lapse or surrender of a policy from six months before to six months after the issue of a new policy is construed to be a replacement. Commission will be adjusted appropriately,

    i) for all riders, unless otherwise announced, the rates of commission are the same as the policy to which they are attached if they are added at the time of issue. If riders are added after the first year, the renewal commissions rates, if any, will apply,

    j) target premium is the maximum amount on which first year commissions are paid. On certain products target premium equals base premium or extra interest premium. Excess premium is the amount over the target premium on which excess commissions are paid. Certain universal life policies have maximum commissionable target premiums. Refer to your "Schedule of Commissions" for details,

    k table ratings and permanent flat extras receive full commissions on term policies and most universal life policies, subject to maximum commissionable premium, and

## 6.  VESTING

The Producer agrees that:

    a) except as provided herein, all first year and renewal commissions will vest immediately,

    b) vesting, if any, applies only to business remaining in force after termination of this Agreement,

    c) if this Agreement is terminated by NACOLAH for cause, commissions from the date of termination are excluded from vesting.

    d) if, after termination other than by cause, commissions are less than $600 in any calendar year, NACOLAH shall have the option of purchasing from the Producer any future commission payable for their present value. "Present Value" as used here means the value of such commissions determined by NACOLAH on the basis of accepted actuarial practices,

    e) if you are appointed as a sole proprietorship and this Agreement is terminated by your death or physical disability at a time when commissions are payable to you,

        i) the Company will continue to pay, for the vesting period specified in this section, such commissions to your legal surviving spouse during his or her life, and,

        ii) thereafter to such persons as your spouse may appoint by will or, in default of appointment, to your spouse's legal representative, and

    f) if this Agreement is terminated by your mental disability or if you die leaving no legal surviving spouse, such commissions will be payable to your legal representative.

## 7.  INDEBTEDNESS

You shall be responsible for your and your employees' present and future indebtedness to NACOLAH. The Company may offset such indebtedness from compensation otherwise due to the Producer from NACOLAH. Any unsatisfied indebtedness to NACOLAH shall accrue interest at a rate equal to NACOLAH's current practice rate and shall be payable upon demand together with all collection costs incurred by NACOLAH.

## 8.  TERRITORY

The General Agent has not been assigned an exclusive territory or market segment.

## 9.  ASSIGNMENT

NACOLAH, by any of its officers or designated employees, must approve in writing any assignment of this Agreement or any current or future compensation assignment under this Agreement. NACOLAH does not assume any responsibility for the validity, sufficiency, or tax consequences of any assignment. No assignment shall be effective until any indebtedness to NACOLAH incurred prior to, or subsequent to, such assignment is satisfied.

## 10. INDEMNITY

    a) The Producer will indemnify and hold NACOLAH harmless from all expenses (including reasonable attorneys' fees incurred by the Company), loss or damages (including punitive and extra contractual damages) suffered by NACOLAH because of violation of, or refusal or failure to comply with the terms of this Agreement or with any federal or state laws, rules or regulations, or resulting from unauthorized acts or transactions, errors or omissions by the Producer or the Producer's employees in the performance of its services under this Agreement.

56

b) NACOLAH will indemnify and hold the Producer harmless for all non-commission related expenses, loss or damage suffered by the Producer resulting from any intentional act or omission by the Company or any of its employees contrary to the terms and provisions of this Agreement, or any claim under or in connection with the issuance or sale of products provided that such claim does not arise out of an act or omission by Producer contrary to the terms of this Agreement. However, NACOLAH will not be liable to the Producer for any legal or other expense the Producer chooses to incur, solely on its own, in connection with any such error.

c) The Producer shall maintain Errors & Omissions liability insurance coverage and a Bond of Indemnity in such amount during the term of this Agreement and in such terms as NACOLAH may from time to time determine. The Producer shall provide evidence of such coverage when requested by NACOLAH.

d) Additionally, the Producer will communicate that the Company requires all agents and brokers to have and maintain Errors and Omissions liability insurance covering themselves during the term of this Agreement.

## 11. RECORDS AND CONFIDENTIALITY

The Producer shall keep full and true records of all business transacted by such Producer and by producers appointed by the Producer. NACOLAH may, during regular business hours, examine any of these records pertaining to NACOLAH's business which are reasonably necessary to show compliance with this Agreement or meet regulatory requirements. All records, books, and papers supplied by NACOLAH shall be and remain the property of NACOLAH and shall be delivered to NACOLAH upon demand.

## 12. TERMINATION

The Producer agrees that:

a) this Agreement may be terminated by any party to the Agreement upon thirty (30) days written notice by certified mail, return receipt requested,

b) if the Producer is a corporation, corporate dissolution or cessation of doing business will cause immediate termination of this Agreement,

c) if the Producer is a partnership, death of one of the partners will cause immediate termination of this Agreement,

d) if the Producer is an individual, his or her death, will cause immediate termination of this Agreement,

e) if the Producer is an individual or corporation, bankruptcy or commission of any act of bankruptcy, will cause immediate termination for cause of this Agreement,

f) NACOLAH at any time also may terminate this Agreement immediately for cause. "For cause" includes any determination by NACOLAH that the Producer:

   i)   has breached this Agreement,

   ii)   has become involved in any legal or regulatory proceeding which might impair its ability to perform its obligation,

   iii)   has committed, or attempted to commit, an illegal or fraudulent act,

   iv)   has encouraged the replacement of NACOLAH policies,

   v)   has acted detrimentally towards NACOLAH or its policyholders,

   vi)   has withheld funds or documents from NACOLAH or its policyholders,

   vii)   has misrepresented NACOLAH's products or services,

   viii)   or has misrepresented, falsified or omitted (or has encouraged or attempted to misrepresent, falsify, or omit) material information furnished to NACOLAH on any applicable license or bond or if the applicable license or bond is refused, canceled, or not renewed,

g) upon termination, the Producer or its legal representative will immediately cease acting on behalf of NACOLAH, will return all of NACOLAH's property, and will promptly account to NACOLAH for all funds held on behalf of NACOLAH, and

h) commissions will continue to vest as provided in Section 6 of this Agreement.

## 13. CONSTRUCTION AND EFFECT

The Producer and NACOLAH agree that:

a) as used in the Agreement, the term "Producer" includes the Producer and the Producer's employees,

b) the term "contract" includes any NACOLAH policy, certificate, endorsement, rider, temporary insurance agreement, addendum or agent agreement,

c) this Agreement constitutes the entire understanding between NACOLAH, the General Agent, and the Producer and supersedes all prior agreements,

d) failure to exercise any right in this Agreement will not constitute a waiver,

e) any written notice under this Agreement must be delivered by certified mail, return receipt requested and postage prepaid, to the last address furnished in writing by either party to this Agreement to the other,

f) Illinois law governs this Agreement.

4

*57*

**EXHIBIT 11**

Jan 23 04 10:09a    EQUOTE    [010] 221 0646    P.2

RECEIVED

2?? JAN 23 PH 3: 16

AC... ...ERVICES

 **North American Company**
for Life and Health Insurance
Administrative Office: P. O. Box 5088 • Sioux Falls, SD 57117-5088
A Member of Sammons Financial Group



## North American Producer Contracting Application
*Transition from Clarica to North American*

By signing this application, I hereby acknowledge I have read a specimen copy of the proposed contract and all applicable supplements and addendums thereto to be entered into between myself and North American Company for Life and Health Insurance (North American) which are attached. I agree to be bound by all of the terms and conditions of such contract, supplements and addendums, a fully executed copy of which will be subsequently forwarded to me by North American.

I understand that during 2003 North American will continue to honor bonus provisions that have been available to my organization through my Clarica contract. During 2003, any North American business produced under this North American contract will be included in determining these bonus awards. Production under any other North American contracts will not be included.

After 2003, bonuses that are determined in whole or in part on prior production will be based on business written under this North American contract as well as the in-force block of business assumed from Clarica by Midland National Life, as applicable. Any other production with Midland National Life will not count toward these bonus calculations under this North American contract. The calculations and methodologies used in determining bonus awards are pursuant to this North American contract.

I agree not to solicit business until I have been notified by North American that I am authorized to do so.

Printed Name: _Hector P. Valdez_    3T 451

By: _Hector P. Valdez_    Date: _Jan 10, 2004_
(Authorized signature)

North American Company for Life and Health Insurance

By: _James C. Nelson_    Date: _2/19/04_
(Authorized signature)

IMC 22884
gvls
Richard
Nira

O-2632    9/03

58

ORIGINAL

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

NORTH AMERICAN COMPANY FOR LIFE AND HEALTH INSURANCE

(b) County of Residence of First Listed Plaintiff   Polk County, Iowa
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorney's (Firm Name, Address, and Telephone Number)

Miles M. Cooley, Esq., Reed Smith LLP, 355 S. Grand Ave., 29th Fl., Los Angeles, California 90071 (213) 457-8000

## DEFENDANTS

County of Residence of First Listed Defendant    Los Angeles
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

'08 CV 0270 BEN NLS

FILED

US DISTRICT
SOUTHERN DISTRICT

'08 FEB 13 PM 3:17

BY: ___ DEPUTY

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | SOCIAL SECURITY | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | LABOR | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | FEDERAL TAX SUITS | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
18 U.S.C. Section 1962(c)

Brief description of cause:
Breach of Contract, Fraud, Civil RICO, etc., relating to sale of life insurance policies

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE ___   DOCKET NUMBER ___

DATE  2/13/08

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #  14760   AMOUNT  350.   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___

2/13/08

**UNITED STATES**
**DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 147610      – SR
* * C O P Y * *
February 13, 2008
15:42:35

**Civ Fil Non-Pris**
USAO #.: 08CV0270 CIV. FIL.
Judge..: ROGER T BENITEZ
Amount.:                    $350.00 CK
Check#.: BC#52010

**Total–> $350.00**

FROM: NO. AMER. CO. FOR LIFE & HEALT
      INS. V.
      CIVIL FILING