**CALLAHAN & BLAINE, APLC**
Daniel J. Callahan (Bar No. 91490)
Michael J. Sachs (Bar No. 134468)
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
(714) 241-4444
(714) 241-4445 Fax
michael@callahan-law.com

Attorneys for Defendant MICHAEL L. PHILPOT

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTH AMERICAN COMPANY FOR LIFE AND HEALTH INSURANCE,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>MICHAEL L. PHILPOT, an individual, VIRGINIA B. HIRSCH, an individual, JOHN B. KUYKENDALL, an individual, RENE ALEJANDRO LACAPE, an individual C. RICHIE MCNAMEE, an individual and HECTOR PAEZ VALDEZ, an individual<br><br>　　　　　Defendants. | Case No. 08 CV 0270 BEN NLS<br><br>**DECLARATION OF MICHAEL J. SACHS IN SUPPORT OF MOTION TO DISMISS**<br><br>(Filed concurrently with Motion to Dismiss; Memorandum of Points and Authorities and Request for Judicial Notice)<br><br>Date:　　July 21, 2008<br>Time:　　10:00 a.m.<br>Crtrm:　　3<br><br>Complaint Filed: February 13, 2008<br>Trial Date: None Set |

I, Michael J. Sachs, declare:

　　1.　　I am an attorney duly admitted to practice law before all the courts in the State of California and this judicial district. I am a partner with the law firm of Callahan & Blaine, attorneys of record for Defendant MICHAEL L. PHILPOT in this matter.

　　2.　　Attached hereto as Exhibit "1" is a true and correct copy of the Initiative Statute, commonly known as Proposition 103, as obtained from the University of California Hastings College of Law website, as linked to by the California Secretary of State website.

1    3.    Attached hereto as Exhibit "2" is a true and correct copy of the September 8,

2    1994 decision of Administrative Law Judge Stephen E. Hjelt, in the matter of *Prudential*

3    *Insurance Company, et al.*

4    4.    Attached hereto as Exhibit "3" is a true and correct copy of a March 26, 1993

5    article from the New York Times.

6    5.    Attached hereto as Exhibit "4" is a true and correct copy of the March 24, 1999

7    correspondence from Elizabeth Tuckwell, staff counsel for the State of California Department

8    of Insurance.

9    6.    Attached hereto as Exhibit "5" is a true and correct copy of the printout from the

10   Sammons Enterprises .com website.

11       I declare under penalty of perjury under the laws of the State of California and the

12   United States of America that the foregoing is true and correct.

13       Executed this 13th day of June, 2008, at Santa Ana, California.

14

15       s/Michael J. Sachs
         MICHAEL J. SACHS
16       email: michael@callahan-law.com

17

18

19

20   G:\2895\2895-02\Pleadings\Dec MJS Mtn to Dismiss.wpd

21

22

23

24

25

26

27

28

EXHIBIT "1"



#435

Office of the Secretary of State
March Fong Eu

Executive Office
1230 J Street
Sacramento, California   95814

(916) 445-6371

June 20, 1988

TO:  All County Clerks/Registrars of Voters (88164)

Pursuant to Section 3523 of the Elections Code, I hereby certify
that on June 20, 1988 the certificates received from the County
Clerks or Registrars of Voters by the Secretary of State
established that the Initiative Statute, INSURANCE RATES AND
REGULATION, has been signed by the requisite number of qualified
electors needed to declare the petition sufficient.  The INSURANCE
RATES AND REGULATION.  INITIATIVE STATUTE. is therefore,
qualified for the November 8, 1988 General Election.

INSURANCE RATES AND REGULATION.  INITIATIVE STATUTE.
Regulates manner in which automobile and other property-
casualty insurance rates are established.  Requires rates be
lowered at least 20 percent from November 8, 1987 levels,
then frozen until November 8, 1989, unless insurance company
is substantially threatened with insolvency.  Requires public
hearing and approval of Insurance Commissioner for rate
changes.  Requires automobile premiums be determined pri-
marily by driving record and miles driven; requires discounts
for good drivers.  Provides for public disclosure of
insurance company operations.  Repeals certain exemptions of
insurance companies from state civil rights and antitrust
laws.  Makes Insurance Commissioner elected officer.  Summary
of estimate by Legislative Analyst and Director Finance of
fiscal impact on state and local governments:  Adoption will
increase the Department of Insurance's administrative costs
by an unknown amount - potentially multi-million dollars - in
1988-89 (partial year) and by about $10 million annually
thereafter.  This cost will be payable from the Insurance
Fund which is supported by annual fees levied on the
insurance industry.  Although the Board of Equalization is to
adjust insurance tax rates for the period of November 1988 to
January 1, 1991 to compensate for the loss of state revenues
from the gross premiums tax paid by insurers, such adjust-
ment will be based on estimates of what the revenues from
gross premiums would have been in the absence of this
measure.  As there is room for error in such estimates, it is
impossible to determine whether there will be any net gain or
loss in state revenues during the transition period.  The
Board of Equalization may incur an unknown, probably minor,
administrative cost for adjusting the gross premiums tax
rate.

Sincerely,

*Marsh Fong Eu*

MARCH FONG EU

**Exhibit 1**

1

#435



| Office of the Secretary of State March Fong Eu | 1230 J Street Sacramento, California 95814 | Elections Division (916) 445-0820 TDD: (800) 833-8683 |

January 11, 1988

TO ALL REGISTRARS OF VOTERS, OR COUNTY CLERKS, AND PROPONENT   (8810)

Pursuant to Section 3513 of the Elections Code, we transmit herewith a copy of the Title and Summary prepared by the Attorney General on a proposed Initiative Measure entitled:

INSURANCE RATES AND REGULATION.
INITIATIVE STATUTE.

Circulating and Filing Schedule

1.  Minimum number of signatures required................................372,178
    Cal. Const., Art. II, Sec. 8(b).

2.  Official Summary Date....................................Monday, 01/11/88
    Elec. C., Sec. 3513.

3.  Petition Sections:

    a.  First day Proponents can circulate Sections for
        signatures..........................................Monday, 01/11/88
        Elec. C., Sec. 3513.

    b.  Last day Proponents can circulate and file with
        the county.  All Sections are to be filed at
        the same time within each
        county............................................Thursday, 06/09/88+
        Elec. C., Secs. 3513, 3520(a).

    c.  Last day for county to determine total number
        of signatures affixed to petition and to
        transmit total to the Secretary of State..............Thursday, 06/16/88

(If the Proponent files the petition with the county on a date prior to 06/09/88, the county has five working days from the filing of the petition to determine the total number of signatures affixed to the petition and to transmit the total to the Secretary of State.)  Elec. C., Sec. 3520(b).

+PLEASE NOTE:  To the Proponent who may wish to qualify for the November 8, 1988 General Election.  The law allows approximately 85 days for county election officials to check and report petition signatures and transmit results.  The law also requires that this process be completed 131 days before the election in which the people will vote on the initiative.  It is possible that the county may not need precisely 85 days.  But if you want to be sure that this initiative qualifies for the November 8, 1988 General Election, you should file this petition with the county before April 6, 1988.

Exhibit 1
2

INSURANCE RATES AND REGULATION.
INITIATIVE STATUTE.
Page 2
January  11, 1988

    d.  Secretary of State determines whether the total
      number of signatures filed with all county clerks
      meets the minimum number of required signatures,
      and notifies the counties.........................Saturday, 06/25/88###

    e.  Last day for county to determine total number of
      qualified voters who signed the petition, and to
      transmit certificate with a blank copy of the
      petition to the Secretary of State..................Sunday, 07/10/88

      (If the Secretary of State notifies the county to
      determine the number of qualified voters who
      signed the petition on a date other than 06/16/88
      the last day is not later than the fifteenth day
      after the county's receipt of notification.)
      Elec. C., Sec. 3520(d), (e).

    f.  If the signature count is more than 409,395 or less
      than 353,569, then the Secretary of State certifies
      the petition has qualified or failed, and notifies
      the counties.  If the signature count is between
      353,569 and 409,395 inclusive, then the Secretary
      of State notifies the counties using the random
      sampling technique to determine the validity of
      all signatures......................................Wednesday, 07/20/88###

    g.  Last day for county to determine actual number
      of all qualified voters who signed the petition,
      and to transmit certificate with a blank copy of
      the petition to the Secretary of State..............Wednesday, 08/31/88

      (If the Secretary of State notifies the county to
      determine the number of qualified voters who have
      signed the petition on a date other than
      07/10/88, the last day is not later than the
      thirtieth working day after county's receipt of
      notification.)
      Elec. C., Sec. 3521(b), (c).

    h.  Secretary of State certifies whether the petition has
      been signed by the number of qualified voters required
      to declare the petition sufficient...................Sunday, 09/04/88

###Date varies based on receipt of county certification.

Exhibit 1
3

INSURANCE RATES AND REGULATION.
INITIATIVE STATUTE.
Page 3
January 11, 1988


4.  The Proponent of the above named measure is:

        Harvey Rosenfield
        ACCESS TO JUSTICE
        P.O. Box 1736
        Santa Monica, California  90406
        (213) 395-7622


5.  Important Points:

    (a) Please refer to Elections Code sections 44, 3501, 3507, 3508, 3517, and
        3519 for appropriate format and type considerations in printing,
        typing, and otherwise preparing your initiative petition for cir-
        culation and signatures.  Please send us a copy of the petition after
        you have it printed.  This copy is not for our review or approval, but
        to supplement our file in this matter.

    (b) Your attention is directed to the campaign disclosure requirements of
        the Political Reform Act of 1974, Government Code section 81000 et seq.

    (c) When writing or calling state or county elections officials, provide
        the official title of the initiative which was prepared by the Attorney
        General.  Use of this title will assist elections officials in
        referencing the proper file.

    (d) When a petition is presented to the county elections official for
        filing by someone other than the proponents, the required authorization
        shall include the name or names of the persons filing the petition.

    (e) When filing the petition with the county elections official, please
        provide a blank petition for elections official use.

                        Sincerely,

                        DEBORAH SEILER
                        Assistant to the Secretary of State
                        Elections and Political Reform


Attachment:  POLITICAL REFORM ACT OF 1974 REQUIREMENTS



01/11/88


Exhibit 1
4

JOHN K. VAN DE KAMP
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1515 K STREET, SUITE 511
P.O. BOX 944255
SACRAMENTO 94244-2550
(916) 445-9555

(916) 323-1995

(.435

FILED
In the office of the Secretary of State
of the State of California

January 11, 1988

JAN 1 1 1988

MARCH FONG EU, Secretary of State

By / _____
Deputy

Honorable March Fong Eu
Secretary of State
1230 J Street
Sacramento, CA  95814

Dear Mrs. Eu:

Initiative Title and Summary.
Subject:  INSURANCE RATES AND REGULATION.   INITIATIVE STATUTE.
Our File No:  SA 87 RF 0046

Pursuant to the provisions of section 3503 and 3513 of the
Elections code, you are hereby notified that on this day we
mailed to the proponent of the above identified proposed
initiative our title and summary.

Enclosed is a copy of our transmittal letter to the proponent, a
copy of our title and summary, a declaration of mailing thereof,
and a copy of the proposed measure.

According to information available in our records, the name and
address of the proponent is as stated on the declaration of
mailing.

Very truly yours,

JOHN K. VAN DE KAMP
Attorney General

*Floyd D. Shimomura*

FLOYD D. SHIMOMURA
Deputy Attorney General

FDS:rrc
Enclosures

**Exhibit 1**
5



JOHN K. VAN DE KAMP
*Attorney General*

State of California
**DEPARTMENT OF JUSTICE**

1515 K STREET, SUITE 511
P.O. BOX 944255
SACRAMENTO 94244-2550
(916) 445-9555

(916) 323-1995

January 11, 1988

Harvey Rosenfield
ACCESS TO JUSTICE
P.O. Box 1736
Santa Monica, CA  90406

Initiative Title and Summary.
Subject:  INSURANCE RATES AND REGULATION.   INITIATIVE STATUTE.
Our File No:  SA 87 RF 0046

Pursuant to your request, we have prepared the attached title and
summary of the chief purposes and points of the above identified
proposed initiative.  A copy of our letter to the Secretary of
State, as required by Elections Code sections 3503 and 3513, our
declaration of mailing, and the text of your proposal that was
considered is attached.

The Secretary of State will be sending you shortly a copy of the
circulating and filing schedule for your proposal that will be
issued by that office.

Please send us a copy of the petition after you have it printed.
This copy is not for our review or approval, but to supplement
our file in this matter.

Very truly yours,

JOHN K. VAN DE KAMP
Attorney General

FLOYD D. SHIMOMURA
Deputy Attorney General

FDS:rrc
Enclosures

Exhibit 1
6

Date: January 11, 1988
File No: SA 87 RF 0046

The Attorney General of California has prepared the following
title and summary of the chief purpose and points of the proposed
measure:

INSURANCE RATES AND REGULATION. INITIATIVE STATUTE. Regulates
manner in which automobile and other property-casualty insurance
rates are established. Requires rates be lowered at least 20
percent from November 8, 1987 levels, then frozen until
November 8, 1989, unless insurance company is substantially
threatened with insolvency. Requires public hearing and approval
of Insurance Commissioner for rate changes. Requires automobile
premiums be determined primarily by driving record and miles
driven; requires discounts for good drivers. Provides for public
disclosure of insurance company operations. Repeals certain
exemptions of insurance companies from state civil rights and
antitrust laws. Makes Insurance Commissioner elected officer.
Summary of estimate by Legislative Analyst and Director of
Finance of fiscal impact on state and local governments:
Adoption will increase the Department of Insurance's
administrative costs by an unknown amount - potentially multi-
million dollars - in 1988-89 (partial year) and by about $10
million annually thereafter. This cost will be payable from the
Insurance Fund which is supported by annual fees levied on the
insurance industry. Although the Board of Equalization is to
adjust insurance tax rates for the period of November 1988 to
January 1, 1991 to compensate for the loss of state revenues from
the gross premiums tax paid by insurers, such adjustment will be
based on estimates of what the revenues from gross premiums would
have been in the absence of this measure. As there is room for
error in such estimates, it is impossible to determine whether
there will be any net gain or loss in state revenues during the
transition period. The Board of Equalization may incur an
unknown, probably minor, administrative cost for adjusting the
gross premiums tax rate.

Exhibit 1
7

# ACCESS TO JUSTICE

P.O. Box 1736
Santa Monica, California 90406
213/ 395-7622

Amendment #2
SA 87 RF 0046
Received 12-23-87

December 22, 1987

Mr. Floyd Shimomura
Office of the Attorney General
1515 K Street, Suite 511
Sacramento, Ca. 95814

Re: Insurance Rate Reduction & Reform Act
    #SA 87 RF 0046

Dear Mr. Shimomura:

As the proponent of the Insurance Rate Reduction & Reform
Act, I am submitting a technical amendment which clarifies
the intent of the initiative filed with the Attorney General
on November 25, 1987.

For your convenience, I have included a full text of the
initiative that embodies the amendments, and a copy of the
text which illustrates the amendments.

Thank you for your assistance, and please do not hesitate to
contact me if there are any questions.

Sincerely yours,

Harvey Rosenfield

Exhibit 1

8

Insurance Rate Reduction and Reform Act                    Amendment #2
[DELETIONS STRUCK]                                         SA 87 RF 0046
Section 1.    Findings and Declaration.

        The People of California find and declare as follows:

        Enormous increases in the cost of insurance have made it both unaffordable and unavailable
to millions of Californians.

        The existing laws inadequately protect consumers and allow insurance companies to charge
excessive, unjustified and arbitrary rates.

        Therefore, the People of California declare that insurance reform is necessary. First, property-
casualty insurance rates shall be immediately rolled back to what they were on November 8, 1987, and
reduced no less than an additional 20%. Second, automobile insurance rates shall be determined
primarily by a driver's safety record and mileage driven. Third, insurance rates shall be maintained
at fair levels by requiring insurers to justify all future increases. Finally, the state Insurance
Commissioner shall be elected. Insurance companies shall pay a fee to cover the costs of
administering these new laws so that this reform will cost taxpayers nothing.


Section 2.    Purpose.


        The purpose of this chapter is to protect consumers from arbitrary insurance rates and
practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance
Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians.


Section 3.    Reduction and Control of Insurance Rates.


Article 10, commencing with Section 1861.01 is added to Chapter 9 of Part 2 of Division 1 of the
Insurance Code to read:


Insurance Rate Rollback


1861.01.(a) For any coverage for a policy for automobile and any other form of insurance subject to
this chapter issued or renewed on or after November 8, 1988, every insurer shall reduce its charges to
levels which are at least 20% less than the charges for the same coverage which were in effect on
November 8, 1987.


Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 1


Exhibit 1
9

(b) Between November 8, 1988, and November 8, 1989, rates and premiums reduced pursuant to subdivision (a) may be only increased if the commissioner finds, after a hearing, that an insurer is substantially threatened with insolvency.

(c) Commencing November 8, 1989, insurance rates subject to this chapter must be approved by the commissioner prior to their use.

(d) For those who apply for an automobile insurance policy for the first time on or after November 8, 1988, the rate shall be 20% less than the rate which was in effect on November 8, 1987, for similarly situated risks.

(e) Any separate affiliate of an insurer, established on or after November 8, 1987, shall be subject to the provisions of this section and shall reduce its charges to levels which are at least 20% less than the insurer's charges in effect on that date.

Automobile Rates & Good Driver Discount Plan

1861.02. (a) Rates and premiums for an automobile insurance policy, as described in subdivision (a) of Section 660, shall be determined by application of the following factors in decreasing order of importance: (1) The insured's driving safety record.
(2) The number of miles he or she drives annually.
(3) The number of years of driving experience the insured has had.
(4) Such other factors as the commissioner may adopt by regulation that have a substantial relationship to the risk of loss. The regulations shall set forth the respective weight to be given each factor in determining automobile rates and premiums. Notwithstanding any other provision of law, the use of any criterion without such approval shall constitute unfair discrimination.

(b) (1) Every person who (A) has been licensed to drive a motor vehicle for the previous three years and (B) has had, during that period, not more than one conviction for a moving violation which has not eventually been dismissed shall be qualified to purchase a Good Driver Discount policy from the insurer of his or her choice. An insurer shall not refuse to offer and sell a Good Driver Discount policy to any person who meets the standards of this subdivision. (2) The rate charged for a Good Driver Discount policy shall comply with subdivision (a) and shall be at least 20% below the rate the insured would otherwise have been charged for the same coverage. Rates for Good Driver Discount policies shall be approved pursuant to this article.

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 2

Exhibit 1
10

(c) The absence of prior automobile insurance coverage, in and of itself, shall not be a criterion for determining eligibility for a Good Driver Discount policy, or generally for automobile rates, premiums, or insurability.

(d) This section shall become operative on November 8, 1989. The commissioner shall adopt regulations implementing this section and insurers may submit applications pursuant to this article which comply with such regulations prior to that date, provided that no such application shall be approved prior to that date.

Prohibition on Unfair Insurance Practices

1861.03 (a) The business of insurance shall be subject to the laws of California applicable to any other business, including, but not limited to, the Unruh Civil Rights Act (Civil Code Sections 51 through 53), and the antitrust and unfair business practices laws (Parts 2 and 3, commencing with section 16600 of Division 7, of the Business and Professions Code).

(b) Nothing in this section shall be construed to prohibit (1) any agreement to collect, compile and disseminate historical data on paid claims or reserves for reported claims, provided such data is contemporaneously transmitted to the commissioner, or (2) participation in any joint arrangement established by statute or the commissioner to assure availability of insurance.

(c) Notwithstanding any other provision of law, a notice of cancellation or non-renewal of a policy for automobile insurance shall be effective only if it is based on one or more of the following reasons: (1) non-payment of premium; (2) fraud or material misrepresentation affecting the policy or insured; (3) a substantial increase in the hazard insured against.

Full Disclosure of Insurance Information

1861.04. (a)  Upon request, and for a reasonable fee to cover costs, the commissioner shall provide consumers with a comparison of the rate in effect for each personal line of insurance for every insurer.

Approval of Insurance Rates

1861.05. (a) No rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter. In considering whether a rate is excessive,

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 3

Exhibit 1
11

inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition and the commissioner shall consider whether the rate mathematically reflects the insurance company's investment income.

(b) Every insurer which desires to change any rate shall file a complete rate application with the commissioner. A complete rate application shall include all data referred to in Sections 1857.7, 1857.9, 1857.15, and 1864 and such other information as the commissioner may require. The applicant shall have the burden of proving that the requested rate change is justified and meets the requirements of this article.

(c) The commissioner shall notify the public of any application by an insurer for a rate change. The application shall be deemed approved sixty days after public notice unless (1) a consumer or his or her representative requests a hearing within forty-five days of public notice and the commissioner grants the hearing, or determines not to grant the hearing and issues written findings in support of that decision, or (2) the commissioner on his or her own motion determines to hold a hearing, or (3) the proposed rate adjustment exceeds 7% of the then applicable rate for personal lines or 15% for commercial lines, in which case the commissioner must hold a hearing upon a timely request.

1861.06. Public notice required by this article shall be made through distribution to the news media and to any member of the public who requests placement on a mailing list for that purpose.

1861.07. All information provided to the commissioner pursuant to this article shall be available for public inspection, and the provisions of Section 6254(d) of the Government Code and Section 1857.9 of the Insurance Code shall not apply thereto.

1861.08. Hearings shall be conducted pursuant to Sections 11500 through 11528 of the Government Code, except that: (a) hearings shall be conducted by administrative law judges for purposes of Sections 11512 and 11517, chosen under Section 11502 or appointed by the commissioner; (b) hearings are commenced by a filing of a Notice in lieu of Sections 11503 and 11504; (c) the commissioner shall adopt, amend or reject a decision only under Section 11517 (c) and (e) and solely on the basis of the record; (d) Section 11513.5 shall apply to the commissioner; (e) discovery shall be liberally construed and disputes determined by the administrative law judge.

1861.09. Judicial review shall be in accordance with Section 1858.6. For purposes of judicial review, a decision to hold a hearing is not a final order or decision; however, a decision not to hold a hearing is final.

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 4

Exhibit 1
12

Consumer Participation

1861.10. (a) Any person may initiate or intervene in any proceeding permitted or established pursuant to this chapter, challenge any action of the commissioner under this article, and enforce any provision of this article.

(b) The commissioner or a court shall award reasonable advocacy and witness fees and expenses to any person who demonstrates that (1) the person represents the interests of consumers, and, (2) that he or she has made a substantial contribution to the adoption of any order, regulation or decision by the commissioner or a court. Where such advocacy occurs in response to a rate application, the award shall be paid by the applicant.

(c) (1) The commissioner shall require every insurer to enclose notices in every policy or renewal premium bill informing policyholders of the opportunity to join an independant, non- profit corporation which shall advocate the interests of insurance consumers in any forum. This organization shall be established by an interim board of public members designated by the commissioner and operated by individuals who are democratically elected from its membership. The corporation shall proportionately reimburse insurers for any additional costs incurred by insertion of the enclosure, except no postage shall be charged for any enclosure weighing less than 1/3 of an ounce. (2) The commissioner shall by regulation determine the content of the enclosures and other procedures necessary for implementation of this provision. The legislature shall make no appropriation for this subdivision.

Emergency Authority

1861.11. In the event that the commissioner finds that (a) insurers have substantially withdrawn from any insurance market covered by this article, including insurance described by Section 660, and (b) a market assistance plan would not be sufficient to make insurance available, the commissioner shall establish a joint underwriting authority in the manner set forth by Section 11891, without the prior creation of a market assistance plan.

Group Insurance Plans

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 5

Exhibit 1
13

1861.12. Any insurer may issue any insurance coverage on a group plan, without restriction as to the purpose of the group, occupation or type of group. Group insurance rates shall not be considered to be unfairly discriminatory, if they are averaged broadly among persons insured under the group plan.

Application  1861.13. This article shall apply to all insurance on risks or on operations in this state, except those listed in Section 1851.

Enforcement & Penalties

1861.14. Violations of this article shall be subject to the penalties set forth in Section 1859.1. In addition to the other penalties provided in this chapter, the commissioner may suspend or revoke, in whole or in part, the certificate of authority of any insurer which fails to comply with the provisions of this article.

Section 4.    Elected Commissioner

Section 12900 is added to the Insurance Code to read:

(a) The commissioner shall be elected by the People in the same time, place and manner and for the same term as the Governor.

Section 5.    Insurance Company Filing Fees

Section 12979 is added to the Insurance Code to read:

Notwithstanding the provisions of Section 12978, the commissioner shall establish a schedule of filing fees to be paid by insurers to cover any administrative or operational costs arising from the provisions of Article 10 (commencing with Section 1861.01) of Chapter 9 of Part 2 of Division 1.

Section 6.    Transitional Adjustment of Gross Premiums Tax

Section 12202.1 is added to the Revenue & Taxation Code to read:

Notwithstanding the rate specified by Section 12202, the gross premiums tax rate paid by property-casualty insurers for any premiums collected between November 8, 1988 and January 1, 1991 shall be adjusted by the Board of Equalization in January of each year so that the gross premium tax revenues

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 6

Exhibit 1
14

collected for each prior calendar year shall be sufficient to compensate for changes in such revenues, if any, including changes in anticipated revenues, arising from this act. In calculating the necessary adjustment, the Board of Equalization shall consider the growth in premiums in the most recent three year period, and the impact of general economic factors including, but not limited to, the inflation and interest rates.

Section 7.    Repeal of Existing Law

Sections 1643, 1850, 1850.1, 1850.2, 1850.3, 1852, 1853, 1853.6, 1853.7, 1857.5, 12900, Article 3 (commencing with Section 1854) of Chapter 9 of Part 2 of Division 1, and Article 5 (commencing Section 750) of Chapter 1 of Part 2 of Division 1, of the Insurance Code are repealed.

Section 8.    Technical Matters

(a) This act shall be liberally construed and applied in order to fully promote its underlying purposes.

(b) The provisions of this act shall not be amended by the Legislature except to further its purposes by a statute passed in each house by roll call vote entered in the journal, two-thirds of the membership concurring, or by a statute that becomes effective only when approved by the electorate.

(c) If any provision of this act or the application thereof to any person or circumstances is held invalid, that invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 7

Exhibit 1
15

Insurance Rate Reduction and Reform Act

Section 1.    Findings and Declaration.

The People of California find and declare as follows:

Enormous increases in the cost of insurance have made it both unaffordable and unavailable
to millions of Californians.

The existing laws inadequately protect consumers and allow insurance companies to charge
excessive, unjustified and arbitrary rates.

Therefore, the People of California declare that insurance reform is necessary. First, property-
casualty insurance rates shall be immediately rolled back to what they were on November 8, 1987, and
reduced no less than an additional 20%. Second, automobile insurance rates shall be determined
primarily by a driver's safety record and mileage driven. Third, insurance rates shall be maintained
at fair levels by requiring insurers to justify all future increases. Finally, the state Insurance
Commissioner shall be elected. Insurance companies shall pay a fee to cover the costs of
administering these new laws so that this reform will cost taxpayers nothing.

Section 2:    Purpose.

The purpose of this chapter is to protect consumers from arbitrary insurance rates and
practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance
Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians.

Section 3:    Reduction and Control of Insurance Rates.

Article 10, commencing with Section 1861.01 is added to Chapter 9 of Part 2 of Division 1 of the
Insurance Code to read:

Insurance Rate Rollback

1861.01.(a) For any coverage for a policy for automobile and any other form of insurance subject to
this chapter issued or renewed on or after November 8, 1988, every insurer shall reduce its charges to
levels which are at least 20% less than the charges for the same coverage which were in effect on
November 8, 1987.

(b) Between November 8, 1988, and November 8, 1989, rates and premiums reduced pursuant to subdivision (a) may be only increased if the commissioner finds, after a hearing, that an insurer is substantially threatened with insolvency.

(c) Commencing November 8, 1989, insurance rates subject to this chapter must be approved by the commissioner prior to their use.

(d) For those who apply for an automobile insurance policy for the first time on or after November 8, 1988, the rate shall be 20% less than the rate which was in effect on November 8, 1987, for similarly situated risks.

(e) Any separate affiliate of an insurer, established on or after November 8, 1987, shall be subject to the provisions of this section and shall reduce its charges to levels which are at least 20% less than the insurer's charges in effect on that date.

Automobile Rates & Good Driver Discount Plan

1861.02. (a) Rates and premiums for an automobile insurance policy, as described in subdivision (a) of Section 660, shall be determined by application of the following factors in decreasing order of importance: (1) The insured's driving safety record.
(2) The number of miles he or she drives annually.
(3) The number of years of driving experience the insured has had.
(4) Such other factors as the commissioner may adopt by regulation that have a substantial relationship to the risk of loss. The regulations shall set forth the respective weight to be given each factor in determining automobile rates and premiums. Notwithstanding any other provision of law, the use of any criterion without such approval shall constitute unfair discrimination.

(b) (1) Every person who (A) has been licensed to drive a motor vehicle for the previous three years and (B) has had, during that period, not more than one conviction for a moving violation which has not eventually been dismissed shall be qualified to purchase a Good Driver Discount policy from the insurer of his or her choice. An insurer shall not refuse to offer and sell a Good Driver Discount policy to any person who meets the standards of this subdivision. (2) The rate charged for a Good Driver Discount policy shall comply with subdivision (a) and shall be at least 20% below the rate the insured would otherwise have been charged for the same coverage. Rates for Good Driver Discount policies shall be approved pursuant to this article.

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 2

Exhibit 1
17

(c) The absence of prior automobile insurance coverage, in and of itself, shall not be a criterion for determining eligibility for a Good Driver Discount policy, or generally for automobile rates, premiums, or insurability.

(d) This section shall become operative on November 8, 1989. The commissioner shall adopt regulations implementing this section and insurers may submit applications pursuant to this article which comply with such regulations prior to that date, provided that no such application shall be approved prior to that date.

## Prohibition on Unfair Insurance Practices

1861.03 (a) The business of insurance shall be subject to the laws of California applicable to any other business, including, but not limited to, the Unruh Civil Rights Act (Civil Code Sections 51 through 53), and the antitrust and unfair business practices laws (Parts 2 and 3, commencing with section 16600 of Division 7, of the Business and Professions Code).

(b) Nothing in this section shall be construed to prohibit (1) any agreement to collect, compile and disseminate historical data on paid claims or reserves for reported claims, provided such data is contemporaneously transmitted to the commissioner, or (2) participation in any joint arrangement established by statute or the commissioner to assure availability of insurance.

(c) Notwithstanding any other provision of law, a notice of cancellation or non-renewal of a policy for automobile insurance shall be effective only if it is based on one or more of the following reasons: (1) non-payment of premium; (2) fraud or material misrepresentation affecting the policy or insured; (3) a substantial increase in the hazard insured against.

## Full Disclosure of Insurance Information

1861.04. (a) Upon request, and for a reasonable fee to cover costs, the commissioner shall provide consumers with a comparison of the rate in effect for each personal line of insurance for every insurer.

## Approval of Insurance Rates

1861.05. (a) No rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter. In considering whether a rate is excessive,

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 3

Exhibit 1
18

inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition and the commissioner shall consider whether the rate mathematically reflects the insurance company's investment income.

(b) Every insurer which desires to change any rate shall file a complete rate application with the commissioner. A complete rate application shall include all data referred to in Sections 1857.7, 1857.9, 1857.15, and 1864 and such other information as the commissioner may require. The applicant shall have the burden of proving that the requested rate change is justified and meets the requirements of this article.

(c) The commissioner shall notify the public of any application by an insurer for a rate change. The application shall be deemed approved sixty days after public notice unless (1) a consumer or his or her representative requests a hearing within forty-five days of public notice and the commissioner grants the hearing, or determines not to grant the hearing and issues written findings in support of that decision, or (2) the commissioner on his or her own motion determines to hold a hearing, or (3) the proposed rate adjustment exceeds 7% of the then applicable rate for personal lines or 15% for commercial lines, in which case the commissioner must hold a hearing upon a timely request.

1861.06. Public notice required by this article shall be made through distribution to the news media and to any member of the public who requests placement on a mailing list for that purpose.

1861.07. All information provided to the commissioner pursuant to this article shall be available for public inspection, and the provisions of Section 6254(d) of the Government Code and Section 1857.9 of the Insurance Code shall not apply thereto.

1861.08. Hearings shall be conducted pursuant to Sections 11500 through 11528 of the Government Code, except that: (a) hearings shall be conducted by administrative law judges for purposes of Sections 11512 and 11517, chosen under Section 11502 or appointed by the commissioner; (b) hearings are commenced by a filing of a Notice in lieu of Sections 11503 and 11504; (c) the commissioner shall adopt, amend or reject a decision only under Section 11517 (c) and (e) and solely on the basis of the record; (d) Section 11513.5 shall apply to the commissioner; (e) discovery shall be liberally construed and disputes determined by the administrative law judge.

1861.09. Judicial review shall be in accordance with Section 1858.6. For purposes of judicial review, a decision to hold a hearing is not a final order or decision; however, a decision not to hold a hearing is final.

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 4

Exhibit 1
19

**Consumer Participation**

1861.10. (a) Any person may initiate or intervene in any proceeding permitted or established pursuant to this chapter, challenge any action of the commissioner under this article, and enforce any provision of this article.

(b) The commissioner or a court shall award reasonable advocacy and  witness fees and expenses to any person who demonstrates that (1) the person represents the interests of consumers, and, (2) that he or she has made a substantial contribution to the adoption of any order, regulation or decision by the commissioner or a court. Where such advocacy occurs in response to a rate application, the award shall be paid by the applicant.

(c) (1) The commissioner shall require every insurer to enclose notices in every policy or renewal premium bill informing policyholders of the opportunity to join an independent, non- profit corporation which shall advocate the interests of insurance consumers in any forum. This organization shall be established by an interim board of public members designated by the commissioner and operated by individuals who are democratically elected from its membership. The corporation shall proportionately reimburse insurers for any additional costs incurred by insertion of the enclosure, except no postage shall be charged for any enclosure weighing less than 1/3 of an ounce. (2) The commissioner shall by regulation determine the content of the enclosures and other procedures necessary for implementation of this provision. The legislature shall make no appropriation for this subdivision.

**Emergency Authority**

1861.11. In the event that the commissioner finds that (a) insurers have substantially withdrawn from any insurance market covered by this article, including insurance described by Section 660, and (b) a market assistance plan would not be sufficient to make insurance available, the commissioner shall establish a joint underwriting authority in the manner set forth by Section 11891, without the prior creation of a market assistance plan.

**Group Insurance Plans**

Exhibit 1
20

1861.12. Any insurer may issue any insurance coverage on a group plan, without restriction as to the purpose of the group, occupation or type of group. Group insurance rates shall not be considered to be unfairly discriminatory, if they are averaged broadly among persons insured under the group plan.

Application   1861.13. This article shall apply to all insurance on risks or on operations in this state, except those listed in Section 1851.

Enforcement & Penalties

1861.14. Violations of this article shall be subject to the penalties set forth in Section 1859.1. In addition to the other penalties provided in this chapter, the commissioner may suspend or revoke, in whole or in part, the certificate of authority of any insurer which fails to comply with the provisions of this article.

Section 4.    Elected Commissioner

Section 12900 is added to the Insurance Code to read:

(a) The commissioner shall be elected by the People in the same time, place and manner and for the same term as the Governor.

Section 5.    Insurance Company Filing Fees

Section 12979 is added to the Insurance Code to read:

Notwithstanding the provisions of Section 12978, the commissioner shall establish a schedule of filing fees to be paid by insurers to cover any administrative or operational costs arising from the provisions of Article 10 (commencing with Section 1861.01) of Chapter 9 of Part 2 of Division 1.

Section 6.    Transitional Adjustment of Gross Premium Tax

Section 12202.1 is added to the Revenue & Taxation Code to read:

Notwithstanding the rate specified by Section 12202, the gross premiums tax rate paid by insurers for any premiums collected between November 8, 1988 and January 1, 1991 shall be adjusted by the Board of Equalization in January of each year so that the gross premium tax revenues collected for each

Insurance Rate Reduction & Reform Act -- December 22, 1987 -- Page 6

Exhibit 1
21

prior calendar year shall be sufficient to compensate for changes in such revenues, if any, including changes in anticipated revenues, arising from this act. In calculating the necessary adjustment, the Board of Equalization shall consider the growth in premiums in the most recent three year period, and the impact of general economic factors including, but not limited to, the inflation and interest rates.

Section 7.    Repeal of Existing Law

Sections 1643, 1850, 1850.1, 1850.2, 1850.3, 1852, 1853, 1853.6, 1853.7, 1857.5, 12900, Article 3 (commencing with Section 1854) of Chapter 9 of Part 2 of Division 1, and Article 5 (commencing with Section 750) of Chapter 1 of Part 2 of Division 1, of the Insurance Code are repealed.

Section 8.    Technical Matters

(a) This act shall be liberally construed and applied in order to fully promote its underlying purposes.

(b) The provisions of this act shall not be amended by the Legislature except to further its purposes by a statute passed in each house by roll call vote entered in the journal, two-thirds of the membership concurring, or by a statute that becomes effective only when approved by the electorate.

(c) If any provision of this act or the application thereof to any person or circumstances is held invalid, that invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

## DECLARATION OF MAILING

The undersigned Declarant, states as follows:

I am over the age of 18 years and not a proponent of the within matter; my place of employment and business address is 1515 K Street, Suite 511, Sacramento, California  95814.

On the date shown below, I mailed a copy of copies of the attached letter to the proponents, by placing a true copy thereof in an envelope addressed to the proponents named below at the addresses indicated, and by sealing and depositing said envelope or envelopes in the United States mail at Sacramento, California, with postage prepaid.  There is delivery service by United States mail at each of the places so addressed, or there is regular communication by mail between the place of mailing and each of the places so addressed.

Date of Mailing:  January 11, 1988

Subject:  INSURANCE RATES AND REGULATION.  INITIATIVE STATUTE.

Our File No:  SA 87 RF 0046

Name of Proponents and Addresses:

Harvey Rosenfield
ACCESS TO JUSTICE
P.O. Box 1736
Santa Monica, CA  90406

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Sacramento, California January 11, 1988.

_Rosemary R. Calderon_
ROSEMARY R. CALDERON
Declarant
(916) 323-1995

Exhibit 1
23

435



Office of the Secretary of State
March Fong Eu

Executive Office
1230 J Street
Sacramento, California  95814

(916) 445-6371

June 20, 1988

Mr. Brian Kidney
Office of the Chief Clerk
State Capitol, Room 3196
Sacramento, California  95814

Dear Mr. Kidney:

    Pursuant to Section 3523.1 of the Elections Code as added by
SB 1412 (Chapter 642, Statutes of 1980), I am hereby transmitting
to you two (2) copies of the initiative entitled:  INSURANCE
RATES AND REGULATIONS.  INITIATIVE STATUTE.  This initiative has
qualified for the November 8, 1988 General Election.

                    Sincerely,

                    MARCH FONG EU

MFE/l/gw

Enclosures

Exhibit 1
24

435

 Office of the Secretary of State
March Fong Eu

Executive Office
1230 J Street
Sacramento, California   95814

(916) 445-6371

June 20, 1988

Mr. Brian Kidney
Office of the Chief Clerk
State Capitol, Room 3196
Sacramento, California   95814

Dear Mr. Kidney:

    Pursuant to Section 3523.1 of the Elections Code as added by
SB 1412 (Chapter 642, Statutes of 1980), I am hereby transmitting
to you two (2) copies of the initiative entitled:   ACQUIRED
IMMUNE DEFICIENCY SYNDROME (AIDS) REPORTING.   INITIATIVE STATUTE.
This initiative has qualified for the November 8, 1988 General
Election.

                    Sincerely,

                    MARCH FONG EU

MFE/l/gw

Enclosures

Exhibit 1
25

435



Office of the Secretary of State
March Fong Eu

Executive Office
1230 J Street
Sacramento, California   95814

(916) 445-6371

June 20, 1988

Mr. Lawrence J. McNamee, M.D.
President, California Physicians
for a Logical AIDS Response
1662 Sierra Vista Drive
La Habra Heights, California   90631

Dear Mr. McNamee:

Pursuant to Elections Code § 3523, I hereby certify that on
June 20, 1988 the certificates received from the County Clerks or
Registrars of Voters by the Secretary of State established that
the Initiative Statute ACQUIRED IMMUNE DEFICIENCY SYNDROME (AIDS)
REPORTING, has been signed by the requisite number of qualified
electors needed to declare the petition sufficient.  The ACQUIRED
IMMUNE DEFICIENCY SYNDROME (AIDS) REPORTING. INITIATIVE STATUTE
is, therefore, qualified for the November 8, 1988 General
Election.

Sincerely,

MARCH FONG EU

MFE/1/gw

Exhibit 1
26

# NEWS RELEASE

## from: Secretary of State March Fong Eu
### 1230 J Street, Sacramento, CA 95814
### (916) 445-6375

For Immediate Release                                    Contact: Caren Daniels-Meade
June 20, 1988

### SECRETARY OF STATE EU CERTIFIES TWO MORE INITIATIVES FOR NOVEMBER

SACRAMENTO — The eighth and ninth initiatives for the November 8 general election ballot qualified today (June 20) as an AIDS reporting and an auto insurance initiative were certified by Secretary of State March Fong Eu.

The "AIDS Reporting" initiative, a statutory proposal sponsored by Rep. William Dannemeyer, R-Fullerton, and Dr. Lawrence McNamee, would require doctors, blood banks and others to report to local health officers any patients and blood donors whom they reasonably feel have been exposed to AIDS or who have tested positive for it. It would also make it a felony to donate blood with the knowledge that the donor is infected or exposed to AIDS. Proponents needed 372,178 registered voter signatures to place this measure on the ballot. With numbers received from 53 of the state's 58 counties, 440,220 projected valid signatures have been reported.

Proponents may be reached at (714) 992-0141.

Dr. Eu's certification of the "Insurance Rates and Regulations" initiative makes it the third automobile insurance-related initiative to qualify for November. This measure, sponsored by Harvey Rosenfield, telephone (213) 395-7622, and the group calling itself Access to Justice, is also backed by consumer advocate Ralph Nader, although he is not an official proponent. If adopted by voters, it would regulate the manner in which automobile and other property-casualty insurance rates are established, and would lower insurance rates at least 20% from Nov. 8, 1987 levels and freeze them there until Nov. 8, 1989 unless the insurance company were substantially threatened with insolvency.

(over)



**Exhibit 1**

27

EU — page 2.

It would also require a public hearing and approval by the Insurance Commissioner, who would be an elected official, to change insurance rates. Further, the measure would require automobile premiums to be determined primarily from driver's record and number of miles driven, with discounts for good drivers; provide for the public disclosure of insurance company operations; and repeal certain exemptions of insurance companies from state civil rights and antitrust laws.

Needing 372,178 voter signatures, this proposed statutory revision received 423,613 projected valid signatures from random sample verifications in the 42 counties which have so far reported.

These two initiatives join seven other initiatives and eight legislative bond measures slated for the Nov. 8 ballot. Three additional initiatives are being verified and are expected to qualify or fail by the June 30 deadline to certify ballot measures for the general election ballot.

###

8874CDM

Exhibit 1

28

INITIATIVE CHECK LIST                    *435*

Phone Notification from AG - Date/Time: *1/11/88 — 2:20*

Title of Initiative: *Insurance Rates & Regulation*

Type of Initiative: _____ CA    ___✓___ S    _____ CA and S

Number of Pages ___*14*___    Number of Proponents ___*1*___

Date and Time Initiative will be ready for pick-up *1/11/88 — 3:30*

    Initial/Date/Time

1. *da  1/11 12:30*  OSSI informs Deborah/David/Barbara/Caren and Don day and time initative will be ready for pick-up.

2. *da  1/11 12:4*  OSSI gives check list to Word Processing Technician to prepare calendar.

3. *da  1/11 14:02*  Word Processing Technician prepares and proofs fraud calendar and log and returns both to OSSI.

4. *da  1/11 14:02*  OSSI proofs calendar and log.

5. *da  1/11 14:03*  OSSI gives final calendar and log to Elections Analyst.

6. *BL 1/11 4:30*  Elections Analyst reviews and has Elections Chief sign.  Elections Analyst returns signed calendar to OSSI.

7. *CA  1/11 14:30*  OSSI makes copies of initiative calendar for each proponent.

8. *da  1/11 14:50*  OSSI attaches copy of Political Reform Act of 1974 Requirements to proponent's copy of initiative calendar.

9. *da  1/11 14:50*  OSSI prepares Mail/Freight Request Form. OSSI hand carrys Mail/Freight Request form and initiative calendar for each proponent (ready for mailing) to Service and Supply.  Initiative calendar sent on *1/11/88* to each proponent.
                /Date

                (This <u>must</u> be sent to each proponent same day AG prepares Title and Summary).

10. *da  1/11 15:00*  OSSI advises Assistant Chief when ini- tiative calendar is sent to proponent(s).

Rev. 12/15/87

**Exhibit 1**
29

INITIATIVE CALENDAR CHECK LIST
Page two

11. _da 1 1/11 14. 51_    OSSI distributes copies of initiative
calendar same day AG prepares Title and
Summary to:

> Tony
> Caren
> Jerry
> Deborah
> Barbara

12. _da 11/12 14:00_    OSSI distributes copies of initiative
calendar to:

> All CC/ROV
> Political Reform (3 copies)
> Elections Staff
> LA Office via LA Pouch -
> J.R. Schultz (12 copies)
> Initiative mailing list
> Extra copies for public
> distribution
> Master copy

13. _da 11/12 15:00_    OSSI advises Assistant Chief of completion
of above distribution.

14. _ap 11/11 14:10_    OSSI makes copies of log and distributes
as follows:

1. Initiative canvass binder
2. Vi Daniels - FTB
3. Archives
4. Oliver Cox
5. Initiative Clipboard

15. _ap 11/11 14:15_    OSSI prepares folder for public
distribution.

16. _ap 11/11 14:20_    OSSI prepares index cards for each
initiative.

17. _da 11/11 14:51_    OSSI staples Mail/Freight Request form to
back of INITIATIVE CHECK LIST.

18. _da 11/12 15:00_    OSSI returns completed INITIATIVE CHECK
LIST to Assistant Chief.

19. _A 1 /1/11 9_    Assistant Chief returns check list to
Election Analyst.

Rev.   12/15/87

Exhibit 1
30

ELECTIONS DIVISION

MAIL/FREIGHT REQUEST

Mail Submitted to Mail Room _____1/11_____ 1   4.50___
                                   /Date          Time

Request mail to be sent no later than _____1/11/88_____.
                                              /Date

MAIL:

[X] 1st Class

[ ] Bulk

[ ] Book Rate                    CHARGES:

[ ] Presort                        Amount:  ___.56___.

[ ] Third Class                    Pieces:  ___1___.

FREIGHT:

[ ] UPS

[ ] Purolator

[ ] Greyhound (Next bus out: Yes _____  No _____)

[ ] Air-Freight

[ ] Truck Lines

ACTIVITY:

[ ] Outreach  (Specify: _____)

[ ] County Mailings (#'s: _____)

[ ] Ballot Pamphlet

[ ] Other    (Specify: _____)

[X] Initiative Calendar to Proponent(s).

Mail room sent requested mail on _____1/11/88_____.

                         ___PH took to mailbox.___
                         /Initial (Service and Supply)

Rev. 6/30/87
I.CHKLIST2-12

Exhibit 1
31

EXHIBIT "2"





RECEIVED SEP 9 1994

BEFORE THE
DEPARTMENT OF INSURANCE
STATE OF CALIFORNIA

| In the Matter of: | | |
|---|---|---|
| Prudential Insurance Company of America (The) An Admitted Insurance Company | ) ) ) ) | OAH Nos. L-60175 L-60174 L-60173 L-60172 L-60171 |
| Metropolitan Life Insurance Company An Admitted Insurance Company | ) ) ) ) | CDI Nos. UPA 0053-AP UPA 0054-AP UPA 0055-AP |
| Transamerica Life Insurance and Annuity Company An Admitted Insurance Company | ) ) ) ) ) | UPA 0056-AP UPA 0057-AP UPA 0057-AP UPA 0058-AP UPA 0104-A UPA 0105-A |
| Transamerica Occidental Life Insurance Company An Admitted Insurance Company | ) ) ) ) | |
| Transamerica Assurance Company An Admitted Insurance Company | ) ) ) | DECISION AFTER ORDER TO SHOW CAUSE HEARING PURSUANT TO INSURANCE CODE SECTION 790.06 |
| New York Life Insurance Company An Admitted Insurance Company | ) ) ) ) | |
| Respondents. | ) ) | |
| -and- | ) ) | |
| California Association of Life Underwriters, Inc., | ) ) ) | |
| Intervenor. | ) ) ) | |

An administrative hearing was regularly held before Stephen E. Hjelt, Administrative Law Judge ("the ALJ") of the State of California Office of Administrative Hearings ("OAH"), on October 4-8, 12-15, and 18-20, 1993, in San Diego, California.

Exhibit 2
32

Richard G. Krenz, Timothy Morgan, and Jennifer Chambers, Staff Counsel, represented the State of California Department of Insurance ("the Department").

Kent R. Keller and Steven H. Weinstein of Barger and Wolen represented Respondent Prudential Insurance Company. Gary L. Fontana and Hilary N. Rowen of Thelen, Marrin, Johnson and Bridges represented Respondent Metropolitan Life Insurance Company. Raoul D. Kennedy and Joel Linzner of Crosby, Heafey, Roach and May and Roger McNitt of McNitt, Edwards and Schraner represented Respondents Transamerica Life Insurance and Annuity Company, Transamerica Occidental Life Insurance Company and Transamerica Assurance Company. Paul Alexander and Vanessa Wells of Heller, Ehrman, White and McAuliffe represented Respondent New York Life Insurance Company.

William E. Robinson and Mike Pinkerton of Johanson and Robinson represented Intervenor California Association of Life Underwriters, Inc.

The ALJ submitted his proposed report dated April 5, 1994 to the California Insurance Commissioner ("the Commissioner"), and recommended its adoption as the decision of the Commissioner. The Commissioner considered but did not adopt the proposed report, and undertook to decide the case upon the record. The

Exhibit 2
33

Commissioner requested and received written argument from each of the parties, and the record was closed on June 1, 1994.

NOW, THEREFORE, having considered the record including the evidence introduced and the transcript of the proceedings in this matter, the Commissioner hereby makes the following Findings of Fact, Determinations of Issues, and Order.

## FINDINGS OF FACT

### I

On or about March 26, 1993 the Department filed and served an Order to Show Cause and Statement of Charges pursuant to Section 790.06 of the California Insurance Code ("the original OSC"). The original OSC alleged that Respondents were engaging in the practice of prohibiting, preventing or penalizing the rebating of commissions by licensed insurance agents authorized to transact business on behalf of Respondents, and that these acts were unfair or deceptive practices and or unfair methods of competition "each method or practice falling within section 790.06 of the California Insurance Code." Respondents were ordered to appear for ". . . the purpose of determining whether the alleged methods, acts or practices, or any of them should be declared unfair or deceptive within the meaning of Article 6.5 of Chapter 1 of the California Insurance Code. . ."

Exhibit 2
34

On July 7, 1993, the Department filed and served a First
Amended Order to Show Cause ("the First Amended OSC") which
alleged that essentially the same conduct set forth in the
original OSC also violated section 790.03 (c)[1] which defines as
unfair methods of competition and unfair and deceptive acts or
practices in the business of insurance ". . . entering into any
agreement to commit, or by any concerted action committing any
act of boycott, coercion or intimidation resulting in or tending
to result in unreasonable restraint of, or monopoly in, the
business of insurance." The First Amended OSC also named an
additional Respondent, New York Life Insurance Company. The
Department subsequently filed and served a Second Amended Order
to Show Cause ("the Second Amended OSC") which varied only
cosmetically from the First Amended OSC.

This hearing was the first conducted under this statute. On
July 7, 1993 a prehearing conference was conducted at OAH. All
parties were represented by counsel, including the California
Association of Life Underwriters ("Intervenors"), which had filed
a motion to intervene. That motion was also heard on July 7,
1993 and was granted.

After considering written argument by the parties, the ALJ

_____

[1]All statutory references are to the California Insurance
Code unless otherwise noted.

Exhibit 2
35

ruled that the Department could not proceed at the same hearing under both sections 790.03 and 790.06. The ALJ held that the 790.03 cause of action was fundamentally different from that based on 790.06, despite having the same factual background. A proceeding under section 790.03 is strictly adjudicatory in nature and could result in a finding that a respondent has engaged in conduct violating a law or regulation and in the imposition of a penalty. On the other hand, a proceeding under section 790.06, although its dominant character is adjudicatory, by its terms is a hearing to determine whether a particular identified practice should be declared unfair, resulting in a report to the Commissioner. Based on this analysis, the ALJ severed the causes of action and ordered the hearing to proceed under section 790.06. It was specifically held that the Department was entitled to separately file and proceed on an accusation against Respondents based upon the conduct alleged to violate section 790.03.

The hearing of this matter was originally set for ten days commencing August 16, 1993. Thereafter, a Motion for Continuance made by the Department and joined in by Respondent New York Life Insurance Company was granted over the objection of the remaining Respondents. The ALJ ordered a status conference for August 16, 1993, on which date all parties were present at OAH in San Diego. Also present was Mark Potter, Esquire, to argue a Motion to Quash

5

Exhibit 2

Subpoena Duces Tecum on behalf of his clients Mark White, Jack White, Direct Insurance Service, Shareholder Service Corporation and Jack White and Company. That motion was set for hearing on August 26, 1993.

On August 26, 1993 the Motion to Quash Subpoenas Duces Tecum was heard. Moving papers, responsive papers and oral argument were received. The motion was granted in part and denied in part pursuant to a September 3, 1993 order of the ALJ.

After consideration of all argument submitted regarding the proper scope of the hearing, the ALJ issued the following order:

" There are three core questions that must be addressed in this hearing. These are:

1. Whether the repeal of Insurance Code section 750 by Proposition 103 mandates and requires life insurance companies to allow agents to rebate commissions on their policies in California.

2. Whether contractually imposed restrictions against commission rebating by California life insurance agents constitutes "unfair acts or methods of competition" under Section 790.06 of the California Insurance Code.

6

Exhibit 2

3.  Whether unrestricted commission rebating would tend to discourage or would tend to promote unfair methods of competition in the business of life insurance."

The ALJ also identified the following corollary issues as proper areas of inquiry, based on the above three core questions:

a.  What is the effect of the repeal of section 750?

b.  What can legally be inferred from the repeal of section 750 and the passage of Proposition 103, acts done not by the Legislature but by the electorate through the initiative process?

c.  The Department refers to restrictions against rebating as thwarting the intent of the electorate as expressed in Proposition 103.  How does the [Commissioner] determine the intent of the electorate?

d.  Within the context of the California Unfair Trade Practices Act and specifically section 790.06 what is an unfair act or method of competition and how should these terms be defined?

e.  Is Respondents' practice of refusing to permit its

Exhibit 2
38

agents to rebate anti-competitive or procompetitive?

f.  In determining the meaning of "unfair act or method of competition" and considering that the term is not otherwise defined for our purposes in the Act, what legal sources should be relied on? Business and Professions Code section 17200 and the Federal Anti-trust laws offer some assistance.  Are there others?

Finally, the ALJ determined the Department's burden of proof to be the preponderance of evidence standard.

II

This proceeding was conducted pursuant to the Administrative Procedure Act ("the APA"), Chapter 5 (commencing at section 11500 of Part 1, Division 3, Title 2) of the California Government Code.  The hearing record was held open for the Department to submit additional written rebuttal testimony, which was filed and served on or about November 3, 1993.  Respondents filed a responsive declaration on November 12, 1993. The parties filed post hearing briefs on November 24, 1993, on which date the record was closed and the matter submitted to the ALJ for his proposed report.

The following documents were filed after October 20, 1994

8

Exhibit 2
39

and made a part of the record:

1. Department's Post Hearing Brief as Exhibit 231;

2. Department letter with citation dated 10/25/93, as Exhibit 232;

3. Argument in support of and in opposition to admission into evidence of Exhibit VVV marked collectively as 233;

4. Department letter with citation dated March 3, 1994 as Exhibit 234;

5. Department's written rebuttal testimony of Professor Comanor received in evidence as Exhibit 235;

6. Post Trial Brief of Intervenor as Exhibit ZZZ;

7. Respondents' Post Trial Brief as Exhibit AAAA;

8. Respondents' Proposed Report as Exhibit BBBB;

9. Appendix of Authorities as Exhibit CCCC;

10. Written surrebuttal testimony of Professor Teece received in evidence as Exhibit DDDD.


III

The Application by Direct Insurance Services for Attorney's Fees stemming from the Motion to Quash Subpena Deuces Tecum is denied. The Commissioner has no authority, under the APA or otherwise, to make such an award.

### IV

Exhibits GGG and RRR were designated as confidential by order dated November 19, 1993, and were sealed in the record.

### V

Official Notice is taken of Exhibits VVV and YYY.

### VI

Each Respondent is a life insurance company authorized to sell policies of life insurance in the State of California pursuant to a valid Certificate of Authority issued by the Commissioner. Respondents Prudential, Metropolitan and New York Life are mutual insurance companies. The three Transamerica Respondents are all subsidiaries of Transamerica Corporation, a publicly traded stock company.

### VII

Each Respondent herein engages in a policy or practice of prohibiting its agency sales force, in the sale of its life insurance policies, from paying, giving or making any rebate to consumers of all or any portion of the commission paid by Respondents in connection with the sale of their policies.

### VIII

Intervenor is a non-profit corporation representing over

Exhibit 2
41

10,000 licensed life and health insurance agents. It has a substantial interest in this proceeding since resolution of this matter would directly impact contracts between insurers and Intervenor's member agents and the methods by which such agents solicit the sale of life and health insurance products.

Intervenor's primary assertion is that unregulated indiscriminate rebating would render its member agents vulnerable to charges of unfair discrimination.

IX

Mark White is an independent agent in La Jolla, California. He testified that he gives commission rebates on every sale of life insurance and advertises that he rebates 50% of the commission on all life insurance policies his company sells. He has done this for more than three years. Three insurers whom Mr. White represents have advised him they have no objection to rebating; Respondents are the only insurers declining to do business with Mr. White by reason of his rebating activities. Mr. White testified that he currently has agency agreements with and sells life insurance products for "35 to 45 life insurers", including many highly-rated life insurance companies, and that he continues to engage in and publicly advertise his commission rebating practices. (R.T. 10/12/93, p. 137:23 - 139:26).

X

The evidence established that commission rebating is unlawful in 48 of the 50 states. In Florida, the practice is governed by a statute which provides that an insurer may prohibit its agents and employees from engaging in commission rebating. In California, commission rebating was illegal from 1917 until 1988. The statute making commission rebating unlawful was set forth in former section 750, which was repealed by the passage of a voter initiative commonly known as Proposition 103 on November 8, 1988.

XI

The passage of Proposition 103 resulted in a number of significant changes in the business of insurance and its regulation in the State of California. Among other things it created an elected, not appointed, Insurance Commissioner. Department witness Deputy Insurance Commissioner William Ahern described the approach taken by the current Commissioner as follows: ". . . Garamendi . . . made it very clear that he wanted the Department of Insurance to be a consumer protection agency and that the protection of the consumers was to be our overriding concern. He made it very clear to the managers and the staff of the Department that he wanted the policies, the actions and the culture of the Department to be one of consumer protection as an overriding policy concern, and our

12
Exhibit 2
43

implementation of all the programs of the Department are to be construed to protect insurance consumers." R.T. 10/13/93 PP 8:26-28, 9:1-7.

## XII

The weight of the evidence indicates that the voters of the State of California, in considering Proposition 103, were given little information other than the language of Proposition 103 itself regarding the repealer of the rebate laws. The voter pamphlet sent to all California voters stated that "this measure [Proposition 103] changes the laws that regulate insurance rates for certain types of insurance. It applies to motor vehicle, fire and liability insurance, but not to life, mortgage and disability insurance." Exhibit C. The voter pamphlet also states that "the measure permits insurance agents and brokers to give certain discounts or rebates to those who buy insurance from them. It does so by eliminating the prohibition in current law against such discounts or rebates."

Harvey Rosenfield, the principal author of Proposition 103, indicated in his testimony that while the repeal of the anti-rebate statue clearly applies to life as well as property and casualty insurance, the primary focus of the material presented to the voters addressed the property/casualty industry and not the life insurance industry. Rosenfield further testified that

Exhibit 2
44

the goals of Proposition 103 included forcing competition broadly throughout the insurance industry.

That the intent of the electorate relating to the issue of rebating generally, and to life insurance specifically, cannot be determined by looking at material provided to voters is clear. Nonetheless, the repeal of the prohibition against rebating would necessarily permit rebating in life insurance, as the prohibition previously set forth in section 750 applied broadly to all lines of insurance, including life insurance. The only lines or products for which a rebating prohibition remains intact are those for which a separate prohibition exists, as in the case of title insurance (sections 12404 et seq.), mortgage guaranty insurance (section 12640.14), and products sold by reciprocal or interinsurance exchanges (section 1490).

## XIII

The Department argued that Proposition 103's pro-competitive mandate, coupled with the repeal of section 750, requires a determination that agents must be unhindered to engage in price competition via rebating. However, it was not established by the evidence that the repeal of section 750 mandated insurance companies doing business in California to permit their agents to rebate any of their commission to consumers.

Exhibit 2
45

The interpretation of an initiative is a question of law. Sanford v. Garamendi (1991) 233 Cal.App.3d 1109, 1122 n. 9. An initiative must be interpreted to give effect to the intent of the voters adopting it. In re Quinn (1991) 35 Cal.App.3d 904, 913. In doing so the primary consideration is the intent of the enacting body whether it be the legislature or the electorate. California Auto Assigned Risk Plan v. Garamendi (1991) 232 Cal.App.3d 904, 913.

To determine the intent of the electorate, one must first look to the language of the initiative. If the language is clear and unambiguous, the initiative must be enforced according to its terms. In re Lance W. (1985) 37 Cal. 3d 873, 886; Sanford v. Garamendi, supra, at 1117 (1991).

In reading the initiative it cannot be said that the voters intended to do anything other than permit rebating in insurance. Put another way, the plain language of the initiative did nothing more than repeal Insurance Code section 750.

The other portion of the initiative which supports Respondents' position is found in Section 2 of Proposition 103 which sets out the purpose of the initiative as follows:

The purpose of this chapter is to protect consumers

Exhibit 2
46

from arbitrary insurance sales and practices, to encourage a competitive marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available and affordable for all Californians. Proposition 103, Section 2.

There is nothing in Proposition 103 which states either directly or indirectly that the purpose of repealing section 750 was to allow agents, over objection of their principal, to discount their charges by rebating. What the repeal of section 750 did was remove the statutory proscription against rebating. The initiative does not address the elimination of insurer restrictions on commission rebating.

XIV

The First Amended OSC alleges that Respondents' practice, although not defined as unfair in section 790.03, should be declared unfair within the meaning of section 790.06. Section 790.06 has no specific test for determining whether particular conduct is unfair. Criteria that evolved through judicial construction of the Unfair Practices Act ("UPA"), Cal. Bus.& Prof. Code Section 17200 et seq., are applicable. Also, the 1980 Statement of Policy of the Federal Trade Commission, 4 Trade Reg. Rep. (CCH) 13,203 ("the FTC Statement"), is a useful guide to giving appropriate content to the term "unfair".

Exhibit 2
47

The UPA prohibits unfair business practices. Cal. Bus. & Prof. Code sections 17200, 17203. California courts have adopted the three-part test set by the FTC and sanctioned by the United States Supreme Court to determine whether a practice that is neither an antitrust violation nor deceptive is nonetheless "unfair" within the meaning of the UPA. Mangini v. R.J. Reynolds Tobacco Co. (1993) 17 Cal.App. 4th 354, 366; People v. Casa Blanca Convalescent Homes, Inc. (1984), 159 Cal.App.3d 509, 530; See, F.T.C. v. Sperry & Hutchinson Co. (1972) 405 U.S. 233, 244-245, n. 5, construing Section 5 of the Federal Trade Commission Act, 15 U.S.C. Section 45(a)(1). This test would require the Department to prove that: (1) the practice causes substantial injury to consumers; (2) the practice offends public policy as it has been established by statutes, the common law or otherwise; and, (3) the practice is immoral, unethical, oppressive or unscrupulous. Mangini v. R.J. Reynolds Tobacco Co., supra, at 366.

It has not been shown that respondents' practice causes substantial injury to consumers. To sustain a finding of such injury, the evidence must show that the asserted injury is substantial, not outweighed by any countervailing benefits to consumers or competition derived from the practice, and is one that consumers themselves could not reasonably avoid. FTC Statement (Department's Hearing Brief Item D, page 4).

To constitute substantial consumer injury, the harm must not merely be speculative or trivial. FTC Statement, p. 4. Substantial injury may be established by small harm to a large number of consumers or by a significant risk of concrete harm to consumers. American Financial Services Association v. F.T.C. 767 F. 2d 957, 972 (D.C. Cir. 1985), citing FTC Statement.

The relevant question in the context of the three-part FTC test is whether there is net harm to consumers, i.e., whether on balance consumers in general will be harmed by Respondents' practice and whether consumers in general will benefit from mandatory rebating.

The evidence of consumer harm offered by the Department was from Dr. William Comanor. He defined a specific class of consumers, the infra-marginals, whom he testified would be harmed by Respondents' practice because they:

a.   did not want or need the services of a full-service agent;

b.   did not want to deal with a direct, no-commission insurer;

c.   did not want to purchase any of the insurance products issued by the life insurance companies who permit their agents to rebate; and,

d.   had insurance needs that could be satisfied only by one of the insurance products issued by one of the Respondents.

The harm demonstrated to the "infra-marginals" must be weighed against benefits to less sophisticated consumers from the full service agents. The FTC Statement clearly recognized this as follows: "Most business practices entail a mixture of economic and other costs and benefits for purchasers . . . The Commission is aware of these tradeoffs and will not find that a practice unfairly injures consumers unless it is injurious in its net effects." It was not established that the benefit to less sophisticated consumers in having full service is outweighed by any potential harm to the infra-marginals.

It was further not established that Respondents' practice violates the "public policy" test of the FTC Statement. As set forth above in Paragraphs XII and XIII, Proposition 103 removes certain statutory impediments to commission rebating, but does not mandate the removal of all contractual restrictions on agent rebating. Without some further statement of public policy, such as a statute, or regulations adopted by the Commissioner, such a finding relating to Respondents' practice cannot be made.

As it has not been found that Respondents' practice causes substantial consumer injury or offends public policy, as set forth above, no finding regarding the third part of the FTC test, that the practice be shown to be immoral, unethical, oppressive or unscrupulous, need be made.

XV

The evidence established that the California life insurance market is generally competitive. This competition comes from the approximately 1000 companies selling life insurance in the State of California. The top 100 life insurers in California account for slightly more than 88 percent of all life insurance and annuity sales, but no one life insurer has a market share of more than approximately 8 percent. In 1991, Respondent Prudential had 8.03 percent of this market, Respondent Metropolitan had 6.52 percent of this market, Respondent New York Life had 4.85 percent of this market, and Respondent Transamerica had 1.69 percent of this market.

The average premium for life insurance products, adjusted to remove the effects of improving mortality, has been declining over the period 1960 to 1990, from approximately $26.00 per $1,000 of coverage to $17.00 per $1,000 of coverage. This trend is "consistent with a high degree of competition" in the life insurance industry. (R.T. 10/13/93, p.86:20-21). Additional indicia of competition in the life insurance industry are the variety of product designs from which a consumer may choose, the influx into the marketplace of new writers and an increase in the portion of income earned by the insurers being returned to policyholders. Nonetheless, that the life insurance industry is typified by a wide degree of price dispersion is indicative of a

20

Exhibit 2

51

less highly competitive industry than Respondents assert.

### XVI

There would be some impact upon the operation of Respondents' business if they are compelled to allow their agents to rebate.

"The Department will concede that a full allowance of rebating by independent agents may have some impact on respondent's career agent force in California. Proposition 103 was enacted to foster competition among agents in the marketplace. It must be presumed that the electorate intended to effectuate some change in the atmosphere in which career and independent agents compete." Footnote 27, p. 22 of Department Post Trial Brief.

The financial impact on Respondents of this change, however, is not substantial. The evidence did not establish that compelling Respondents to allow their agents to rebate would result in insurer insolvency. At most, it may have some minor impact on future company profitability.

### XVII

Respondents argue that unrestricted agent rebating will have a significant impact on persistency; however, the weight of the

21

Exhibit 2
52

evidence does not support this position. "Persistency" is the rate at which life insurance policies remain in effect over time, taking into account death rates and policy lapses.

Persistency has an impact on insurer profitability; high persistency rates are a factor in maintaining insurer solvency. Respondents maintain that rebating will induce existing policyholders to terminate their life insurance policies with their current insurer and replace them with policies offered by agents who rebate, and in turn, that this will cause an insurer's persistency rate to decline, resulting in an impact on solvency. Respondents argue that they do not permit their independent agent force to rebate in order to maintain high persistency rates and, therefore, company solvency. The evidence does not support this.

Because the benefit derived from the rebate of a commission may be outweighed by other important policyholder considerations, it is likely that rebating will have little effect on a company's mature business, life insurance policies which have been in force for more than five years. Replacement of an existing policy with one from another company is not without risk: a policyholder may have become uninsurable in the interim, and may face the loss of cash reserves built up under an old policy and exposure to new clauses such as non-contestability and suicide. There are also requirements under section 10509 for the agent and the insurer

should replacement of a policy be contemplated. These all contribute to limit the number of consumers who will opt to change their policy to take advantage of rebating. The contention that rebating will lead to widespread replacement of policies is not supported by the evidence.

There may be some impact on persistency due to rebating on new business, particularly at the time of the payment of the first renewal premium. This "sticker shock" phenomenon is well known in the life insurance business; insurers routinely factor into their rates the higher incidence of cancellation or non-renewal at the first year anniversary.

## XVIII

Respondents argue that rebating will result in widespread free riding and that in the long run consumers will be harmed. The weight of the evidence does not support this. Some amount of free riding will occur but its incidence will not be sufficient to harm the marketplace or the best interests of consumers.

Free riding occurs when a customer obtains service, information or advice from a full service provider and then goes to a discounting provider to actually purchase the product. When free riding occurs, the consumer obtains the benefits of a service without paying for it, and the discounting producer

23

Exhibit 2

54

obtains the competitive benefit of service without providing it. Most significantly, the full service provider receives a strong disincentive to continue providing service because that service inures only to the benefit of others.

Respondents have an interest in attempting to avoid free riding. However, free riding has a symbolic significance that is far greater than its real impact on the insurance marketplace. Insurance companies are concerned about it because it threatens a status quo so important to an industry that by its nature prefers long term stability.

While free riding will occur in the context of rebating, it will not occur often. The agency system for the sale of life insurance rests upon a "foundation of relationship." The development of this relationship is a significant factor that will work against free riding.

The other important factor which will militate against free riding is that most consumers need presale service. Because they are largely unfamiliar with the intricacies of purchasing life insurance, the whole transaction to them involves both a policy and the presale and post-sale service that go along with the policy. The fact that those services are needed and required is far more salient than the fact that a shrewd purchaser can get a

Exhibit 2
55

one-time discount on the purchase.

## XIX

The record in this matter does not support a finding that rebating will result in unfair discrimination.

Although Respondents and Intervenor expressed concern over indiscriminate rebating, the rebating practice at issue here is neither indiscriminate nor unfairly discriminatory within the meaning of section 790.03(f). Mark White offers the same flat percentage rebate of 50 percent to all customers except those generated by referral from financial planners (whom he pays 75 percent). This is one permissible method of non-discriminatory rebating, although certainly not the only method. Paying commissions on a sliding scale or different commissions on the basis of the type of policy, i.e., term versus whole life are other possible methods.

## DETERMINATIONS OF ISSUES

### I

It was not established by the evidence that Respondents or any of them have engaged in unfair acts, or practices, and/or unfair and deceptive methods of competition, by terminating their agreements with Mark White or his companies or by engaging in a practice of preventing their agents from rebating all or any

Exhibit 2
56

portion of commissions earned on the sale of life insurance policies in the State of California.  In the absence of a statute or regulation to the contrary, grounds do not exist to declare such acts and practices unfair or deceptive within the meaning of California Insurance Code section 790.06.

II

It was not established that Respondents' practices in prohibiting their employees and agents from commission rebating have had, or are reasonably likely to have, an adverse effect on competition in the life insurance marketplace.

III

It was not established that the repeal of former Insurance Code section 750 has the effect of requiring insurers to allow their agents to engage in rebating.

Accordingly, it is determined that the practices of Respondents in refusing to allow their agents to engage in commission rebating and declining to utilize the services of agents who engage in commission rebating do not violate any existing law or established public policy of the State of California and do not constitute a method of competition or act or practice that is unfair, deceptive or otherwise in violation of Insurance Code section 790.06.

Exhibit 2
57

IV

It was established that the repealer, in Proposition 103, of former section 750 had the effect of permitting commission rebating for all lines of insurance, including life, other than those lines for which a separate specific prohibition exists.

V

It was not established that the practice of commission rebating will have a detrimental impact on life insurer solvency.

VI

It was not established that the practice of commission rebating is necessarily unfairly discriminatory within the meaning of section 790.03(f).

ORDER

The original OSC, the First Amended OSC and the Second Amended OSC are hereby dismissed.

Dated this 8th day of September, 1994.

JOHN GARAMENDI
Insurance Commissioner

By

JANICE E. KERR
Deputy

Exhibit 2
58

EXHIBIT "3"

Insurers Cited on Barring Rebates - New York Times          file:///G:72895/2895-02/research/insurers%20Cited%2...

Case 3:08-cv-00270-BEN-NLS    Document 20-3    Filed 06/13/2008    Page 64 of 71

HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS    Log In    Register Now

The New York Times
Thursday, April 24, 2008

**Business**

Ameriprise
Search

WORLD U.S. N.Y. / REGION BUSINESS TECHNOLOGY SCIENCE HEALTH SPORTS OPINION ARTS STYLE TRAVEL
JOBS REAL ESTATE AUTOS

## Insurers Cited on Barring Rebates

By PETER KERR
Published: March 26, 1993

E-MAIL
PRINT
SAVE
SHARE



The insurance commissioner of California accused three large insurance companies yesterday of violating a state law that allows insurance agents to rebate part of their commissions to customers.

The controversial practice of rebating has been advocated by consumer groups as a way to reduce prices and increase competition.

The commissioner, John Garamendi, charged that the companies had stopped doing business with an agent who had offered rebates to his customers to lower the price of their policies. All three companies -- Prudential, Transamerica Life and Metropolitan Life -- denied any wrongdoing.

Insurance agents who sell life insurance receive substantial commissions that can exceed 50 percent of the policy premium in the first year and 5 percent or more in the following years. Opposition to Rebates

Agents and many insurance companies oppose the rebates, saying they can jeopardize the quality of service by agents and brokers. Such salespeople would lead customers to overemphasize price as they decide what policies to buy.

For most of this century, rebating has been illegal in all states, helping agents avoid the price wars that might significantly cut their incomes. But in 1988, California voters passed a ballot proposition that allowed agents to rebate part of their commissions.

Rebates were also legalized in Florida in recent years as a result of a court ruling, and consumer advocates have been pressing for rebating in other states.

In yesterday's announcement, Mr. Garamendi accused the three companies of discontinuing business with Mark White, a San Diego agent, solely because he had provided rebates to customers. The companies sell policies through independent agents and brokers.

"Commission rebating brings greater competition to the insurance marketplace and allows consumers to reap significant savings," Mr. Garamendi said. "Companies that attempt to prohibit rebating by firing, harassing or taking other measures against their agents will not be tolerated."

Ads by Google                                     what's this?

**New Chrysler Town&Country**
Find the Latest Offers and Prices
From Local Dealers Now
www.chryslerdealer.com

**4x4 Pricing & Info**
Reviews, Ratings, & Pricing info.
Compare latest prices from dealers.
www.edmunds.com

**MOST POPULAR**

E-MAILED  BLOGGED  SEARCHED

1. Maureen Dowd: Wilting Over Waffles
2. Well: Boy or Girl? The Answer May Depend on Mom's Eating Habits
3. Editorial: The Low Road to Victory
4. American Exception: Inmate Count in U.S. Dwarfs Other Nations'
5. Well: A Hard Plastic Is Raising Hard Questions
6. Debt Collection Done From India Appeals to U.S. Agencies
7. Op-Ed Contributor: Visible Man
8. For Obama, a Struggle to Win Over Key Blocs
9. Kremlin Rules: At Expense of All Others, Putin Picks a Church
10. Making Money, the How-To Way

Go to Complete List »

The New York Times                TECH
                        nytimes.com/tech

**Exhibit 3**
59

The commissioner's action requires the companies to appear before an administrative law judge on Aug. 16. If the California Department of Insurance convinces the court that its charges are true, the commissioner would be empowered to seek a restraining order if the companies continue to engage in the same activities.

"Rebates amount to artificial inducements to buy insurance," said Charles Sahner, a spokesman for Metropolitan Life. "The consumer should buy insurance based on need not based on a rebate offer."

A spokesman for Prudential, Jim Longo, said that Prudential had stopped doing business with Mr. White because of his rebating and that the company's lawyers believed its actions were legal under California law.

"He is free to do business as he likes and we, as contractors, can do business with anyone we like," Mr. Longo said. "We are opposed to rebating. We have told him we do not want to have him write business for us if he continues to do this."

James Jackson, a spokesman for Transamerica, and three affiliates that the commissioner accused of wrongdoing, said the company would not comment specifically on its relationship with Mr. White. But he said that the company believed it was illegal and discriminatory for any agent to give rebates to any one customer unless the agent gave the same rebates to all customers in the state of the same general class.

A class, for example, might mean all customers of the same age, same sex and same general risks.

The National Association of Life Underwriters, a trade group representing health and life insurance agents, which has bitterly opposed the legalization of rebating, says it fears a return to abuses of consumers that existed in the last century, before the laws were passed.

Among other difficulties, said Jay Morris, an association spokesman, is that rebates tend to discriminate against individual buyers in favor of large groups and lead to what he called unsavory sales practices that encouraged consumers to buy cheaper products that might be of low quality.



**Meet the world's smallest HD camcorder**

Also in Tech:

Instant digital prints

Do you need to calibrate your HDTV?

What was the #1 most popular song when you were born?

Ads by Google                               what's this?

**HughesNet ® $99 Installed**
After Rebates or $0 Down. 30 Day Trial. Order at 866-664-2788
www.satellite-internet.tv/HughesNet

**New Car Rebate**
Compare 8 rock-bottom car quotes before heading to the dealer
www.WomenCarBuying.com

**INSIDE NYTIMES.COM**

**Exhibit 3**

Insurers Cited on Barring Rebates - New York Times    file:///G:/2895/2895-02/research/insurers%20Cited%2...

Case 3:08-cv-00270-BEN-NLS    Document 20-3    Filed 06/13/2008    Page 66 of 71

SPORTS »



Measuring Up, on the Doorway and Draft Board

FASHION & STYLE »



Long Live the Dress (for Now)

OPINION »

Op-Ed: Visible Man

It is surprisingly difficult being The Guy Who Got Where He Is Only Because He's Black.

HOME & GARDEN »



Kips Bay: Coloring In the White Boxes

BUSINESS »



As Economy Slows, So Do Laser Eye Surgeries

OPINION »



Letters: The Democrats Read the Tea Leaves

Home    World    U.S.    N.Y. / Region    Business    Technology    Science    Health    Sports    Opinion    Arts    Style
Travel    Jobs    Real Estate    Autos    Back to Top

Copyright 2008 The New York Times Company    Privacy Policy    Search    Corrections    RSS    First Look    Help
Contact Us    Work for Us    Media Kit    Site Map

**Exhibit 3**
**61**

EXHIBIT "4"

STATE OF CALIFORNIA                                              CHUCK QUACKENBUSH, Insurance Commissioner

**DEPARTMENT OF INSURANCE**
LEGAL DIVISION, COMPLIANCE BUREAU
45 FREMONT STREET, 21st FLOOR
SAN FRANCISCO, CA 94105

Elizabeth Tuckwell, Staff Counsel
Phone: (415) 538-4151
Fax: (415) 904-6429
E-Mail: tuckwelle@insurance.ca.gov

March 24, 1999

Dear Alexander:

Thanks for your letter of March 23rd, 1999. As we discussed on the telephone, it is now lawful for an agent to rebate commission to the insured. A former statute (former Section 755 of the California Insurance Code) prohibited the sharing of commission with an unlicensed person, resulting in a prohibition against rebating to the insured. However, Proposition 103, enacted by the California voters on or about November 8, 1988, repealed that statute, making it lawful for the agent to rebate commission to the insured

Since commission can, in some cases, be as great as the first-year premium, and it is lawful to rebate the entire commission, it would be lawful for the agent to pay the premium for the insured, in the sense that the commission is being rebated in the same amount as the premium. If the agent wishes to pay the premium in excess of commission earned, the additional payment would not be prohibited by the California Insurance Code.

I am enclosing a photocopy of a page of the California Insurance Code containing notes about the impact of Proposition 103 on the splitting of commissions with an unlicensed person.

Thank you for your interest in abiding by the insurance laws and regulations of California.

Sincerely,

Elizabeth Tuckwell
Staff Counsel
415/538-4151

**Exhibit 4**
62

ESN 00048

EXHIBIT "5"



## SAMMONS COMPANIES

### BRIGGS INTERNATIONAL

Briggs Construction Equipment

Briggs Equipment UK

Briggs Equipment US

Briggs Equipment Mexico

### THE GROVE PARK INN RESORT & SPA

### SRI VENTURES LLC

### SAMMONS FINANCIAL GROUP

Midland National

North American

Sammons Annuity Group

Sammons Corporate Markets Group

History

Leadership

Contact

Fact Sheet

Sammons Securities Company

# SAMMONS CORPORATE MARKETS GROUP
## OVERVIEW



Sammons Corporate Markets Group has a concentrated focus which designs and sells insurance and other financial products to banks, insurance companies, trusts, hospitals and other medical organizations, and other corporations.

The company of 15 people in Fargo, North Dakota, invests its time in developing partnerships with selected distributors that are focused on specific target markets.

Corporate Market's products are represented by fewer than 200 licensed producers. That number is not intentionally small; it is selectively small. The company requires the producers to be good stewards of its reputation and integrity, as well as focus on the specific market.

The company realizes that the barriers for its customers to switch to another insurance company are low, so Sammons Corporate Markets Group continues to develop products with new features valued by its customers. Perhaps more importantly, Corporate Markets treats its customers with respect, maintaining its integrity, its customer relationships and its business.

**Exhibit 5**
63

1

## PROOF OF SERVICE

2

       I am a resident of the State of California, over the age of eighteen years, and not a

3 party to the within action.  I am employed in the office of a member of the bar of this Court at whose direction service was made.  My business address is Callahan & Blaine, APLC, 3 Hutton

4 Centre, Ninth Floor, Santa Ana, California 92707.

5        On June 13, 2008, I electronically filed the following document with the Clerk of the Court using the CM/ECF system, which sent electronic notification of such filing to all other

6 parties appearing on the docket sheet as listed below.

7

## DECLARATION OF MICHAEL J. SACHS IN SUPPORT OF
## MOTION TO DISMISS

8

9    Miles Michael Cooley             mcooley@reedsmith.com

   Raymond A. Greenberg          raylaw43@msn.com

10    M. Andrew Schneider            aschneider@tahlaw.com

11

12        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on June 13, 2008 at Santa Ana, California.

13

14

15                                Jane M. Jones
                                 email: jjones@callahan-law.com

16

G:\2895\2895-02\POS efiling.wpd

17

18

19

20

21

22

23

24

25

26

27

28